IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA,
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHESAPEAKE REGIONAL MEDICAL | ) | |
| CENTER, | ) | |
| | ) | NO. 2:25-CR-00001-EWH-RJK |
| a/k/a CHESAPEAKE GENERAL | ) | |
| HOSPITAL, | ) | |
| | ) | |
| a/k/a CHESAPEAKE REGIONAL | ) | |
| HEALTHCARE | ) | |
| | ) | |
| Defendant. | | |

**CHESAPEAKE REGIONAL MEDICAL CENTER'S BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE**

Pursuant to Fed. R. Crim. P. 12(b) and Local Rule 47(F), defendant the Chesapeake

Hospital Authority ("CHA"), which does business as the Chesapeake Regional Medical Center,

submits this brief in support of its motion to dismiss the indictment with prejudice. The indictment

should be dismissed for three reasons:

1. as an entity created by the Commonwealth, CHA is not a "person" within the meaning
   of the two statutes prompting the charges;

2. CHA's status as an arm of the Commonwealth cloaks it with the same immunity from
   federal criminal prosecution in this Court as the Commonwealth enjoys itself;

3. as a matter of law, an entity such as CHA cannot form a specific intent to defraud, a
   necessary element of the charged offenses.

CHA emphasizes that it does not assert these defenses to avoid responding to the

indictment's factual allegations or to circumvent responsibility for alleged criminal conduct.

Indeed, CHA categorically rejects as false the charges that it engaged in conspiracy and fraud. It asserts these threshold defenses, however, to safeguard and preserve important legal rights conferred upon it as an arm of the Commonwealth of Virginia.

## I.    Factual Background[1]

During the mid-1960s, citizens and physicians in the Chesapeake area of Virginia began a grassroots effort to establish a hospital to serve the people who lived in that region. As a result of those efforts, the 1966 Virginia General Assembly created the Chesapeake Hospital Authority, "a public body politic and corporate" to "exercise[e] public and essential governmental functions to provide for the public health, welfare, convenience and prosperity of the residents of the City of Chesapeake and such other persons who might be served by the Authority … and to provide improved medical care and related services to such residents and persons[.]" Virginia's 1966 Acts of Assembly, chapter 271, attached as Exhibit A. Construction of the hospital began in 1973, and it began providing medical services to the community in 1976. Originally called "Chesapeake General Hospital," the hospital was renamed "Chesapeake Regional Medical Center" ("CRMC") in 2007 to reflect the broad span of the organization's services and patient base.

As the indictment in this case alleges, to perform a procedure at CRMC, a physician must have privileges at the hospital. *See* Doc. 1 at 5. In 1983, Dr. Javaid Perwaiz, an obstetrician and gynecologist, applied for and was granted such privileges. *See* Doc. 1 at 6.

---

[1] These background facts likely are not in dispute. But, even if they are, Fed. R. Crim. P. 12(d) and (f) establish that a court may make some factual findings in deciding a motion to dismiss. *See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."); Fed. R. Crim. P. 12(f) ("All proceedings at a motion hearing, including any findings of fact and conclusions of law made orally by the court, must be recorded by a court reporter or a suitable recording device. "); *see also Kentucky v. Long*, 837 F.2d 727, 750 (6th Cir. 1988) (noting that "courts may make preliminary factual findings necessary to decide the questions of law presented by a pre-trial motion").

Thirty-six years later, in November 2019, Perwaiz was charged in the Eastern District of Virginia with various crimes relating to health care fraud and identity theft. *See* Doc. 1 at 6; *see also* Docs. 3, 21, and 50, *United States v. Perwaiz,* case no. 2:19-cr-189, in the United States District Court for the Eastern District of Virginia. The indictment in that case alleged that, in furtherance of a scheme to defraud private and public insurers, Perwaiz had falsified the due dates of patients so that he would be the health care provider who would deliver their babies; induced labor before 39 weeks gestation despite a lack of medical necessity; peppered patient records with false symptoms, false statements, and false diagnoses; falsely claimed that he had performed in-office procedures and examinations that in truth he had not performed; and falsified sterilization consent forms, among other things. *See* Doc. 50 in case no. 2:19-cr-189. At his 2020 federal criminal trial, the government told the jury that Perwaiz had hidden all these actions from those who could have intervened, asserting that, "to cover his tracks," Perwaiz had "manipulated his own medical records" and "filled them with untruths, even about things as straightforward as the date"; "ma[d]e up other symptoms that the patients weren't having, and … papered his own medical records with the same untruths"; and "hid[den] what he was doing from others" while being "very careful to control what he documented about his patients." *See* Doc. 210 at 106–07, 115, 125 in case no. 2:19-cr-189 (government's opening statement).

In November 2020, a jury convicted Perwaiz of 23 counts of healthcare fraud and 29 counts of making false statements. Doc. 1 at 6; *see* Doc. 171 in case no. 2:19-cr-189. The district court sentenced Perwaiz to serve 59 years in prison and ordered him to pay restitution of more than $18.5 million to Medicaid, Medicare, TRICARE, Optima, and Anthem. *See* Doc. 203 in case no. 2:19-cr-189.

Despite the government's theme at Perwaiz's trial that Perwaiz had actively and effectively hidden his criminal conduct by falsifying patient medical records and other documents, the government has now sought and obtained a criminal indictment charging CHA—a victim of Perwaiz in its own right—with knowing about and participating in Perwaiz's health care fraud scheme. *See* Doc. 1. Although CHA has never disputed, and indeed readily acknowledges, the reprehensible nature of Dr. Perwaiz's conduct, the facts and evidence will not bear out the indictment's contention that CHA knowingly took part in Perwaiz's inexcusable actions.  Indeed, Dr. Perwaiz's admission at his trial that he had back-dated documents was in line with the overarching scheme advanced by the government that Perwaiz had been altering or keeping inaccurate records to leave everyone, including CHA, in the dark.  *See* Doc. 220 at 183, case no. 2:19-cr-189.

But, before any factfinder is called upon to address the factual contentions, state and federal law require this Court to address three preliminary legal questions that, if resolved in CHA's favor, require dismissal of the indictment. As explained below, even setting aside the falsity of the indictment's allegations, the indictment should be dismissed with prejudice because (1) CHA constitutes an arm of the Commonwealth of Virginia to which neither section 371 nor section 1347 applies; (2) as a Commonwealth entity, CHA is wholly immune from prosecution by the federal government; and (3) if CHA is a "municipal corporation" as the indictment alleges, it could never form a specific intent to defraud, which is a necessary element of the charged offenses. Dismissal of the indictment with prejudice is appropriate because the United States cannot amend the indictment to state an offense against it. *See Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801 (1989) (dismissal of indictment is appropriate when defendant is immune from prosecution).

## II.    Legal Standard for Dismissal

In any criminal case involving a claim of immunity from prosecution, the propriety of the immunity defense must be decided "early in the proceedings" so as "to avoid requiring [the defendant] to run the gauntlet of standing trial and having to wait until later to have the [immunity] issue decided." *Kentucky v. Long*, 837 F.2d 727, 752 (6th Cir. 1988). The goal of an immunity defense "is not only to avoid the possibility of conviction … but also to avoid the necessity of undergoing the entire process of the … criminal procedure." *Id.* And when an indictment is based on statutes for which a defendant could never be criminally liable, these same considerations apply.

Therefore, immunity from prosecution for the conduct alleged in the indictment, in addition to the charged statutes' inapplicability to the defendant, are grounds that fall within Fed. R. Crim. P. 12(b)(2), which permits a defendant to move to dismiss based on a lack of jurisdiction; under Rule 12(b)(3)(A), which permits a defendant to seek dismissal of the indictment based on a defect in the institution of the prosecution; and under Rule 12(b)(3)(B)(v), which permits a defendant to move to dismiss based on the failure to state an offense. *See Midland Asphalt*, 489 U.S. at 801; *cf. United States v. Vinson*, 805 F.3d 120, 122 (4th Cir. 2015) (addressing motion to dismiss based on contention that defendant charged under 18 U.S.C. § 922(g) did not constitute a person prohibited from possessing a firearm).

When considering a motion to dismiss, this Court must review the indictment as a whole and accept the allegations as true. *See United States v. Brewbaker*, 87 F.4th 563, 579 (4th Cir. 2023), *cert. denied*, No. 24-124,  2024 U.S. LEXIS 4585 (2024). Doing so here establishes that the indictment should be dismissed because CHA is not a "person" within the terms of section 371 or section 1347, is wholly immune from criminal prosecution, and could not form the criminal intent required for a violation of section 371 or section 1347.

III.    **The Indictment Should Be Dismissed Because CHA Is not a "Person" Subject to 18 U.S.C. §§ 371 and 1347.**[2]

The indictment in this case charges CHA with conspiring with Dr. Perwaiz to defraud the United States and to interfere with lawful government functions in violation of 18 U.S.C. § 371 and with health care fraud, in violation of 18 U.S.C. §§ 1347 and 2. Section 371 provides in pertinent part:

> If two or more **persons** conspire … to … defraud the United States, … and one or more of **such persons** do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

(Emphasis added.) Section 1347 provides in total:

> (a)    **Whoever** knowingly and willfully executes, or attempts to execute, a scheme or artifice—
>
>     (1)    to defraud any health care benefit program; or
>
>     (2)    to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), **such person** shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, **such person** shall be fined under this title, or imprisoned for any term of years or for life, or both.
>
> (b)    With respect to violations of this section, **a person** need not have actual knowledge of this section or specific intent to commit a violation of this section.

---

[2] As we explain below, the indictment should also be dismissed because, among other reasons, CHA, as an arm of the Commonwealth of Virginia, is wholly immune from prosecution. But the Supreme Court explained in *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 779 (2000), that, when both immunity and the reach of a statute are at issue, the statutory question is "logically antecedent to the existence of" the immunity issue and "there is no realistic possibility that addressing the statutory question will expand the Court's power beyond the limits that the jurisdictional restriction has imposed." "This combination of logical priority and virtual coincidence of scope makes it possible, and indeed appropriate, to decide the statutory issue first." *Id.* at 779–80.

By their express terms, both statutes apply to the conduct of a "person" (or, in the case of section 371, two "persons.").

In determining whether any conduct of CHA could ever fall within the reach of these statutes, therefore, this Court must determine whether CHA constitutes a "person." *See Stevens*, 529 U.S. at 780 (2000) (examining whether a state agency constitutes a "person" for purposes of the civil False Claims Act). To do so, this Court must apply to the statutory text the Supreme Court's "longstanding interpretive presumption that 'person' does not include the sovereign." *Id.* (citations omitted). "The presumption is 'particularly applicable where it is claimed that Congress has subjected the States to liability to which they had not been subject before.'" *Id.* at 780–81 (citations omitted).

Long before the enactment of the criminal statutes at issue here, indeed since the founding of the United States, states have been treated as sovereign entities that are not subject to criminal liability. *See Quern v. Jordan*, 440 U.S. 332, 359 n.16 (1979) ("The General Government cannot punish the State[.]") (quoting comments of Representative Burchard regarding the Civil Rights Act of 1871); *United States v. Horn*, 29 F.3d 754, 761 (1st Cir. 1994) ("sovereign immunity operates on the broadest possible level: it stands as an obstacle to virtually all direct assaults against the public fisc"). Although the United States Constitution does not explicitly address this concept, state ratifying conventions understood that the Constitution, as adopted, did not extend "the judicial power of the United States, in cases in which a state may be a party, … to criminal prosecutions, or to authorize any suit by any person against a state." *See Alden v. Me.*, 527 U.S. 706, 718 (1999)  (quoting the Rhode Island Convention's proclamation that "it is declared by the Convention, that the judicial power of the United States, in cases in which a state may be a party, does not extend to criminal prosecutions, or to authorize any suit by any person against a state,"

and the New York Convention's declaration of its understanding "that the judicial power of the United States, in cases in which a state may be a party, does not extend to criminal prosecutions, or to authorize any suit by any person against a state").

Five years after the Constitution was adopted, the Supreme Court ruled, contrary to that understanding as to civil actions, that the Constitution did not prohibit private citizens from suing states. *See id.* at 719–20. To "restore the original constitutional design" regarding private-citizen suits, Congress promptly passed the Eleventh Amendment, which explicitly provides that private citizens may not sue any state in federal court. *See id.* at 719–23.

But no constitutional amendment has ever been needed to clarify the framers' intent related to state immunity from criminal prosecution because the Supreme Court has never even questioned that immunity.[3] As one Senator remarked when sponsoring Sections 5, 6, and 7 of the Enforcement Act of 1870 (Cong. Globe, 41st Cong., 2d Sess., pp. 3611–13), "[Congress] cannot pass a criminal law as applicable to a State." And just as the federal government cannot hold a state criminally liable for the actions of its agents, "[a] state agency cannot be held criminally liable by either the state itself or the federal government." *In re Witness Before the Special Grand Jury 2000-2*, 288 F.3d 289, 294 (7th Cir. 2002) (citing Appendix to *United States v. Price*, 383 U.S. 787, 810 (1967)); *see Al-Haramain Islamic Found., Inc. v. Obama*, 705 F.3d 845, 854 (9th Cir. 2012) (rejecting as "patently absurd" the idea that a criminal prosecution may be maintained against a government office); *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 920 (8th Cir. 1997)

---

[3] Although Virginia is a commonwealth rather than a state, states and commonwealths are identically situated with respect to their relationship to the nation as a whole, and precedents that address "state" immunity apply equally to the Commonwealth of Virginia. *See Va. Marine Res. Comm'n v. Chincoteague Inn*, 287 Va. 371, 381 (2014) (referring to the Commonwealth of Virginia as a "state sovereign").

(although a corporation may be subject to both civil and criminal liability for the actions of its agents, "the actions of White House personnel, whatever their capacity, cannot expose the White House as an entity to criminal liability"); *cf. United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) ("*Oberg I*") (noting that "arm-of-the-state status may well constitute an affirmative defense in the related Eleventh Amendment context"); *NiGen Biotech, LLC v. Paxton*, 804 F.3d 389, 393 n.2 (5th Cir. 2015) (stating in civil case that a state agency shares the sovereign immunity of the State); *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996) (Eleventh Amendment sovereign immunity extends to "arms of a state," including state agencies and state officers acting in their official capacities).

Therefore, if CHA constitutes a sovereign arm of the Commonwealth of Virginia, it cannot constitute a "person" subject to criminal liability under sections 371 and 1347 unless Congress made its intent to abrogate the states' immunity from prosecution "unmistakably clear in the language of the statute[s]." *See Mojsilovic v. Bd. of Regents for the Univ. of Okla.*, 841 F.3d 1129, 1131 (10th Cir. 2016) (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000)); *accord Stevens*, 529 U.S. at 782 (examining whether text of the False Claims Act overcomes presumption that states are not covered).

As we explain below, CHA does constitute an arm of the Commonwealth, and nothing in section 371 or 1347 overcomes the presumption that Commonwealth entities are not covered by those provisions.

A.    **The Fourth Circuit's Arm-of-the-State Analysis Establishes that CHA Is an Arm of the Commonwealth of Virginia.**

Whether a government entity is equivalent to, or part of, a state (or Commonwealth) for purposes of federal-court immunity is a question of federal law. *Regents of the Univ. of Cal. v.*

*Doe*, 519 U.S. 425, 429 (1997) (addressing sovereign immunity from civil liability for state university regents). In the Fourth Circuit, a court addressing this question generally considers four nonexclusive factors:

> (1) whether any judgment against the entity as defendant will be paid by the State or whether any recovery by the entity as plaintiff will inure to the benefit of the State;
>
> (2) the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions;
>
> (3) whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and
>
> (4) how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State.

*United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646, 650 (4th Cir. 2015) ("*Oberg II*"); *see Ram Ditta v. Maryland Nat'l Cap. Park & Planning Comm'n*, 822 F.2d 456, 457–58 (4th Cir. 1987).

Although the Fourth Circuit has never been called upon to analyze these factors in the criminal context—likely because the government rarely, if ever, seeks to prosecute an entity that even arguably constitutes an arm of the state—the four-part test provides the best available framework here, given that the same state sovereignty concerns arise in both the civil and criminal contexts. An analysis of the factors establishes that CHA constitutes an arm of the Commonwealth of Virginia that is not a "person" under either section 371 or section 1347.

### i.    The Treasury of the Commonwealth Is Implicated.

The first Fourth Circuit factor considers whether any judgment against the entity will be, as a practical if not invariable matter, paid by the state. *Oberg II*, 804 F.3d at 657. This inquiry

considers both legal liability and "functional" liability. *Id*. If the state would be liable, the inquiry generally is at an end, and immunity attaches. *Id.* at 651 (quoting *Cash v. Granville Cnty. Bd. of Educ*., 242 F.3d 219, 223 (4th Cir. 2001) ("[I]f the State treasury will be called upon to pay a judgment against a governmental entity, the [entity is an arm of its creating state], and consideration of any other factor becomes unnecessary.")).

To determine whether the state is legally liable for an entity's obligations, including a fine or penalty, courts consider whether state law provides that the entity's obligations are binding on the state. *See Oberg I*, 745 F.3d at 137 (citation omitted). The enabling statute for CHA does not specifically address that question. Sections 1 and 7.1(6) of Virginia's 1966 Acts of Assembly, chapter 271, authorize CHA to sue and be sued, make contracts or guarantees, incur liabilities, borrow money, and secure any obligations of others. But aside from providing in section 10 that any bonds CHA issues shall not be a debt of the state, the statute does not explicitly say whether the Commonwealth shares liability for CHA's financial obligations, including for significant criminal penalties.

The Commonwealth's practical and functional financial liability to ensure CHA's ability to fulfill its state mandate, however, is clear. Functional liability exists when, "as a practical matter, a judgment against a state-created entity puts state funds at risk, despite the fact that the state is not legally liable for the judgment." *Oberg II*, 804 F.3d at 658. And here, criminal penalties or restitution would, depending on their magnitude, require recourse to the funds of the Commonwealth.

In Va. Code § 15.2-5300, the Virginia General Assembly declared that:

> conditions resulting from the concentration of population of various cities of the Commonwealth require the construction, maintenance and operation of adequate hospital facilities for the care of the public health, for the control and treatment of

11

epidemics, for the care of the indigent and for the public welfare. In various cities of the Commonwealth, adequate hospital facilities are not available to the inhabitants, and, consequently, many persons, including persons of low income, are forced to do without adequate medical and hospital care and accommodations. These conditions cause an increase in and the spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the Commonwealth and impair economic values. The aforesaid conditions also exist in certain areas surrounding such cities, and these conditions cannot be remedied by the ordinary operations of private enterprises. **The providing of adequate hospital and medical care are public uses and purposes for which public money may be spent and private property acquired.** It is in the public interest that adequate hospital and medical facilities and care be provided in such concentrated centers of population in order to care for and protect the health and public welfare. The provisions hereinafter enacted are declared as a matter of legislative determination necessary in the public interest.

(Emphasis added.) To address the findings set forth in this declaration, the General Assembly also called for the creation of Hospital Authorities, such as CHA, to function as "a political subdivision of the Commonwealth, with such public and corporate powers as are set forth in th[at] chapter." *See* Va. Code § 15.2-5302.

Together with CHA's enabling statute, these provisions establish that, if, in the course of this action, the fines and penalties imposed on CHA were to jeopardize in any meaningful manner CHA's ability to continue to provide its statutorily mandated "public and essential governmental functions to provide for the public health [and] welfare," the Commonwealth would have little practical choice but to intervene and to use "public money" to ensure that CHA could continue to perform its state-delegated functions. Indeed, the Commonwealth does so whenever necessary to protect the health and welfare of the public. Just last year, to address a community need for behavioral-health services, the Virginia General Assembly appropriated $4.5 million for CHA to use to provide and enhance behavioral-health services in its emergency department or outpatient

or inpatient settings.[4] *See https://budget.lis.virginia.gov/item/2023/2/HB6001/Chapter/1/312/.* If financial repercussions from this proceeding were to endanger CHA's ability to continue to provide adequate medical care for the community, the Commonwealth would have to appropriate much more than that. To deny that CHA functions as an arm of the Commonwealth when Commonwealth funds are in peril "would ignore economic reality." *See Ristow v. South Carolina Ports Auth.*, 58 F.3d 1051, 1054 (4th Cir. 1995) (finding Commonwealth Port Authority to be an arm of the Commonwealth despite absence of legal liability because, among other reasons, the Commonwealth "provides whatever economic support is necessary over and above the Port Authority's net revenues to insure its continued vitality").

Moreover, it is telling that, since CHA's inception, the Internal Revenue Service has recognized CHA as a political subdivision of the Commonwealth that is exempt from federal taxation. And, in an official statement issued for a 2019 hospital revenue-bond issue, the IRS described CHA's defined benefit pension plan as a "governmental plan," making it exempt from the Employee Retirement Income Security Act (commonly known as "ERISA"), which applies only to private-sector employees, and likewise described CHA's section 457(b) employee retirement plan as a "governmental plan." The IRS thus plainly views CHA as an extension of the Commonwealth for financial taxation purposes.

For these reasons, this factor supports a finding that CHA is an arm of the Commonwealth.

---

[4] Section U.1 of the appropriations bill includes a provision for the Virginia Department of Behavioral Health and Developmental Services to contract with CHA for Commonwealth use of up to eight beds of an acute, inpatient psychiatric to be built at CRMC, and it directs that department to "provide an estimated **annual state contribution to support Chesapeake Regional Healthcare**." (Emphasis added.) In other words, it calls for the Commonwealth to assume liability for at least some of CRMC's expenses.

### ii.    The Commonwealth Strictly Delimits CHA's Autonomy.

The second Fourth Circuit factor considers "the degree of autonomy that the entity exercises, including such circumstances as who appoints the entity's directors and officers, who funds the entity, and whether the state retains a veto over the entity's actions." *Oberg II*, 804 F.3d at 668. "Also relevant to the autonomy inquiry is the determination whether an entity has the ability to contract, sue and be sued, and purchase and sell property, and whether it is represented in legal matters by the state attorney general." *Id.* (internal quotation marks and citation omitted).

In this case, although CHA functions with a degree of autonomy, it also faces significant state-regulated restrictions regarding the scope of its operations and its use of funds. For example, the Virginia General Assembly limits the scope of CHA's operations to the services that it specifically enumerated in the statute, such as providing medical care and developing and operating medical facilities. 1966 Acts of Assembly, chapter 271, §§ 3, 4. It obligates CHA to hold all funds in trust and to apply them solely in the manner prescribed in its enabling statute. *Id. §* 14. It delineates who shall be included as members of the Authority and who may appoint them. *Id. §* 2. It prohibits the Authority from discriminating against any person on the basis of race, color, religion, and other characteristics in the procurement of goods and services. *Id. §* 7.3. Although it authorizes CHA to exercise the power of eminent domain, it substantially restricts the reach of that power and the purpose for which it may be exercised. *Id.* § 5. And the list of state-issued controls and limits goes on and on.

More fundamentally, CHA is a statutorily created entity, a creature of the Commonwealth rather than of any municipality, town, county, or city. Consequently, any autonomy that CHA possesses is by the grace of the Virginia General Assembly. That governing body retains control over CHA via its ability to amend CHA's enabling statute as it sees fit. Indeed, since it was first

enacted in 1966, the General Assembly has amended that statute twelve times, most recently in 2019. The General Assembly also can and does enact other types of legislation that affects CHA's power and autonomy, such as Va. Code § 2.2-4345, which refers to CHA as a "public body" and permits it "in the exercise of any power conferred under Chapter 271" to "enter into contracts without competitive sealed bidding or competitive negotiation." The Commonwealth, and not any city or city entity, continues to exercise active and ultimate control over CHA and its operations. These facts further confirm that CHA acts as an arm of the Commonwealth of Virginia.

Moreover, although the Virginia statutes do not require the Commonwealth's Attorney General to routinely represent the Authority in all of its legal matters, the Attorney General may "compromise and settle or discharge" "any dispute, claim or controversy [that] involves the interests of any … authority … of the Commonwealth." *See* Va. Code § 2.2-514. If the settlement amount exceeds $250,000, the Governor must approve. *Id*. If the amount is less than $250,000, the Attorney General alone can agree to a settlement, so long as the head of the pertinent authority agrees too. *Id*.

This provision allows for more than mere oversight by the Attorney General. It permits the Attorney General to actively resolve legal disputes involving an Authority's interests. This evidences the General Assembly's intent for CHA to serve as an arm of the Commonwealth.

### iii.    CHA Is not Limited to Local Concerns.

The third Fourth Circuit factor asks whether the entity claiming immunity is involved with "state" concerns rather than "non-state" concerns—meaning local or out-of-state matters. *See Oberg II,* 804 F.3d at 674. If the state (or Commonwealth) considers the entity's work to be an "essential governmental function," if that function is "clearly of legitimate state concern," and if

the entity "does provide significant services to the citizens of [the state]," this factor supports a finding that the entity functions as an arm of the state. *See id*. at 675.

As discussed above, the Virginia legislature created CHA as a public instrumentality "exercising public and essential governmental functions to provide for the public health, welfare, convenience and prosperity of" its service area. *See* 1966 Acts of Assembly, chapter 271, §§ 3, 16. It expressly stated, "The exercise of the powers granted by this act shall be in all respects for the benefit of the inhabitants of the Commonwealth, for the promotion of their safety, health, welfare, convenience and prosperity ...." *Id*. at § 16.

The provision of medical care is of legitimate Commonwealth concern. *See* Va. Code § 15.2-5300 ("The providing of adequate hospital and medical care are public uses and purposes for which public money may be spent and private property acquired. It is in the public interest that adequate hospital and medical facilities and care be provided in such concentrated centers of population in order to care for and protect the health and public welfare."); *Retail Indus. Leaders Ass'n v*. Fielder, 475 F.3d 180, 203 (4th Cir. 2007) (improving health care for low-income residents is a traditional state concern); *New York State Health Maint. Org. Conference v. Curiale*, 64 F.3d 794, 803 n.25 (2d Cir. 1995) (referring to state action involving health care as a "traditional exercise[] of state power"); *Scholz v. Metro. Pathologists, P.C.*, 851 P.2d 901, 907 (Colo. 1993) ("[I]t can hardly be argued that the effort to increase the availability of health care is not a legitimate governmental interest."). Indeed, it is of such great Commonwealth concern that a non-profit hospital such as CHA may not dispose of its assets without first notifying the Attorney General at least 60 days in advance of any proposed sale and "conven[ing] a public meeting to set forth its expectations concerning how the health care needs of the community will be served following the proposed disposition of assets." *See* Va. Code § 32.10374. The Commonwealth

expends hundreds of millions of dollars on that function annually. *See https://sfac.virginia.gov/pdf/ health/2024/02012024_No3_VDH_Budget.pdf.* When required to ensure that CHA can fulfill its state-mandated mission, it directs some of those funds directly to CHA. *See, e.g., https://budget.lis.virginia.gov/item/2023/2/HB6001/Chapter/1/312/.*

Although CHA's enabling legislation provides that its "service area" must include the "residents of the City of Chesapeake," the General Assembly did not limit service to the city's confines. *See id.* Instead, it provided that its "public and essential governmental functions" are to be provided to all "such other persons who might be served by [CHA]." *See id.* That area currently extends well beyond the Chesapeake city limits, with CHA offering various services in Newport News, Norfolk, Virginia Beach, and Suffolk. *See https://chesapeakeregional.com/locations.* CHA also operates a mobile mammography unit that travels to several Virginia communities. *See https://chesapeakeregional.com/services-specialties/breast-health/3d-mammography.* It does not function as or within merely one city or municipal entity. Indeed, in the past 12 months alone, CMRC has served inpatients living in 375 distinct zip codes, 366 of which were outside the City of Chesapeake. Its much more extensive outpatient population comes from an even broader area.

CHA's widespread activities are essential to thousands of Virginia citizens, and those activities significantly affect both the health and wellness of the state's citizens and Virginia's overall economy. Although CHA also renders a small percentage of its services—less than 15 percent—to patients who reside in northern North Carolina, the overwhelming majority of its revenue derives from its extensive in-state functions. Consequently, this Fourth Circuit factor favors a finding that CHA operates as an arm of the Commonwealth of Virginia. *See Oberg II*, 804 F.3d at 674–75 (even if entity performs out-of-state activities, this factor addresses whether entity mainly participated in state activities); *see also Ram Ditta*, 822 F.2d at 459 (considering whether

services provided by entity inured mainly to benefit of locals rather than to state citizens in general).

> #### iv.    Virginia Law Establishes that CHA Is an Arm of the Commonwealth.

The final Fourth Circuit factor—that is, "how the entity is treated as a matter of state law"—puts the nail in the arm-of-the-state coffin because the question of whether an entity is properly considered an arm of the state (or Commonwealth) "can be answered only after considering the provisions of state law that define the agency's character." *See Regents of the Univ. of Cal.*, 519 U.S. at 429. And the Virginia legislature explicitly defined CHA as a Commonwealth entity.

As discussed above, CHA is a "Hospital Authority" created by the Virginia General Assembly in accordance with Va. Code § 15.2-5302. That provision defines a "Hospital Authority" as "a political subdivision of the Commonwealth, with such public and corporate powers as are set forth in th[at] chapter …." *Id.*

CHA's own enabling legislation likewise describes CHA as a "public body politic and corporate … with such public and corporate powers" as set forth in the statute. *See* 1966 Acts of Assembly, chapter 271, § 3. The General Assembly deemed it to be a "public instrumentality, exercising public and essential governmental functions." *See id.*; *see also id.* § 16. Section 5 of the statute authorizes CHA to acquire property "by the exercise of the power of eminent domain," which is a traditional state function.[5] Section 16 of the statute allows it to issue tax-free bonds.

---

[5] Although Section 5 of Chapter 271 limits CHA's exercise of its power of eminent domain to "within the corporate limits of the City of Chesapeake and only for the purpose of acquiring property to be used for operating projects," CHA's power of eminent domain does not depend on the approval or assistance of another body, such as the City of Chesapeake. CHA itself determines whether it will exercise that power, and it has done so to acquire a significant amount of real property.

And, in section 10, the statute expressly refers to CHA as a "political subdivision" of the Commonwealth by stating, "The bonds and other obligations of the Authority ... shall not be a debt of the Commonwealth or any political subdivision thereof and neither the Commonwealth nor any political subdivision thereof *other than the Authority* shall be liable thereon[.]" (Emphasis added.)

Considering these fundamental characteristics, Virginia courts have consistently determined that, as a Commonwealth entity, CHA enjoys sovereign immunity from civil claims. *See Dupuy German v. Perwaiz*, 109 Va. Cir. 276, 278 (Va. Cir. 2022), attached as Ex. B; *Fernandez-Becerra v. Javid A. Perwaiz M.D., et al.*, Case No. CL20-5901 (Chesapeake Cir. Oct. 7, 2021), attached as Ex. C; *Lizbeth Holdstein v. Chesapeake Hosp. Auth.*, et al., Case No. CL13-1016 (Va. Beach Cir. July 18, 2014), attached as Ex. D; *James v. Chesapeake General Hosp.*, Case No. CL96-1259 (Chesapeake Cir. March 25, 1998), attached as Ex. E; *Brooks v. Jamali*, Case No. 19807-M (Chesapeake Cir. July 31, 1985), attached as Ex. F; *Jennings v. Chesapeake Gen. Hosp.*, Case No. 10676-M (Chesapeake Cir. June 4, 1985), attached as Ex. G; *Holloman v. Chesapeake Hosp. Auth.*, Record No. 840237 (Nov. 16, 1983), attached as Ex. H; *Webster v. Chesapeake Gen. Hosp.*, Case No. 17733-H (Chesapeake Cir. Aug. 12, 1982), attached as Ex. I; *cf. Hughes v. Lake Taylor City Hosp.*, 54 Va. Cir. 239, 241 (Norfolk Cir. 2000) (holding similarly situated hospital authority immune from liability), attached as Ex. J. Other courts have determined that entities that are similarly situated to CHA likewise constitute state entities. *See United States ex rel. King v. Univ. of Texas Health Sci. Ctr.*, 544 Fed. Appx. 490, 495–98 (5th Cir. 2013) (University of Texas Health Science Center-Houston is an arm of the state and consequently is not a "person" under the False Claims Act); *United States ex rel. Adrian v. Regents of Univ. of California*, 363 F.3d 398, 401–02 (5th Cir. 2004) (Regents of the University of California is a state agency not subject to the False Claims Act; citing cases); *United States v. Harris Cnty. Hosp. Dist.*, Civil Action No. 4:20-

CV-0296, 2023 U.S. Dist. LEXIS 15766, *1 (S.D. Tex. Jan. 31, 2023) (Harris County Hospital District is a political subdivision of the State of Texas that is immune from suit; unpublished); *United States ex rel. Jones v. Univ. of Utah Health Scis. Ctr.*, Case No. 2:11cv1200, 2013 U.S. Dist. LEXIS 137797, *6 (D. Utah 2013) ("There is no question that [university hospitals] are state entities and are therefore not 'persons' under the FCA."; unpublished).

These rulings are consistent with the Supreme Court's decision in *Cook County v. United States ex rel. Chandler*, 538 U.S. 119 (2003). At issue in *Chandler* was whether a county-created hospital authority—not a state-created one as here—constituted a "person" for purposes of the False Claims Act and qui tam liability. The question arose because, under *Stevens*, 529 U. S. at 787–88, states are not "persons" subject to qui tam liability. Noting that state agencies are immune from qui tam liability but "municipal" corporations—*created by municipalities* (and their voters)—are not, the Court held that the Cook County Hospital, which had been created by a county, was not an arm of the state and consequently qualified as a "person" for purposes of the FCA. 538 U.S. 126–29 and n.7.

Relying on *Chandler,* the Fourth Circuit noted in *Oberg II,* 804 F.3d at 650, that "[c]orporations, including municipal corporations like cities and counties, are 'persons' under the FCA, *see* [*Chandler*, 538 U.S. at 126–27], but states and state agencies are not[.]" Given that CHA is not a city or county-created entity but is instead a Commonwealth-created entity, CHA constitutes an arm of the Commonwealth of Virginia and is entitled to the presumption that it does not constitute a "person" subject to liability under section 371 or section 1347.

B.    **The Government Cannot Overcome the Presumption that Congress Did not Intend Section 371 or Section 1347 to Apply to States and State Entities.**

"The presumption is, of course, not a 'hard and fast rule of exclusion,' … but it may be disregarded only upon some affirmative showing of statutory intent to the contrary." *Stevens*, 529 U.S. at 781 (citations omitted). Congressional intent for a statute to render a state liable must be "unmistakably clear in the language of the statute." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000) (internal quotation marks omitted). This is because (1) "the ordinary rule of statutory construction" is that "if Congress intends to alter the usual constitutional balance between States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute," and (2) "statutes should be construed so as to avoid difficult constitutional questions." *Stevens*, 529 U.S. at 787.

Yet neither section 371 nor section 1347 includes any language, much less "unmistakably clear" language, demonstrating Congressional intent to overcome the presumption against state criminal liability. Section 371 applies only to "persons" who conspire to commit an offense against the United States or to defraud the United States, while section 1347 applies to "whoever" participates in a health-care-fraud scheme, noting that such "person" can be fined or imprisoned and that "a person need not have actual knowledge of th[at] section or specific intent to commit a violation of th[at] section." Unlike other statutory provisions that define "person" to include state entities, *see, e.g.,* 42 U.S.C. § 6903(15), neither section 371 nor section 1347 defines "person" or "whoever," and "standing alone, these broad terms signal no intent to abrogate sovereign immunity — certainly not an 'unmistakably clear' congressional intent to do so." *See Mojsilovic v. Bd. of Regents for the Univ. of Okla.*, 841 F.3d 1129, 1132–33 (10th Cir. 2016) (citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246 (1985)), in which the Supreme Court concluded that statutory

language creating liability for "any recipient" of federal assistance did demonstrate an unmistakably clear intent to abrogate sovereign immunity; also citing *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 631–32 (1999), in which the Supreme Court observed that previously undefined statutory language creating liability for "whoever" violated patent laws did not abrogate sovereign immunity). Given that 1 U.S.C. § 1 provides that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise … the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"—with no mention of "states" or state entities—the text of the statutes at issue here "does less than nothing to overcome the presumption that States are *not* covered." *See Stevens*, 529 U.S. at 782 (emphasis in original).

For similar reasons and others, the Supreme Court determined in *Stevens*, 529 U.S. at 781–88, that the civil False Claims Act, which likewise refers to "persons" without specifically defining that term, does not render states—or state entities—liable for civil false claims. In construing the FCA, the *Stevens* Court noted that "the Program Fraud Civil Remedies Act of 1986 (PFCRA), a sister scheme creating administrative remedies for false claims—and enacted just before the FCA was amended in 1986—contains (unlike the FCA) a definition of 'persons' subject to liability, and that definition does not include States." *Id.* at 786 (citing 31 U.S.C. § 3801(a)(6)). The Court remarked that "[i]t would be most peculiar to subject States to treble damages and civil penalties in qui tam actions under the FCA, but exempt them from the relatively smaller damages provided under the PFCRA." *Id.* It would be even more peculiar to subject states—and state entities—to potentially crippling criminal penalties for conduct similar to that addressed by the FCA and the PFCRA without any clear indication of Congressional intent to do so.

CHA therefore is not a "person" subject to section 371 or section 1347, and the indictment should be dismissed with prejudice.

## IV.    CHA's Sovereign Immunity Constitutes a Complete Bar to this Prosecution.

Even if this Court were to determine that the term "person" as used in sections 371 and 1347 could include states and state entities, the indictment should still be dismissed with prejudice based on sovereign immunity. "Sovereign immunity is a rule of social policy, which protects the state from burdensome interference with the performance of its governmental functions and preserves its control over state funds, property, and instrumentalities." *Jean Moreau & Assocs. v. Health Ctr. Comm'n*, 283 Va. 128, 137 (2012) (quotation marks and citations omitted).

"[T]he doctrine of sovereign immunity is 'alive and well' in Virginia." *Messina v. Burden*, 228 Va. 301, 307 (1984). Undoubtedly, the Commonwealth itself is entitled to sovereign immunity. *Maddox v. Commonwealth*, 267 Va. 657 (2004). And, when the General Assembly creates a separate entity as an agency of the Commonwealth to perform a function of state government, that entity will also be clothed with the Commonwealth's immunity. *Va. Elec. & Power Co. v. Hampton Redevelopment & Hous. Auth.*, 217 Va. 30, 32 (1976) (citing *Elizabeth River Tunnel District v. Beecher*, 202 Va. 452, 1456–57 (1961)). To obtain such immunity, the entity must "come into existence by state initiative" and not "local activation, [that is] optional with each locality." *Id.* at 32; *see also Cnty. of York v. Peninsula Airport Com.*, 235 Va. 477, 481 n.1 (1988) ("It is true that when participating localities retain 'substantial local control' over an entity they have created, local activation negates its status as a state agency or an 'arm' of the Commonwealth.").

For all the reasons discussed above, CHA constitutes an arm of the Commonwealth of Virginia exercising essential governmental functions. And, as explained above, states and arms of

the state are wholly immune from criminal prosecution, absent an express waiver. Given the lack of waiver here, CHA should not be required to run the gauntlet of standing trial. Instead, the indictment should be immediately dismissed with prejudice.

**V.    If CHA Constitutes a Municipal Corporation, It Is Still Entitled to the Commonwealth's Sovereign Immunity.**

Even if this Court were to view CHA as a municipal corporation rather than as some other form of Commonwealth entity, CHA would still be entitled to dismissal of the indictment because, "[w]hen municipal corporations exercise governmental functions, they act as arms or agencies of the State" and share in the Commonwealth's sovereign immunity. *See Jean Moreau & Assocs. v. Health Ctr. Comm'n*, 283 Va. 128, 140 (Va. 2012) (citing *Southern Railway Co.  v. City of Danville*, 175 Va. 300, 305 (1940)); *accord Massey v. Va. Polytechnic Inst. & State Univ.*, 75 F.4th 407, 415 (4th Cir. 2023) ("in cases where the defendant is not the Commonwealth itself but is instead a municipality or a quasi-governmental entity authorized by state law, the determination of whether sovereign immunity applies turns on an evaluation of various factors, many of them fact-driven, such as whether the municipality was engaged in a governmental function or a proprietary function").

Affirming a state circuit court's dismissal on sovereign-immunity grounds of a contractor's quantum meruit suit against a county health center commission, the *Jean Moreau* court explained, "The shield of sovereign immunity does not just apply to the State; it also applies to municipal corporations under certain circumstances"—that is, when a municipal corporation is performing governmental functions, rather than proprietary functions. *Id*. at 137. And "[i]f municipal corporations act as arms or agencies of the State when they exercise governmental functions, then they should be protected — like the Commonwealth — from both tort and quasi-contractual

claims." *Id*. at 140. The court concluded, therefore, that "municipal corporations performing governmental functions are immune from quantum meruit claims and … recovery against municipal corporations on a quantum meruit basis is limited to proprietary functions." *Id*.; *accord Consortium Sys., LLC v. Lane Eng'g, Inc*., 95 Va. Cir. 73, 75 (Va. Cir. 2017) ("Municipal corporations are also entitled to sovereign immunity when exercising governmental functions, as they are acting as arms or agencies of the State.").

The same principles apply here. If CHA constitutes a municipal corporation, and if CHA's actions in permitting Dr. Perwaiz to use its facilities and in billing federal payers for the hospital services attendant to that use constituted governmental functions, CHA is cloaked with the same sovereign immunity that the Commonwealth enjoys. "Governmental functions are powers and duties performed exclusively for the public welfare." *City of Chesapeake v. Cunningham*, 268 Va. 624, 633 (Va. 2004).

As a Virginia Circuit Court determined in a civil suit against CHA, CHA's actions in granting Dr. Perwaiz hospital privileges constituted CHA's operational—and thus governmental—functions. *Perwaiz*, 109 Va. Cir. at 279–80. The court explained that a "governmental function" "entails the exercise of an entity's political, discretionary, or legislative authority," and said, "The granting of credentials and hospital privileges involves a great deal of discretion." *Id*. at 279. The court concluded that "[t]he evaluation of the relevant standards of practice and a physicians' [*sic*] compliance therewith or departures therefrom involve significant discretion and therefore constitute a governmental function." *Id*. at 279–80. Indeed, the enabling legislation expressly provides that CHA's "operation and maintenance of any project which the Authority is authorized to undertake will constitute the performance of an essential governmental function[.]" 1966 Va. Acts, ch. 271, § 16.

25

Consequently, the actions of CHA delineated in the indictment, all of which relate to the billing for medical services provided by CRMC, fell within CHA's governmental functions. Under these circumstances, regardless of whether CHA is characterized as Commonwealth entity or as a municipal corporation, CHA is entitled to sovereign immunity. *See Southern R. Co. v. Danville*, 175 Va. 300, 305 (Va. 1940); *see also Hughes*, 54 Va. Cir. at 241 (holding that Virginia hospital authority that constituted a municipal corporation was entitled to sovereign immunity from tort liability); *Stevens v. Hospital Auth. of Petersburg*, 42 Va. Cir. 321, 323 (Va. Cri. 1997) (same); *cf. Jean Moreau & Assocs.*, 283 Va. at 145 (affirming dismissal of suit against county health center commission where commission was municipal corporation exercising governmental functions, entitling it to sovereign immunity).

## VI.    Even if CHA Is Not a Sovereign Arm of the State, it Could Never Form the Mens Rea Necessary for a Conviction Under Section 371 or Section 1347.

Finally, even if this Court views CHA as a municipal corporation that is not entitled to sovereign immunity, the indictment must still be dismissed. In holding that punitive damages are not available against a municipality in suits under the civil racketeering statutes, 18 U.S.C. § 1961 *et seq.*, numerous courts have held that "government entities are incapable of forming malicious intent."[6] *Lancaster Cnty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 404 (9th Cir. 1991) (citing case); *accord Liang v. City of N.Y.*, No. 10-CV-3089 (ENV) (VVP), 2013 U.S. Dist. LEXIS 136795, at *39 (E.D.N.Y. Sep. 18, 2013) (citing cases and noting, "At the pleading doorway, Liang's RICO claim against the City itself is dismissed because, as many previous courts in this Circuit have held, 'a municipal corporation is incapable of having the criminal intent to support

---

[6] Section 1961(1) defines "racketeering activity" as including various criminal activities that require a showing of malicious intent, such as various types of fraud.

RICO's predicate offense requirement.'"); *see also Pedrina v. Chun*, 97 F.3d 1296, 1300 (9th Cir. 1996); *Genty v. Resolution Trust Corp*., 937 F.2d 899, 914 (3d Cir. 1991); *Rogers v. City of New York*, 359 F. App'x 201, 204 (2d Cir. 2009) (citing *Pedrina* and holding that "there is no municipal liability under RICO"); *Navajo Nation v. Peabody Holding Co*., 209 F. Supp. 2d 269, 272 (D.D.C. 2002) (describing the Court's earlier grant of a motion to dismiss RICO claims against a municipal corporation that could not be liable under RICO for punitive damages); *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 457 (S.D.N.Y. 1998) (noting that "every court in this Circuit that has considered the issue has held that a municipality cannot form the requisite criminal intent to establish a predicate act, and has therefore dismissed the claim against the municipality"), *aff'd*, 182 F.3d 899 (2d Cir. 1999).

These cases rely on the common-law rule that the Supreme Court addressed in *Newport v. Fact Concerts*, 453 U.S. 247, 267 (1981), that the criminal intent of an agent of a municipal corporation can never be imputed to the municipal corporation itself because the retribution for a municipality's wrong should not "be visited upon the shoulders of blameless or unknowing taxpayers." The *Newport* Court explained:

> Under ordinary principles of retribution, it is the wrongdoer himself who is made to suffer for his unlawful conduct. If a government official acts knowingly and maliciously to deprive others of their civil rights, he may become the appropriate object of the community's vindictive sentiments. … A municipality, however, can have no malice independent of the malice of its officials. Damages awarded for punitive purposes, therefore, are not sensibly assessed against the governmental entity itself.

*Id*. Referring to the Missouri Supreme Court's reference in *Hunt v. City of Boonville*, 65 Mo. 620, 624, 625 (1877), to "'respectable authority' to the effect that municipal corporations 'can not, as such, do a criminal act or a willful and malicious wrong and they cannot therefore be made liable for exemplary damages,'" the Court distinguished municipal corporations from ordinary private

corporate entities, stating:

> The relation which the officers of a municipal corporation sustain toward the citizens thereof for whom they act, is not in all respects identical with that existing between the stockholders of a private corporation and their agents; and there is not the same reason for holding municipal corporations, engaged in the performance of acts for the public benefit, liable for the willful or malicious acts of its officers, as there is in the case of private corporations.

*Id*. at 261–62 (quoting *Boonville*, 65 Mo. at 625 (alteration omitted)). The Court explained that, because a municipal entity consists of citizens and taxpayers, punishing such an entity for injuries inflicted by its officers and agents would in fact punish the very victims of the crime. *Id*. at 263–63. As the Ninth Circuit said in *Lancaster Cnty Hosp*., 940 F.2d at 404, "[P]ublic policy is offended if all the citizens of a state are made liable for extraordinary damages as a result of the actions of a few dishonest officials." *Id.* at 404.

Although we categorically reject the charge that any CHA official engaged in fraudulent activity with respect to CHA's billing for Dr. Perwaiz's services (or with respect to anything else, for that matter), these cases establish that, even if they had, their criminal intent may not be imputed to CHA as an entity. Therefore, the United States could never sustain the section 371 or section 1347 charge against CHA, and the indictment should be dismissed with prejudice.

## Conclusion

For these reasons, CHA requests this Court to dismiss the indictment with prejudice.

DATED:  January 28, 2025

By:     /s/   *Nick Oberheiden*
        Nick Oberheiden
        Admitted *Pro Hac Vice*
        N.Y. Reg. No. 4619011
        Oberheiden P.C.
        440 Louisiana St., Suite 200
        Houston, Texas 77002
        (214) 334-7648 (Telephone)
        (972) 559-3365 (Facsimile)
        Nick@federal-lawyer.com

        and

        /s/    *William H. Newman*
        William H. Newman
        Virginia Bar No. 98738
        Oberheiden, P.C.
        440 Louisiana Street, Suite 200
        Houston, Texas 77002
        (214) 334-7648 (Telephone)
        (972) 559-3365 (Facsimile)
        Will@federal-lawyer.com

        Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on January 28, 2025, a true and correct copy of the above and foregoing instrument was served on all counsel of record via CM-ECF filing.

/s/ *William H. Newman*
William H. Newman

Exhibit A

Virginia Authorities
# Chesapeake Hospital Authority

## Created
1966 Acts of Assembly, c. 271.

## Amendments
1971, c. 97 (§§ 2, 11)
1971, c. 245 (provided effective date for 1971, c. 97)
1973, c. 53 (§ 2)
1987, c. 396 (§§ 2, 3, 4, 5, 7, 7.1 [added], 9, 10, 11, 12, 13)
1990, c. 419 (§ 7.2 [added])
1993, cc. 281, 300 (§§ 4, 5)
1998, cc. 659, 697 (§ 2)
1998, cc. 666, 697 (§ 7.3 [added])
2006, c. 658 (§§ 2, 7, 7.1, 7.2)
2015, c. 358 (§ 2)
2017, cc. 541, 557 (§ 2)
2019, cc. 249, 250 (§ 7.1)

§ 1. There is hereby created a public body politic and corporate to be known as the "Chesapeake Hospital Authority," hereinafter referred to as "The Authority," with such public and corporate powers as are hereinafter set forth. The Authority may sue and be sued, plead and be impleaded, and shall have the power and authority to contract and be contracted with and to exercise and discharge all the powers and duties imposed and conferred upon it, as hereinafter provided. (1966, c. 271)

§ 2. The Authority shall be composed of eleven members, two of whom shall be licensed members of the medical profession, all of whom shall be appointed by the city council. The terms of the members shall be four years and staggered so that no more than four members shall be appointed in any one year; provided, however, that for terms which commence in 1999, the council shall appoint four members for four-year terms and two members for five-year terms, and for terms which commence in 2001, the council shall appoint four members for four-year terms and one member for a three-year term. Any member may be reappointed; however, after July 1, 2017, no member shall serve more than two consecutive terms. Any person who has served more than one and one-half terms as a member of the Authority as of July 1, 2017, shall not be eligible for reappointment for another consecutive term. A member of the Authority shall serve at the pleasure of the city council of the City of Chesapeake. No Authority member shall work for the Authority within one year after serving as a member. Members shall be compensated for their services in the amount of $250 per attendance at each meeting, provided, however, that no member shall be compensated for participation in a meeting by electronic means when the member is not physically present at the meeting. The Authority shall adopt as part of its bylaws a definition of "compensable meeting" prior to compensating any member in accordance with this section. Members shall be entitled to reimbursement for necessary traveling and other expenses incurred while engaged in the performance of their duties. Each member shall continue to hold office until the earlier of the effective date of his resignation or the date on which his successor has been appointed and qualified. The council shall have the right to remove any member or officer, for malfeasance or misfeasance, incompetency or gross neglect of duty. Vacancies shall be filled by appointment of the council for unexpired terms, or in the case of an increase in the size of the Authority, filled by appointment of the council, which appointments may be for an

initial term less than four years. Members shall take an appropriate oath of office and same shall be filed with the city clerk. Members shall elect on an annual basis one of their number as chairman and another as vice-chairman and shall also elect a secretary and treasurer for terms to be determined by them, who may or may not be one of the members. The same person may serve as both secretary and treasurer. The members shall make such rules, regulations and bylaws for their own government and procedure as they shall determine; they shall meet regularly at least once a month and may hold such special meetings as they deem necessary. (1966, c. 271; 1971, c. 97; 1973, c. 53; 1987, c. 396; 1998, cc. 659, 697; 2006, c. 658; 2015, c. 358; 2017, cc. 541, 557)

§ 3. The Authority shall be deemed to be a public instrumentality, exercising public and essential governmental functions to provide for the public health, welfare, convenience and prosperity of the residents of the City of Chesapeake and such other persons who might be served by the Authority ("its service area") and to provide improved medical care and related services to such residents and persons and is hereby authorized to exercise the powers conferred by the following sections. (1966, c. 271; 1987, c. 396)

§ 4. The Authority may plan, design, construct, renovate, enlarge, equip, maintain and operate projects for the purpose of providing medical care and related services and other appropriate purposes. The Authority may lease, sell or otherwise convey any or all of its projects to others who agree to provide for the operation of the same if the Authority determines that such sale, lease or other conveyance will assist, promote or further the purposes and intent of this act, subject to the provisions of § 5 below.

"Projects" as used in this act shall mean any medical facilities and approaches thereto and appurtenances thereof. Medical facilities shall include any and all medical facilities and equipment, including, without limitation, hospitals, nursing homes, continuing care facilities, self-care facilities, medical office facilities, clinics, out-patient surgical centers, alcohol, substance abuse and drug treatment centers, laboratories, research facilities, sanitariums, hospices, facilities for the residence or care of the elderly, the handicapped or the chronically ill, residential facilities for nurses, interns, and physicians and any other kind of facility for the treatment of sick, disturbed or infirm persons, together with all related and supporting facilities and equipment necessary and desirable in connection therewith or incidental thereto, or equipment alone, including, without limitation, parking facilities, kitchen, laundry, laboratory, pharmaceutical, administrative, communications, computer and recreational facilities and equipment, storage space, mobile medical facilities, vehicles and other equipment necessary or desirable for the transportation of medical equipment or the transportation of patients.

"Operating project" as used in this act shall mean any project operated by the Authority or directly controlled by the Authority and shall include, without limitation, parking facilities operated by the Authority or an agent therefor and medical office buildings with respect to which the Authority exercises the normal powers of a landlord. (1966, c. 271; 1987, c. 396; 1993, cc. 281, 300)

§ 5. The Authority may acquire property, real or personal, by purchase, gift, devise or by the exercise of the power of eminent domain, on such terms and conditions, and in such manner as it may deem proper, and such rights, easements or estates therein as may be necessary for its purposes, and sell, lease and dispose of the same, or any portion thereof or interest therein whenever it shall become expedient to do so and in any manner it deems appropriate, including without limitation by the granting of mortgages and other liens, the conveyance of property to

related entities and the disposition of property no longer necessary or desirable for its operations; provided, however, that the Authority may not sell or otherwise dispose of all, or substantially all, of its property providing hospital care, other than to an entity controlled by the Authority, without the approval of the City Council of the City of Chesapeake, expressed in a resolution. For purposes of the previous sentence, the granting of mortgages, deeds of trust, security interests, and other liens as security for indebtedness or other obligations of the Authority shall not be considered a sale or other disposition nor shall approval of the City Council be required for any sale or other disposition resulting from the execution or foreclosure or other enforcement of such liens or other security devices. The exercise of the power of eminent domain shall be in accordance with Chapter 1.1 of Title 25 of the Code of Virginia and shall be exercised only within the corporate limits of the City of Chesapeake and only for the purpose of acquiring property to be used for operating projects. No property of any corporation itself having the power of eminent domain may be condemned hereunder. (1966, c. 271; 1987, c. 396; 1993, cc. 281, 300)

§ 6. The Authority may fix and revise from time to time and charge and collect rates, rentals, fees and other charges for the services and facilities furnished by the Authority, and establish and revise from time to time regulations, in respect to the use, occupancy or operation of any such facility or part thereof, or service rendered. (1966, c. 271)

§ 7. The Authority may accept loans, grants, or assistance from the federal government, the Commonwealth, any municipality thereof, or from any other sources, public or private, to carry out any of its purposes and may enter into any agreement or contract regarding or relating to the acceptance or use or repayment of any such loan, grant or assistance. This power shall include the power to refinance all or any portion of the Authority's debt, to renegotiate the terms of all or any portion of such debt, and to retire all or any portion of such debt prior to its maturity date. (1966, c. 271; 1987, c. 396; 2006, c. 658)

§ 7.1. The Authority shall have the following powers to carry out the purposes and intent of this act:

(1) To provide or assist in providing medical care and related services in its service area.

(2) To promote, develop, improve and increase the commerce and economic development of the City of Chesapeake and its environs.

(3) To assist in or provide for the creation of domestic or foreign stock and nonstock corporations, limited liability companies, partnerships, limited partnerships, associations, foundations or other supporting organizations or other entities, and to purchase, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, shares of or other interests in, or obligations of, any domestic or foreign stock and nonstock corporations, limited liability companies, partnerships, limited partnerships, associations, foundations or other supporting organizations, joint ventures or other entities organized for any purpose, or direct or indirect obligations of the United States, or of any other government, state, territory, governmental district or municipality or of any other obligations of any domestic or foreign stock or nonstock corporation, limited liability company, partnership, limited partnership, association, foundation or other supporting organization, joint venture or other entity organized for any purpose or any individual. The investment of funds held by the Authority, or contributed to its affiliated foundations, shall

be exempt from the application of the Investment of Public Funds Act, Chapter 45 (§ 2.2-4500 et seq.) of Title 2.2 of the Code of Virginia. The investments of any entity wholly owned or controlled by the Authority that is an "institution," as such term is defined in § 55-268.12, shall be governed by the Uniform Prudent Management of Institutional Funds Act (§ 55-268.11 et seq.) of the Code of Virginia.

(4) To provide domestic or foreign stock and nonstock corporations, limited liability companies, partnerships, limited partnerships, associations, foundations or other supporting organizations, joint ventures or other entities owned in whole or in part or controlled, directly or indirectly, in whole or in part, by the Authority with appropriate assistance, including making loans and providing time of employees, in carrying out any activities authorized by this act.

(5) To make loans and provide other assistance to domestic or foreign stock and nonstock corporations, limited liability companies, partnerships, limited partnerships, associations, foundations or other supporting organizations, joint ventures or other entities.

(6) To make contracts or guarantees, incur liabilities, borrow money, or secure any obligations of others.

(7) To transact its business, locate its offices and control, directly or through domestic or foreign stock and nonstock corporations, limited liability companies, partnerships, limited partnerships, associations, foundations or other supporting organizations, joint ventures or other entities, facilities that will assist or aid the Authority in carrying out the purposes and intent of this act.

(8) To participate in joint ventures with individuals, domestic or foreign stock and nonstock corporations, limited liability companies, partnerships, limited partnerships, associations, foundations or other supporting organizations or other entities for providing medical care or related services or other activities that the Authority may undertake to the extent that such undertakings assist the Authority in carrying out the purposes and intent of this act.

(9) To conduct or engage in any lawful business, activity, effort or project, necessary or convenient for the purposes of the Authority or for the exercise of any of its powers.

(10) To exercise all other powers granted to nonstock corporations pursuant to § 13.1-826 of the Code of Virginia, as amended.

(11) To procure such insurance, participate in such insurance plans, or provide such self-insurance, or any combination thereof, as it deems necessary or convenient to carry out the purposes and provisions of this act. The purchase of insurance, participation in an insurance plan, or creation of a self-insurance plan by the Authority shall not be deemed a waiver or relinquishment of any sovereign immunity to which the Authority or its members, officers, directors, employees, or agents are otherwise entitled. (1987, c. 396; 2006, c. 658; 2019, cc. 249, 250)

§ 7.2. Notwithstanding the Virginia Freedom of Information Act (§ 2.2-3700 et seq) of the Code of Virginia, the Authority shall be permitted to conduct executive or closed meetings to discuss or consider the condition, acquisition or use of real or personal property or plans for the future of the Authority which could affect the value of property, real or personal owned or desirable for

bequests and fund-raising activities; grants and contracts for services or work to be performed by the Authority; marketing and operational strategies that will affect competitive position; and the discussion or consideration of members of its medical staff, and qualifications and appointments thereto. The Authority shall follow the provisions of § 2.2-3712 when convening executive or closed meetings.

The Authority shall not be required to disclose records pertaining to the qualifications for or continued membership on its medial staff; proprietary information gathered by or in the possession of the Authority from third parties; contract cost estimates prepared for confidential use and awarding contracts for construction or the purchase of goods or services; data, records or information of a proprietary nature produced or collected by or for the Authority or members of its staff; financial statements not publicly available which may be filed with the Authority from third parties; customer account information; consulting or other reports paid for by the Authority to assist the Authority in connection with its strategic planning and goals; and the determination of marketing and operational strategies that affect competitive position.

The Authority's exemptions from the Freedom of Information Act shall be limited to those activities specifically described in this section and those exemptions otherwise granted under the provisions of the Act. Except as specifically provided in this section, the Authority shall be subject to the provisions of the Freedom of Information Act.

Notwithstanding exemptions from the Freedom of Information Act granted by this section, the Authority shall comply with all applicable state reporting requirements. (1990, c. 419; 2006, c. 658)

§ 7.3. The provisions of the Virginia Public Procurement Act (§ 11-35 et seq. of the Code of Virginia) shall not apply to the Authority in the exercise of any power conferred under this chapter. The Authority shall not discriminate against any person on the basis of race, color, religion, national origin, sex, pregnancy, childbirth or related medical conditions, age, marital status, or disability in the procurement of goods and services. (1998, cc. 666, 697)

§ 8. The Authority may borrow money and issue bonds as hereinafter provided. (1966, c. 271)

§ 9. In addition to the powers granted by general law or by charter, any county or municipality in the Commonwealth is empowered to cooperate with the Authority as follows:

(a) To make such appropriations and provide such funds for the operation and carrying out the purposes of the Authority as the governing body may deem proper, either by outright donation or by loan, or the governing body may agree with such Authority to take such action.

(b) To dedicate, sell, conveyor lease any of its interest in property, or grant easements, licenses or any other privileges therein to any such Authority.

(c) To cause parks, playgrounds, recreational, community, educational, water, sewer or drainage facilities, or any other works which it is otherwise empowered to undertake, to be furnished adjacent to or in connection with property of or any facility or project of such Authority.

(d) To furnish, dedicate, close, pave, install, grade or regrade, plan or replan streets, roads, roadways, alleys, sidewalks or other places which it is otherwise empowered to undertake.

(e) Plan or replan, zone or rezone any part of such county or municipality in connection with the use of any property of such Authority or any property adjacent to the property of such Authority or any of its facilities or projects which it is otherwise empowered to undertake, in accordance with general laws.

(f) To cause services to be furnished to the Authority of the character which such county or municipality is empowered to furnish.

(g) To purchase any of the bonds of such Authority or legally invest in such bonds any funds belonging to or within the control of such county or municipality and exercise all the rights of any holder of such bonds.

(h) To do any and all things necessary or convenient to aid or cooperate in the planning, undertaking, construction or operation of any of the plans, projects or facilities of such Authority.

(i) To enter into agreements with such Authority respecting action to be taken by such county or municipality pursuant to any of the above powers. (1966, c. 271; 1987, c. 396)

§ 10. The Authority is hereby authorized to issue bonds from time to time in its discretion for the purpose of paying all or any part of the cost of any project within its service area or for the purpose of paying or refunding, at or prior to the maturity thereof, any bonds previously issued by the Authority, the Commonwealth or any agency or political subdivision thereof . The Authority may issue such types of bonds as it may determine, including (without limiting the generality of the foregoing) bonds payable as to principal and interest from any one or more of the following: (a) its revenues generally; (b) the income and revenues of a particular project (including revenues from the sale of or lease of such project); (c) the income and revenues of certain designated projects, whether or not they are financed in whole or in part from the proceeds of such bonds; (d) the proceeds of the sale or lease of any project or projects, whether or not they are financed from the proceeds of such bonds; (e) funds realized from the enforcement of security interests or other liens securing such bonds; (f) proceeds from the sale of bonds of the Authority; (g) payments due under letters of credit, policies of bond purchase agreements or other credit enhancements securing payment of bonds of the Authority; (h) any reserve or sinking funds created to secure such payment; or (i) other available funds of the Authority; however, bonds issued to finance the construction or acquisition of projects that are not operating projects of the Authority shall not be payable from revenues of the Authority generally or from any revenues derived from operating projects. "Bonds" as used in this act shall include bonds, notes, revenue certificates and other evidences of indebtedness.

"Cost" as used in the previous paragraph shall mean costs of construction, acquisition of lands, structures, rights-of-way, franchises, easements and other property rights and interests; costs of demolition, removal or relocation of buildings or structures; costs of labor, materials, machinery and all other kinds of equipment; financing charges; interest on bonds and other borrowing in connection with a project prior to and during construction thereof and for a period not exceeding one year after the completion of such construction; costs of engineering, financial and legal services, plans, specifications, studies, surveys, estimates of costs and of revenues, feasibility studies, administrative expenses, including administrative expenses during the start-up of any facility; provisions for working capital to be used in connection with any project; reserve funds

and other reserves for the payment of principal and interest on bonds; and all other expenses necessary, desirable or incidental to the construction and acquisition of projects, the financing of the same or placing of the same in operation.

Any such bonds may be additionally secured by a pledge of any grant or contribution from a participating political subdivision, the Commonwealth or any political subdivision, agency or instrumentality thereof, any federal agency or any unit, private corporation, copartnership, association, or individual, or a pledge of any income or revenues of the Authority, or a mortgage of or a deed of trust or other lien on or a security .interest in, any particular project or projects or other property of the Authority.

Neither the members of the Authority nor any person executing any bonds issued under the provisions of this act shall be liable personally on the bonds by reason of the issuance thereof. The bonds and other obligations of the Authority (and such bonds and obligations shall so state on their face) shall not be a debt of the Commonwealth or any political subdivision thereof and neither the Commonwealth nor any political subdivision thereof other than the Authority shall be liable thereon, nor shall such bonds or obligations be payable out of any funds or properties other than those of the Authority. The bonds shall not constitute an indebtedness within the meaning of any debt limitation or restriction. Bonds of the Authority are declared to be issued for an essential public and governmental purpose. (1966, c. 271; 1987, c. 396)

§ 11. Bonds of the Authority shall be authorized by resolution and may be issued in one or more series, shall be dated, shall mature at such time or times not exceeding forty years from their date or dates and shall bear interest payable at such time or times at such rate or rates, as may be determined by the Authority, or as may be determined in such manner as the Authority may provide, including the determination by agents designated by the Authority under guidelines established by the Authority, and may be made redeemable before maturity, at the option of the Authority at such price or prices and under such terms and conditions as may be fixed by the Authority prior to the issuance of the bonds. The Authority shall determine the form of the bonds, including any interest coupons to be attached thereto, and the manner of execution of the bonds, and shall fix the denomination or denominations of the bonds and the place or places of payment of principal and interest, which may be at any bank or trust company within or without the Commonwealth. In case any officer whose signature or a facsimile of whose signature shall appear on any bonds or coupons shall cease to be such officer before delivery of such bond, such signature or such facsimile shall nevertheless be valid and sufficient for all purposes the same as if he had remained in office until such delivery. Notwithstanding any of the other provisions of this act or any recitals in any bonds issued under the provisions of this act, all such bonds shall be deemed to be negotiable instruments under the laws of the Commonwealth. The bonds may be issued in coupon or registered form or both, as the Authority may determine, and provision may be made for the registration of any coupon bonds as to principal alone and also as to both principal and Interest, and for the reconversion into coupon bonds of any bonds registered as to both principal and Interest. Bonds issued in registered form may be issued under a system of book-entry for recording the ownership and transfer of ownership of rights to receive payments of principal of and premium, if any, and interest on such bonds. The Authority may contract for

the services of one or more banks, trust companies, financial institutions or other entities or persons, within or outside the Commonwealth, for the authentication, registration, transfer, exchange and payment of the bonds, or may provide such services itself. The Authority may sell such bonds in such manner, either at public or private sale, and for such price, as It may determine to be for the best interests of the Authority.

Prior to the preparation of definitive bonds the Authority may, under like restrictions, issue interim receipts or temporary bonds, with or without coupons, exchangeable for definitive bonds when such bonds shall have been executed and are available for delivery. The Authority may also provide for the replacement of any bonds which shall become mutilated or shall be destroyed or lost.

Bonds may be issued under the provisions of this act without obtaining the consent of any commission, board, bureau or agency of the Commonwealth or of any political subdivision, and without any other proceedings or the happening of other conditions or things than those proceedings, conditions or things which are specifically required by this act. (1966, c. 271; 1971, c. 97; 1987, c. 396)

§ 12. In the discretion of the Authority any bonds issued under the provisions of this act may be secured by a trust indenture by way of conveyance, deed of trust or mortgage of any project or any other property of the Authority, whether or not financed in whole or in part from the proceeds of such bonds, or by a trust agreement by and between the Authority and a corporate trustee, which may be any trust company or bank having the powers of a trust company within or without the Commonwealth or by both such conveyance, deed of trust or mortgage and indenture or trust agreement. Such trust indenture or agreement, or the resolution providing for the issuance of such bonds may pledge or assign fees, rents and other charges to be received. Such trust indenture or agreement, or resolution providing for the issuance of such bonds, may contain such provisions for protecting and enforcing the rights and remedies of the bondholders as may be reasonable and proper and not in violation of law, including covenants providing for the repossession and sale by the Authority or any trustees under any trust indenture or agreement of any project, or part thereof, upon any default under the lease or sale of such project, setting forth the duties of the Authority in relation to the acquisition of property and the construction, improvement, maintenance, repair, operation and insurance of any project or other property of the Authority, the amounts of fees, rents and other charges to be charged, the collection of such fees, rents, and other charges, and the custody, safeguarding and application of all moneys of the Authority, and conditions or limitations with respect to the issuance of additional bonds. It shall be lawful for any national bank with its main office in the Commonwealth or any other state or any bank or trust company incorporated under the laws of the Commonwealth or another state which may act as depository of the proceeds of such bonds or of other revenues of the Authority to furnish indemnifying bonds or to pledge such securities as may be required by the Authority. Such trust indenture or agreement or resolution may set forth the rights and remedies of the bondholders and of the trustee, and may restrict the individual right of action by bondholders.

In addition to the foregoing, such trust indenture or agreement or resolution may contain such other provisions as the Authority may deem reasonable and proper for the security of the bondholders, including, without limitation, provisions for the assignment to a corporate trustee or escrow agent of any rights of the Authority in any project owned by, or leases or sales of any projects made by, the Authority. All expenses incurred in carrying out the provisions of such

trust indenture or agreement or resolution or other agreements relating to any project, including those to which the Authority may not be a party, may be treated as a part of the cost of a project. (1966, c. 271; 1987, c. 396)

§ 13. The Authority is hereby authorized to fix, revise, charge and collect fees, rents and other charges for the use of any project. Such fees, rents and other charges shall be so fixed and adjusted as to provide a fund sufficient with other revenues to pay the principal and any interest on such bonds secured by or otherwise to be paid by such revenues, as the same shall become due and payable, to create reserves for such purposes and for other purposes of the Authority and to pay the cost of maintaining, repairing and operating the project. Such fees, rents and charges shall not be subject to supervision or regulation by any commission, board, bureau or agency of the Commonwealth or any such participating political subdivision. The fees, rents and other charges received by the Authority may be applied and set aside from time to time in the order and in the manner as may be provided in such resolution or trust indenture or agreement including application to a sinking fund which may be pledged to, and charged with, the payment of the principal of and the interest on such bonds as the same shall become due, and the redemption price or the purchase price of such bonds retired by call or purchase as therein provided. All pledges of such fees, rents and other charges to payment of bonds shall be valid and binding from the time when the pledge is made. The fees, rents and charges so pledged and thereafter received by the Authority shall immediately be subject to the lien of such pledge without any physical delivery thereof or further act, and the lien of any such pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Authority, irrespective of whether such parties have notice thereof. Neither the resolution nor any trust indenture by which a pledge is created need be filed or recorded except in the records of the Authority. The use and disposition of moneys to the credit of such sinking fund shall be subject to the provisions of the resolution authorizing the issuance of such bonds or of such trust indenture or agreement. Except as may otherwise be provided in such resolution or such trust indenture or agreement, such sinking fund shall be a fund for all such bonds without distinction or priority of one over another. (1966, c. 271; 1987, c. 396)

§ 14. All moneys received pursuant to the authority of this act, whether as proceeds from the sale of bonds or as revenues, shall be deemed to be trust funds to be held and applied solely as provided in this act. (1966, c. 271)

§ 15. Any holder of bonds, notes, certificates or other evidence of borrowing issued under the provisions of this act or of any of the coupons appertaining thereto, and the trustee under any trust indenture or agreement, except to the extent of the rights herein given may be restricted by such trust indenture or agreement, may, either at law or in equity, by suit, action, injunction, mandamus or other proceedings, protect and enforce any and all rights under the laws of the Commonwealth or granted by this act or under such trust indenture or agreement or the resolution authorizing the issuance of such bonds, notes or certificates, and may enforce and compel the performance of all duties required by this act or by such trust indenture or agreement or resolution to be performed by the Authority or by any officer or agent thereof, including the fixing, charging and collection of fees, rents and other charges. (1966, c. 271)

§ 16. The exercise of the powers granted by this act shall be in all respects for the benefit of the inhabitants of the Commonwealth, for the promotion of their safety, health, welfare, convenience and prosperity, and as the operation and maintenance of any project which the Authority is authorized to undertake will constitute the performance of an essential

governmental function, no authority shall be required to pay any taxes or assessments upon any project acquired and constructed by it under the provisions of this act; and the bonds, notes, certificates or other evidences of debt issued under the provisions of this act, their transfer and the income therefrom including any profit made on the sale thereof, shall at all times be free and exempt from taxation by the Commonwealth and by any political subdivision thereof. (1966, c. 271)

§ 17. Bonds issued by the Authority under the provisions of this act are hereby made securities in which all public officers and public bodies of the Commonwealth and its political subdivisions, all insurance companies, trust companies, banking associations, investment companies, executors, administrators, trustees and other fiduciaries may properly and legally invest funds, including capital in their control or belonging to them. Such bonds are hereby made securities which may properly and legally be deposited with and received by any State or municipal officer or any agency or political subdivision of the Commonwealth for any purpose for which the deposit of bonds or obligation is now or may hereafter be authorized by law. (1966, c. 271)

§ 18. This act shall constitute full and complete authority, without regard to the provisions of any other law, for the doing of the acts and things herein authorized, and shall be liberally construed to effect the purposes hereof. The provisions of this act are severable, and if any of its provisions shall be held unconstitutional by any court of competent jurisdiction, the decision of such court shall not affect or impair any of the other provisions of this act. (1966, c. 271)

5/17/2024 12:00:00

Exhibit B

**A** Neutral

As of: May 17, 2024 4:01 PM Z

## *DuPuy-German v. Perwaiz*

Circuit Court of the City of Chesapeake, Virginia

February 3, 2022, Decided

Case No. CL20-2667

**Reporter**

109 Va. Cir. 276 *; 2022 Va. Cir. LEXIS 10 **

Brittni DuPuy-German v. Javaid Perwaiz and Chesapeake Hospital Authority, d/b/a Chesapeake Regional Medical Center

## Core Terms

hospital authority, governmental function, sovereign immunity, political subdivision, municipal corporation, credentials, argues, entity, immune, hospital privileges

## Case Summary

### Overview

HOLDINGS: [1]-The court found that the process of granting credentials and hospital privileges to physicians was, at the very least, part of the "operation and maintenance" of the hospital authority, and therefore the legislative intent of the "Enabling Statute" (1966 Va. Acts ch. 271) was to deem such activities a governmental function; [2]-Assuming, without deciding, that the hospital authority was not an arm of the Commonwealth entitled to sovereign immunity, the express language of the statute left no doubt that the hospital authority had the attributes of a municipal corporation; [3]-The evaluation of the relevant standards of practice and a physicians' compliance therewith or departures therefrom involve significant discretion and therefore constitute a governmental function; [4]-The hospital authority had not forfeited its immunity.

### Outcome

The plea of sovereign immunity was sustained, and the hospital authority was dismissed from this case.

## LexisNexis® Headnotes

Torts > Public Entity

Liability > Immunities > Sovereign Immunity

*HN1*[⬇] **Immunities, Sovereign Immunity**

In a familiar refrain, the Supreme Court of Virginia has often stated that the doctrine of sovereign immunity is alive and well in Virginia.

Business & Corporate

Compliance > Healthcare > Business Administration & Organization

Healthcare Law > Business Administration & Organization

Business & Corporate

Compliance > Governments > Local Governments

Governments > Local Governments

*HN2*[⬇] **Healthcare, Business Administration & Organization**

Upon the creation of the Hospital Authority pursuant to 1966 Va. Acts ch. 271, as amended, the legislature deemed the Hospital Authority to be a "public body politic and corporate," created for the public purpose "to provide for the public health, welfare, convenience, and prosperity of the residents of the City of Chesapeake and such other persons who might be served by the Authority and to provide improved medical care and related services to such residents and persons." 1966 Va. Acts ch. 271, §§ 1, 3. The legislature further dictated that "the operation and maintenance of any project which the Authority is authorized to undertake will constitute the performance of an essential governmental function." 1966 Va. Acts ch. 271, § 16. A "project" is defined to include a hospital. 1966 Va. Acts ch. 271, § 4.

109 Va. Cir. 276, *276; 2022 Va. Cir. LEXIS 10, **10

Governments > Local Governments > Claims By & Against

**HN3[↓] Local Governments, Claims By & Against**

In Virginia, municipal corporations are immune from tort liability when performing governmental functions, but are not immune when exercising proprietary functions.

Governments > Local Governments > Claims By & Against

Torts > Public Entity Liability > Immunities > Sovereign Immunity

**HN4[↓] Local Governments, Claims By & Against**

The Supreme Court of Virginia has set forth a six factor test to determine whether an entity is a municipal corporation, as follows. (1) Creation as a body corporate and politic and as a political subdivision of the Commonwealth; (2) Creation to serve a public purpose; (3) Power to have a common seal, to sue and be sued, to enter into contracts, to acquire, hold, and dispose of its revenue, personal and real property; (4) Possession of the power of eminent domain; (5) Power to borrow money and issue bonds which are tax exempt, with interest on such bonds enjoying the same status under tax laws as the interest on bonds of other political subdivisions of the state; (6) Management of the corporation vested in a board of directors or a commission. The existence of sovereign immunity is a question of law.

Governments > Local Governments > Claims By & Against

**HN5[↓] Local Governments, Claims By & Against**

Neither the Commonwealth nor any political subdivision thereof other than the Authority shall be liable thereon. 1966 Va. Acts, ch. 271, § 1.

Business & Corporate Compliance > Healthcare > Business Administration & Organization
Healthcare Law > Business Administration & Organization

Governments > Local Governments > Claims By & Against

Healthcare Law > ... > Actions Against Facilities > Defenses > Immunities

**HN6[↓] Healthcare, Business Administration & Organization**

The Chesapeake Hospital Authority was created by the Virginia General Assembly directly. In Carter, the Court begins with the premise that the defendant was a political subdivision created by a locality pursuant to statutory authorization. The Court has held that such entities may be entitled to the status of a municipal corporation for purposes of immunity from tort liability in certain circumstances.

Governments > Local Governments > Claims By & Against

Healthcare Law > Business Administration & Organization > Hospital Privileges > Professional Review

**HN7[↓] Local Governments, Claims By & Against**

A proprietary function is a ministerial act and involves no discretion, such as those functions that comprise the routine maintenance or operation of a municipal service. A governmental function, on the other hand, entails the exercise of an entity's political, discretionary, or legislative authority. The granting of credentials and hospital privileges involves a great deal of discretion.

Business & Corporate Compliance > Healthcare
Healthcare Law

Governments > Local Governments > Claims By & Against

**HN8[↓] Business & Corporate Compliance, Healthcare**

The evaluation of the relevant standards of practice and a physicians' compliance therewith or departures therefrom involve significant discretion and therefore constitute a governmental function.

## Headnotes/Summary

109 Va. Cir. 276, *276; 2022 Va. Cir. LEXIS 10, **10

**Headnotes**

In this case, the defendant hospital was given governmental immunity from suit by a legislative act.

**Judges:** [**1] MARJORIE A. TAYLOR ARRINGTON, JUDGE.

**Opinion by:** MARJORIE A. TAYLOR ARRINGTON

# Opinion

[*276]   BY JUDGE MARJORIE A. TAYLOR ARRINGTON

This case was before the Court on January 19, 2022, to hear oral argument on the Plea of Sovereign Immunity filed by the Defendant, Chesapeake Hospital Authority, d/b/a Chesapeake Regional Medical Center ("the Hospital Authority"). The Court has considered the briefs in support, opposition, and reply, as well as the arguments of counsel.

The allegations of this case are set forth in *DuPuy-German v. Perwaiz, 106 Va. Cir. 279, 107 Va. Cir. 358*, and 108 Va. Cir. __ (Chesapeake City 2020-2021), in which this Court found that the Complaint filed by Plaintiff, Brittni Dupuy-German, stated a claim against the Hospital Authority for negligence both vicariously, as the employer of surgeon Javaid Perwaiz, M.D., and directly for breach of the Hospital's duty to exercise reasonable care in granting and reviewing the surgeon's credentials and hospital privileges. After having extensively briefed and argued its rather novel and complex demurrer, necessitating a ruling by the Court, the Hospital now brings this relatively simple and straightforward Plea of Sovereign Immunity. The Court finds that the plea is dispositive, and dismisses the Hospital Authority [**2] from the case for the reasons that follow.

*HN1*[⬆] In a familiar refrain, the Supreme Court of Virginia has often stated that "[t]he doctrine of sovereign immunity is 'alive and well' in Virginia." *City of Chesapeake v. Cunningham, 268 Va. 624, 633, 604 S.E.2d 420, 426 (2004)* (citing *Niese v. City of Alexandria, 264 Va. 230, 238, 564 S.E.2d 127, 132 (2002)* (quoting *Messina v. Burden, 228 Va. 301, 307, 321 S.E.2d 657, 660 (1984)*)). In this case, sovereign immunity is conferred on the Hospital Authority not only according to the common law, but by an Act of the Virginia General Assembly. The Plaintiff asks the Court to circumvent [*277] precedent and circumscribe the legislature to deprive the Hospital Authority of immunity, which it is without authority to do.

**I.** *Is the Hospital Authority a Municipal Corporation*

*HN2*[⬆] Upon the creation of the Hospital Authority pursuant to 1966 Acts of Assembly, chapter 271, as amended, which the parties have referred to as the "Enabling Statute," the legislature deemed the Hospital Authority to be a "public body politic and corporate," created for the public purpose "to provide for the public health, welfare, convenience, and prosperity of the residents of the City of Chesapeake and such other persons who might be served by the Authority and to provide improved medical care and related services to such residents and persons." *Id.* at §§ 1, 3. The legislature further dictated that "the operation [**3] and maintenance of any project which the Authority is authorized to undertake will constitute the performance of an essential governmental function." *Id.* at § 16. A "project" is defined to include a hospital. *Id.* at § 4.

The Court finds that the process of granting credentials and hospital privileges to physicians is, at the very least, part of the "operation and maintenance" of the Hospital Authority, and therefore the legislative intent of the Enabling Statute was to deem such activities a governmental function. *Id.* at 16. The Plaintiff, however, argues that the legislature does not have authority to dictate what activities constitute governmental functions, and therefore it is necessary for this Court to not only revisit that inquiry, but also to determine whether the Hospital Authority is a municipal corporation entitled to sovereign immunity for any function at all.

*HN3*[⬆] In Virginia, "[m]unicipal corporations are immune from tort liability when performing governmental functions, but are not immune when exercising proprietary functions." *Carter v. Chesterfield County Health Comm'n, 259 Va. 588, 590, 527 S.E.2d 783, 785 (2000)* (citing *City of Richmond v. Long's Adm'rs, 58 Va. (17 Gratt.) 375, 379 (1867)*, rev'd on other grounds, *First Va. Bank-Colonial v. Baker, 225 Va. 72, 301 S.E.2d 8 (1983)*). Assuming, without deciding, that the Hospital Authority is not an arm of the Commonwealth entitled to sovereign immunity, [**4] the express language of the statute leaves no doubt that the Hospital Authority has the attributes of a municipal corporation. *HN4*[⬆] The Supreme Court of Virginia has set forth a six factor test to determine whether an entity is a municipal corporation, as follows:

(1) Creation as a body corporate and politic and as a political subdivision of the Commonwealth;

(2) Creation to serve a public purpose;

 [*278] (3) Power to have a common seal, to sue and be sued, to enter into contracts, to acquire, hold, and dispose of its revenue, personal and real property;

(4) Possession of the power of eminent domain;

(5) Power to borrow money and issue bonds which are tax exempt, with interest on such bonds enjoying the same status under tax laws as the interest on bonds of other political subdivisions of the state;

(6) Management of the corporation vested in a board of directors or a commission. *Richmond v. Richmond Metro. Auth., 210 Va. 645, 647, 172 S.E.2d 831, 832 (1970)*. "The existence of sovereign immunity is a question of law." *Cunningham, 268 Va. at 633, 604 S.E.2d at 426*. In its prior opinion, *Dupuy-German v. Perwaiz, 108 Va. Cir. 183 (June 8, 2021)*, this Court noted that the *Richmond Metropolitan* Court "determined whether an entity was a municipal corporation based solely on the legislation creating that entity," and that "the Enabling Statute expressly confers all six of the characteristics [**5] enumerated in *Richmond Metropolitan Authority.*" *Id.* at __.

The arguments that the Plaintiff advances in support of this plea have not persuaded the Court otherwise. Regarding the first factor in the *Richmond Metropolitan* rule, Plaintiff argues that the Enabling Statute does not create a political subdivision of the Commonwealth because section 1 thereof employs only the term "body politic and corporate," and not "political subdivision." In *County of York v. Peninsula Airport Comm'n, 235 Va. 477, 369 S.E.2d 665, 4 Va. Law Rep. 2976 (1988)*, the Supreme Court of Virginia addressed the same issue, holding that, while the statute creating an airport authority did not expressly state that the authority was a "political subdivision," it did state that "neither the Commonwealth nor any *political subdivision thereof other than the commission* shall be liable" on its bonds and obligations. *Id. at 481, 369 S.E.2d at 667* (emphasis in original) (quoting 1946 Va. Acts, ch. 22, § 8). *HN5*[⬆] Likewise, the Enabling Statute states that "neither the Commonwealth nor any *political subdivision thereof other than the Authority* shall be liable thereon. . . ." 1966 Va. Acts, ch. 271, § 1 (emphasis added).

Regarding the second factor in the *Richmond Metropolitan* rule, Plaintiff argues that the legislature did

not create the Hospital Authority to serve a public purpose because it failed to identify a public [**6] need for a hospital. The *Hospital Authorities Act, Va. Code § 15.2-5300, et seq.* (the "HAA") enables a locality to create a hospital authority, but requires that it declare "that there is need for an authority to function in the city." Unlike those authorities created by a locality pursuant to the HAA, such [*279] as the authority in *Carter v. County Health Comm'n, 259 Va. 588, 527 S.E.2d 783 (2000)*, *HN6*[⬆] the Chesapeake Hospital Authority was created by the Virginia General Assembly directly. In *Carter*, the Court begins with the premise that the defendant was "a political subdivision created by a locality pursuant to statutory authorization. We have held that such entities may be entitled to the status of a municipal corporation for purposes of immunity from tort liability in certain circumstances." *Carter, 259 Va. at 590, 527 S.E.2d at 784-85*. In that case, the parties agreed that the defendant was a municipal corporation and there was no analysis of this issue. Plaintiff cites no constitutional or other authority which would limit the legislative power in the same way that the HAA limits a locality. The Enabling Statute clearly states the public purpose for the Hospital Authority, as noted above.

II. *Is the Act of Granting Credentials and Hospital Privileges a Governmental Function?*

Plaintiff argues that the activities at issue in this case are, at best, part of [**7] the operation and maintenance of a municipal service, and that the Court should disregard the Enabling Statute's language deeming "operation and maintenance" a governmental function and rule that they are a proprietary function instead. In *Virginia Electric & Power Co. v. Hampton Redevelopment & Housing Auth., 217 Va. 30, 225 S.E.2d 364 (1976)*, the Supreme Court of Virginia held that:

> [t]o the extent, however, that the statutory language in question might constitute a legislative declaration that, for tort immunity purposes, the activities of a housing authority are governmental functions, the declaration is not conclusive; the courts are not thereby precluded from looking behind the declaration to ascertain the true nature of the functions.

*Id. at 35, 225 S.E.2d at 368*. *HN7*[⬆] A proprietary function is a "ministerial act and involves no discretion," such as those functions that comprise the "routine maintenance or operation of a municipal service." *Cunningham, 268 Va. at 634, 604 S.E.2d at 426, 427*. A governmental function, on the other hand, "entails the

exercise of an entity's political, discretionary, or legislative authority." *Id. at 634, 604 S.E.2d at 426*. The granting of credentials and hospital privileges involves a great deal of discretion. Plaintiff's own allegations implicate a failure of that discretion by pleading that the Hospital Authority "either never evaluated the appropriateness **[**8]** of Dr. Perwaiz's care, including his significant departures from generally accepted standards of practice, or it failed to conduct a reasonable and prudent evaluation of Dr. Perwaiz's departures from generally accepted standards of practice and his ability and/or willingness to comply with generally accepted standards of practice." Complaint at para. 62. **HN8**[⬆] The evaluation of the relevant standards **[*280]** of practice and a physicians' compliance therewith or departures therefrom involve significant discretion and therefore constitute a governmental function.

In a related argument, Plaintiff asserts that, because the Enabling Statute does not expressly confer the power to grant credentials and hospital privileges, the Hospital Authority is not performing a governmental function when doing so. Plaintiff compares the Enabling Statute to the HAA, which expressly grants hospital authorities created thereunder the "power to determine and regulate the conditions under which the privilege of practicing within any hospital operated by the authority may be available to physicians." *Va. Code § 15.2-5332*. While the Enabling Statute does not contain similar language, the power to grant and revoke physicians' privileges is essential **[**9]** and indispensable to safely running a hospital. Indeed, the Plaintiff herself has alleged as much in asserting that the Hospital Authority has an affirmative "non-delegable duty to perform corporate and administrative functions, such as credentialing and privileging, in accordance with the standards of practice among similar health care providers." (Complaint at para. 11.)

III. *Has the Hospital Authority Forfeited Its Immunity*?

Plaintiff also argues that the Hospital forfeited sovereign immunity in general because it operates locations outside of Virginia, which the Enabling Statute does not authorize it to do. However, even assuming the operation of other locations was not a governmental function, this case does not arise out of any action by the Hospital Authority at those locations. Plaintiff cites no cases holding that, when an immune entity exceeds its authority or territorial limits by some acts, it forfeits sovereign immunity for all other acts.

Finally, Plaintiff asks this Court to distinguish precedent

extending sovereign immunity to public hospitals exercising a governmental function because the Hospital Authority is an entire "healthcare system." It argues that its extensive **[**10]** profits and commercial enterprise make all of the Hospital Authority's acts proprietary, and this Court should consider a "sea change" in the law governing sovereign immunity in the healthcare industry. The Court disagrees, and declines the invitation to make new law on this question, which may be more appropriately addressed on appeal.

For the foregoing reasons, the Plea of Sovereign Immunity is sustained, and Chesapeake Hospital Authority is dismissed from this case.

---

**End of Document**

Exhibit C

VIRGINIA:    IN THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE

MARIA FERNANDEZ-BECERRA,

        Plaintiff,

v.                                                    Case No.CL20-5901

JAVAID A. PERWAIZ, M.D., et al.,

        Defendants

## ORDER

    This matter came before the Court on Defendant Chesapeake Hospital Authority d/b/a Chesapeake Regional Medical Center ("Defendant CHA")'s Plea of Sovereign Immunity. The parties filed briefs in support of the written Plea and in opposition and reply thereto, and the Court heard argument on September 15, 2021.

    Wherefore, upon consideration of the written Plea, the memoranda of law in support and in opposition thereto, the arguments of counsel in open court, and all relevant authority, it is hereby:

    ORDERED that Defendant CHA's Plea in Bar of Sovereign Immunity is hereby SUSTAINED AND GRANTED for the reasons stated on the record in open Court. This action is therefore DISMISSED WITH PREJUDICE as to Defendant CHA only, and will proceed against the remaining defendants.

    IT IS SO ORDERED.

Entered this _7TH_ day of ~~September~~ October 12, 2021

The Honorable Judge Robert G. MacDonald

CERTIFIED TO BE A TRUE COPY OF THE RECORD IN MY CUSTODY
ALAN P. KRASNOFF CLERK
CIRCUIT COURT, CHESAPEAKE, VA
BY: _____
DEPUTY CLERK

1/2

I ASK FOR THIS:

_____

Jason R. Davis, Esq., VSB #37917
jrdavis@kaufcan.com
John M. Bredehoft, Esq., VSB #33602
jmbredehoft@kaufcan.com
Lauren S. Kadish, Esq., VSB #92822
lskadish@kaufcan.com
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
(757) 624-3000
(888) 360-9092 – Facsimile
*Counsel for Defendant Chesapeake Hospital Authority*
*d/b/a Chesapeake Regional Medical Center*


SEEN AND OBJECTED TO FOR THE REASONS
STATED IN THE WRITTEN OPPOSITION TO THE
PLEA IN BAR AND IN OPEN COURT:

_____

Kevin Biniazan, Esq. (VSB #92109)
Breit Cantor Grana Buckner, PLLC
Town Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
kbiniazan@breitcantor.com
*Counsel for Plaintiff Maria Fernandez-Becerra*


SEEN:

_____

Rodney S. Dillman, Esq. (VSB #46803)
Julie C. Mayer, Esq. (VSB #78377)
HANCOCK, DANIEL & JOHNSON, P.C.
One Columbus Center
283 Constitution Drive, Suite 301
Virginia Beach, VA 23462
rdillman@hancockdaniel.com
jmayer@hancockdaniel.com
*Counsel for Defendant Javaid Perwaiz, M.D.*
*and Javaid A. Perwaiz, M.D., P.C.*

2/2

19830646v1

Exhibit D

# COMMONWEALTH OF VIRGINIA

EDWARD W. HANSON, JR.
A. BONWILL SHOCKLEY
H. THOMAS PADRICK, JR.
STEPHEN C. MAHAN
WILLIAM R. O'BRIEN
LESLIE L. LILLEY
GLENN R. CROSHAW



CIRCUIT COURT
CITY OF VIRGINIA BEACH
JUDICIAL CENTER, BLDG. 10
2425 NIMMO PARKWAY
VIRGINIA BEACH, VA 23456-9017
(757) 385-4501
www.vbgov.com/courts

## SECOND JUDICIAL CIRCUIT

Direct Dial # 385-8680

July 18, 2014

Mark E. Warmbier, Esq.
Kaufman & Canoles, P.C.
150 West Main Street
Suite 2100
Norfolk, VA 23510

Raymond L. Hogge, Esq.
Hogge Law
500 East Plume Street
Suite 800
Norfolk, VA 23510

Re: *Lizbeth Holdstein v. Chesapeake Hospital Authority, et al.*
Case No.: CL13-1019

Dear Counsel:

The parties came before the court on June 10, 2014 on Defendant Chesapeake Hospital Authority's Plea in Bar and Defendant Andrew McWhorter's Demurrer. All actions regarding Defendant Tiffany Sturtsman have been stayed. After the hearing, Plaintiff submitted a brief, which the court received on June 12, 2014 and Defendant Chesapeake Hospital Authority submitted a brief which the court received on June 17, 2014. The court has considered the arguments of counsel and the parties' briefs and finds as follows.

This action arises from statements about Lizbeth Holdstein (Plaintiff) made by defendant Andrew McWhorter (McWhorter) and defendant Tiffany Sturtsman (Sturtsman) to defendant Chesapeake Hospital Authority (CHA), as well as statements about Plaintiff made by CHA to the Virginia Department of Health Professions (DHP).

This matter was heard by Judge Mahan on June 11, 2013 on Defendants' demurrers to the initial complaint and on CHA's plea in bar for sovereign immunity. On



REC'D JUL 2 2 2014

October 16, 2013 Judge Mahan issued an opinion denying the pleas in bar of the individual defendants and overruling CHA's plea in bar. In that opinion, Judge Mahan found that the court could not conclude that CHA has met its burden of establishing that it is entitled to sovereign immunity as a matter of law, as CHA could not establish that it meets all the criteria to be a municipal corporation (specifically, CHA could not establish that it has the power to issue tax-exempt bonds).

Plaintiff filed her First Amended Complaint on July 26, 2013. Defendant CHA filed a second plea in bar as to all claims against it. Defendant McWhorter has demurred to the tortious interference and intentional infliction of emotional distress claims against him.

### 1. CHA's Plea in Bar

CHA filed a plea in bar for sovereign immunity arguing it is entitled to absolute immunity to all claims against it because it is a public body politic and corporate entity acting in a governmental function.

"A 'hospital authority,' even though a local government subdivision, is considered a municipal corporation and enjoys tort immunity if it possesses six distinct criteria and performs a 'governmental' function." *Hughes v. Lake Taylor City Hospital*, 54 Va. Cir. 239, 240 (Norfolk Cir. 2000) (citing *Richmond v. Metropolitan Authority*, 210 Va. 645 (1970)).

The six criteria "essential to viability as a municipal corporation" are:

1) Creation as a body corporate and politic and as a political subdivision of the Commonwealth;
2) Created to serve a public purpose;
3) Power to have a common seal, to sue and be sued, to enter into contracts, to acquire, hold and dispose of its revenue, personal and real property;
4) Possession of the power of eminent domain;
5) Power to borrow money and issue bonds which are tax exempt;
6) Management of the corporation vested in a board of directors or a commission

*See Richmond Metropolitan*, 210 Va. 645, 647 (1970)

The only criterion presently at issue is the power to issue tax exempt bonds. Judge Mahan's October 16, 2013 opinion denied the Plea in Bar, stating that the court was unable to conclude that CHA had this power. CHA now alleges that it previously

relied on an incomplete version of the Enabling Statute and that it now has a complete copy, which does contain such a power.

The complete 1966 Enabling statute, which has now been submitted, under which CHA was created contains eighteen sections. Section 8 of the enabling statute states: "The Authority may borrow money and issue bonds as hereinafter provided." The Authority's powers and limitations regarding issuing bonds are discussed in § 10 of the enabling statute, which is silent as to the authority to issue bonds that are exempt from taxes. However, Section 16 of the Enabling Statute includes the grant of authority to issue tax exempt bonds. The version of the Enabling Statute on which CHA relied in the earlier hearing before Judge Mahan on their first plea in bar did not contain Section 16. **Because CHA has now produced the complete Enabling Statute which does grant CHA the power to issue tax exempt bonds, the court finds that CHA is a public body entitled to assert the defense of sovereign immunity in appropriate circumstances.**

Whether CHA is entitled to sovereign immunity also involves analysis of whether it was performing a governmental or proprietary function. Virginia has held that municipal corporations are immune from liability in tort for discretionary/governmental functions, but not necessarily for ministerial/proprietary functions. *See Freeman v. City of Norfolk*, 221 Va. 57, 60 (1980). Case law has defined proprietary as "a ministerial act [that] involves no discretion". *City of Chesapeake v. Cunningham*, 268 Va. 624, 634-35 (2004). In contrast, a governmental function requires the exercise of discretion and the making of a judgment by the Commonwealth.[1] *Freeman*, 221 Va. at 60.

Plaintiff's specific claim centers around CHA's statutory duty to report Plaintiff's alleged conduct to DHP under Va. Code § 54.1-2400.6(A). Plaintiff has characterized CHA's statutory duty to report Plaintiff's alleged conduct to DHP as ministerial; however, the Supreme Court of Virginia has rejected such a theory. In *Niese v. City of Alexandria*, 264 Va. 230 (2002), the plaintiff alleged that she reported to a Department of Mental Health counselor that she had been raped by a city police officer. That counselor did not report the rape to local law enforcement, which the plaintiff alleged

---

[1] Several courts, including the Supreme Court of Virginia, have held that hospital authorities and cities perform governmental functions in the operation of hospitals, nursing homes, and emergency ambulance services because they are functions that involve preservation of public health. *See, e.g., Hughes v. Lake Taylor City Hospital*, 54 Va. Cir. 239 (Norfolk 2000); *Carter v. Chesterfield County Health Commission*, 259 Va. 588 (2000); *Stevens v. Hospital Authority of the City of Petersburg*, 42 Va. Cir. 321 (Richmond 1997); *Edwards v. Portsmouth, et al.*, 237 Va. 167 (1989).

was in violation of Va. Code § 63.2-55.3.[2] The plaintiff argued that the city did not enjoy sovereign immunity because the duty of the counselor was ministerial. The court disagreed, stating:

> [Plaintiff's] characterization of the reporting requirement as "ministerial" is incorrect. The words, "who has reason to suspect that an adult is an abused, neglected or exploited adult," in Code § 63.1-55.3(A), require the exercise of judgment and discretion in concluding that a report must be made. While individual cases may present patently obvious circumstances where reporting must take place, other cases may be subtle and more questionable. We must focus upon the statute and not the circumstances in this case to determine whether the statutory duty is ministerial. We hold that the provisions of Code § 63.1-55.3 applicable to this case impose a discretionary duty and not a ministerial duty upon those individuals with reporting requirements.

*Niese*, 264 Va. at 241.

The case at bar involves a code section with a reporting requirement much like Va. Code § 63.1-55.3. In this case, CHA was required under Code § 54.1-2400.6(A) to submit a report to DHP if, after a reasonable investigation, CHA found a reasonable probability that unprofessional conduct occurred. Therefore, like the statute in *Niese*, Code § 54.1-2400.6(A) is not ministerial and requires the exercise of judgment and discretion in making the report.

Plaintiff also seeks to hold CHA vicariously liable for the tortious acts of McWhorter under the doctrine of respondeat superior. In *Hatch v. Musgrove*, 50 Va. Cir. 544 (Norfolk 1996), the Norfolk Circuit Court held that a city enjoys sovereign immunity for its employees' intentional torts, as well as its employees' negligence. The court stated:

> The Supreme Court of Virginia has never expressly held that the defense of sovereign immunity applies against intentional torts. It has, however, stated . . . that a city performing a governmental function is not responsible for the misconduct, negligence or omissions of the agents employed.

---

[2] This code section, which is now found in Code 63.2-1606(A), requires that mental health professionals who have "reason to suspect that an adult is abused, neglected or exploited" must immediately report the suspected abuse to the local department where the abuse is believed to have occurred.

*Hatch*, 50 Va. Cir. at 545 (citing *Richmond v. Long's Adm'rs*, 58 Va. 375, 378-79, 384 (1867); Ashbury v. Norfolk, 152 Va. 278, 291 (1929).

The court finds that CHA enjoys sovereign immunity for the claims directly against it, as well as the claims of vicarious liability for McWhorter's tortious acts. **Therefore, the Plea in Bar is granted and all claims against CHA should be dismissed.**

### 2. Demurrers of Individual Defendants

Defendant McWhorter has demurred to the tortious interference and intentional infliction of emotional distress claims. "A demurrer tests the legal sufficiency of facts alleged in pleadings, not the strength of proof. We accept as true all facts properly pleaded in the bill of complaint and all reasonable and fair inferences that may be drawn from those facts." *Hubbard v. Dresser, Inc.*, 271 Va. 117, 119 (2006) (citations omitted).

#### a. Tortious Interference

In order to state a claim for tortious interference with a business expectancy, a plaintiff must establish:

1. The existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff;
2. Defendant's knowledge of the relationship or expectancy;
3. A reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and
4. Damage to plaintiff.

Additionally, in order to state a claim for tortious interference with prospective economic advantage, a plaintiff must demonstrate that the defendant employed improper methods, such as conduct that is illegal or independently tortious, violence, threats or intimidation, bribery, fraud, misrepresentation or deceit, defamation, duress, undue influence, or breach of a fiduciary relationship.

The court finds that Plaintiff's allegations plead facts sufficient to state a claim for tortious interference. **As such, Defendant McWhorter's demurrer to the tortious interference claim is overruled.**

*Lizbeth Holdstein v. Chesapeake Hospital Authority, et al*
July 18, 2014
Page | 6

b.  Intentional Infliction of Emotional Distress

A claim for intentional infliction of emotional distress has four elements:

1. Defendant's conduct was intentional or reckless;
2. The conduct was outrageous and intolerable;
3. There was a causal connection between the wrongdoer's conduct and the emotional distress; and
4. The emotional distress was severe

*Harris v. Kreutzer*, 271 Va. 188, 203 (2006). This tort requires allegations of conduct that goes beyond "all possible bounds of decency…" *Id.* (internal citations omitted). Additionally, the facts must allege the injury is extreme, "so severe that no reasonable person could be expected to endure it." *Id.*

The court finds that Plaintiff has alleged sufficient facts to state a claim for intentional infliction of emotional distress. **Therefore, Defendant McWhorter's demurrer to the intentional infliction of emotional distress claim is overruled.**

Counsel for Plaintiff is requested to circulate the attached order for endorsement and arrange for the endorsed version to be submitted to the court for entry within 14 days.

Very truly yours,

Leslie L. Lilley
Presiding Judge

LLL:ec:dls

VIRGINIA:   IN THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH

LIZBETH HOLDSTEIN

     Plaintiff,

v.

                                Case No.:   CL13-1016

CHESAPEAKE HOSPITAL AUTHORITY,
ET AL.,

     Defendant(S).

## ORDER

This matter came before the court on Defendant Chesapeake Hospital Authority's Plea in Bar and Defendant McWhorter's Demurrer.

It is **ORDERED** that Defendant Chesapeake Hospital Authority's Plea in Bar is granted and all claims against Chesapeake Hospital Authority are dismissed.

It is **ORDERED** that Defendant McWhorter's Demurrer as to the Tortious Interference and Intentional Infliction of Emotional Distress Claims is overruled.

Enter this 15th day of Aug 2014

_signature_
Leslie L. Lilley
Judge

CERTIFIED TO BE A TRUE COPY
OF RECORD IN MY CUSTODY
TINA E.SINNEN, CLERK CIRCUIT COURT
VIRGINIA BEACH , VA
BY _signature_
DEPUTY CLERK

_signature_
Raymond L. Hogge
Counsel for Plaintiff

Seen and objected to by Plaintiff as to granting of Plea in Bar and dismissal of claims against Chesapeake Hospital Authority for the reasons previously stated in the pleadings and on the record.

_signature_
Mark E. Warmbier
Counsel for Defendants

Seen and objected to by Defendant McWhorter as to overruling of Demurrer for the reasons stated in papers and oral argument.

Exhibit E

VIRGINIA: IN THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE

BARBARA JAMES,

        Plaintiff,

          v.                           LAW NO.  CL96-1259
                                           LAW NO.  CL96-1197

CHESAPEAKE GENERAL HOSPITAL
and NELSON SANTIAGO, RT,

        Defendant.

### ORDER

THIS DAY came defendants, Chesapeake General Hospital and Nelson Santiago, RT, by counsel, and moved this Honorable Court grant their Special Plea to Sovereign Immunity.  Upon review of the legal briefs submitted;  upon argument of counsel;  and further for good cause shown, it is hereby

ORDERED, ADJUDGED and DECREED that the defendants, Chesapeake General Hospital and Nelson Santiago, RT, are sovereignly immune from this tort claim sounding in negligence.  The Court hereby incorporates its Letter Opinion of July 8, 1997, as if recited herein.

Entered: _____ 3/25/98

Honorable Russell I. Townsend

WE ASK FOR THIS:

Robert E. Moreland, Esq.,
counsel for defendants

SEEN AND OBJECTED TO:

Raymond H. Strople, Esq.,
counsel for plaintiff

VIRGINIA: IN THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE

BARBARA JAMES,

    Plaintiff,

v.                                                    AT LAW NO. CL96-1197
                                    CONSOLIDATED WITH CL 96-1259

CHESAPEAKE GENERAL HOSPITAL and
NELSON SANTIAGO,

    Defendant.

## **NOTICE OF APPEAL**

TAKE NOTICE that Barbara James files her Notice of Appeal from the Court

Order entered in this cause on March 25, 1998 holding that Chesapeake General

Hospital and Nelson Santiago are sovereignly immune from a tort claim sounding

in negligence.

A copy of the transcript of the hearing before the Court on June 11, 1997

has been ordered from the Court Reporter who reported same and will be

hereinafter filed along with any other incidents of trial in accordance with the

Rules of Court.

                                  BARBARA JAMES

                                  BY _____
                                     OF COUNSEL

Raymond H. Strople, Esquire
MOODY, STROPLE & KLOEPPEL, INC.
500 Crawford Street, Suite 300
Post Office Box 1138
Portsmouth, VA  23705
(757) 393-4093

# Virginia Courts Case Information

[ Name List ]   [ Main Menu ]   [ Logoff ]

## Supreme Court of Virginia
### Appeals

## Case Information

| | |
|---|---|
| **Case Number:** 981225 | **Case Type:** CIVIL |
| **Appellant:** JAMES, BARBARA | **Appellee:** CHESAPEAKE GENERAL HOSPITAL, ET |
| **Second Appellant:** | |
| **Lower Court:** CITY OF CHESAPEAKE | |
| **Record Received:** 06/26/98 | |

## Petition for Appeal

| | | |
|---|---|---|
| **Petition for Appeal Received:** 06/22/98 | | |
| **Brief in Opposition Received:** 07/10/98 | **Received:** | **Received:** |
| **Reply Brief Received:** | | |
| **Certificate of Appeal:** | | |
| **CSA Oral Argument:** | | |
| **Panel Date:** 09/02/98 | | |
| **Disposition Date:** 09/08/98 | **Disposition:** REFUSED | |
| **Petition for Rehearing Received:** | | |
| **Petition for Rehearing Date:** | **Decision:** | |

## Appeal

| | | |
|---|---|---|
| **Opening Brief Received:** | | |
| **Appendix Received:** | | |
| **Appellee Brief Received:** | **Received:** | **Received:** |
| **Reply Brief Received:** | | |
| **Amicus Curiae Received:** | **Received:** | |
| **Session:** | | |
| **Disposition Date:** | **Disposition:** | |
| **Notice of Rehearing Received:** | | |
| **Petition for Rehearing Received:** | | |
| **Petition for Rehearing Date:** | **Decision:** | |

VIRGINIA: IN THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE

BARBARA JAMES,

    Plaintiff,

        v.
                         LAW NO. CL96-1259
                         LAW NO. CL96-1197

CHESAPEAKE GENERAL HOSPITAL
and NELSON SANTIAGO, RT,

    Defendant

### ORDER

    THIS DAY came defendants, Chesapeake General Hospital and Nelson Santiago, RT, by counsel, and moved this Honorable Court grant their Special Plea to Sovereign Immunity. Upon review of the legal briefs submitted; upon argument of counsel; and further for good cause shown, it is hereby

    ORDERED, ADJUDGED and DECREED that the defendants, Chesapeake General Hospital and Nelson Santiago, RT, are sovereignly immune from this tort claim sounding in negligence. The Court hereby incorporates its Letter Opinion of July 8, 1997, as if recited herein.

                               Entered: 3/25/98
                               Honorable Russell I. Townsend

WE ASK FOR THIS:

Robert B. Moreland, Esq.,
counsel for defendants

SEEN AND OBJECTED TO:

Raymond H. Strople, Esq.,
counsel for plaintiff

Exhibit F

VIRGINIA:    IN THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE

DONALD G. BROOKS,

                Plaintiff,

v.

A. JAMALI, M.D.,
et al,

                Defendants.

LAW DOCKET
NO. 19807-M

## O R D E R

THIS DAY came the parties, by counsel, upon the plea of
sovereign immunity and motion to dismiss filed by the defendant
Chesapeake Hospital Authority, t/a Chesapeake General Hospital,
and was argued by counsel.

And, it appearing to the Court that Chesapeake General
Hospital is a hospital authority and is therefore immune from
suit;

It is ORDERED, ADJUDGED, and DECREED that the
defendant's plea of sovereign immunity and motion to dismiss



is sustained and that Chesapeake General Hospital be dismissed from this action.

ENTER: 7/31/55

Judge Farra
Judge

I ask for this:

Counsel for Chesapeake General Hospital

Seen:

Counsel for Donald G. Brooks

Counsel for A. Jamali, M.D.

2

Exhibit G

VIRGINIA:  IN THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
ON THE 4TH DAY OF JUNE, 1985.

LILLIE H. JENNINGS,

        Plaintiff,

v.                            At Law No. 19676 M

CHESAPEAKE GENERAL HOSPITAL,

        Defendant.

## ORDER OF DISMISSAL

Upon consideration of defendant Chesapeake Hospital Authority t/a Chesapeake General Hospital's Plea of Sovereign Immunity to the Motion for Judgment filed against it on November 16, 1984, and upon consideration of oral argument and briefs by counsel; and

After review of the case law and upon consideration of the prior rulings of this Court holding the hospital immune from tort liability,

It is hereby ORDERED, ADJUDGED and DECREED that Chesapeake General Hospital's Plea of Sovereign Immunity is sustained, its Motion to Dismiss is granted, and further, that this case be and hereby is DISMISSED, with prejudice.

                          ENTERED:  6/4/85

                        s/ Russell I. Townsend, Jr.
                        Judge

I Ask For This:

_Michael Inglowf_ p.d.

Seen and Objected to:

_R. Co___f___ p.g.

A COPY, TESTE: LILLIE H. GUY, CLERK
BY _____ D.C.

Exhibit H

*VIRGINIA:*

*In the Supreme Court of Virginia held at the Supreme Court Building in the*

*City of Richmond on*     Thursday   *the*   21st   *day of*     June, 1984.

Pearlie Holloman,                                              Appellant,

   against          Record No. 840237
                    Circuit Court No. L-18202-M

Chesapeake Hospital Authority,
  d/b/a, etc.,                                                 Appellee.


            From the Circuit Court of the City of Chesapeake


            Upon review of the record in this case and consideration
of the argument submitted in support of and in opposition to the
granting of an appeal, the Court is of opinion there is no
reversible error in the judgment complained of.  Accordingly, the
Court refuses the petition for appeal.  Code § 8.01-675.


                        A Copy,

                        Teste:

                                Patricia L. Harrington, Clerk

                        By:
                             *Ebby Edwards*
                             Deputy Clerk

VIRGINIA:    IN THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE

PEARLIE HOLLOMAN,

                          Plaintiff,

v.                                                          AT LAW NO.

CHESAPEAKE HOSPITAL AUTHORITY
d/b/a CHESAPEAKE GENERAL HOSPITAL,                          18202-M

                          Defendant.


                          O R D E R

        THIS DAY came the parties, by counsel, upon the plea
of sovereign immunity and motion to dismiss filed herein by
defendant, Chesapeake Hospital Authority, t/a Chesapeake General
Hospital, and was argued by counsel.

        And, it appearing to the Court that Chesapeake General
Hospital is a hospital authority and is therefore immune from
suit;

        It is ORDERED, ADJUDGED, and DECREED that the defendant's
plea of sovereign immunity and motion to dismiss is sustained and
that Chesapeake General Hospital be dismissed from this action.

                          ENTER: 11-16-83

                          _____
                                          Judge

I ask for this:

_____
Counsel for Chesapeake
General Hospital


CERTIFIED TO BE A TRUE COPY
OF THE RECORD IN MY CUSTODY,
FAYE W. MITCHELL, CLERK
CIRCUIT COURT, CHESAPEAKE, VA
BY:_____
          DEPUTY CLERK

## VIRGINIA:

*In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond on* Thursday *the* 21st *day of* June, 1984.

Pearlie Holloman,                                          Appellant,

  against       Record No. 840237
                Circuit Court No. L-18202-M

Chesapeake Hospital Authority,
 d/b/a, etc.,                                              Appellee.

From the Circuit Court of the City of Chesapeake

      Upon review of the record in this case and consideration of the argument submitted in support of and in opposition to the granting of an appeal, the Court is of opinion there is no reversible error in the judgment complained of.  Accordingly, the Court refuses the petition for appeal.  Code § 8.01-675.

A Copy,

Teste:

Allen L. Lucy, Clerk

By:  *[signature]*

Deputy Clerk

Exhibit  I



OF VIRGINIA

WILLIAM H. HODGES, JUDGE
CHESAPEAKE, VIRGINIA 23320

CIRCUIT COURT OF
CITY OF CHESAPEAKE

August 12, 1982

Robert R. Kinser, Esquire
752 Cedar Road
Chesapeake, Virginia, 23320

John A. Heilig, Esquire
Stoney Point Center
700 Newtown Road
Norfolk, Virginia

Re:  Frances K. Webster v. Chesapeake General Hospital
     and Dr. Frank W. Gruber

Gentlemen:

Since hearing your oral arguments on the plea of
Chesapeake General Hospital for sovereign immunity, I
have had an opportunity to review your memoranda and
other authorities.  The Court has concluded that the
Hospital's plea should be sustained and the hospital
should be dismissed as a party to this proceeding.

Accordingly, I will request that Mr. Heilig draft
an appropriate order in accordance herewith noting the
plaintiff's exception to the Court's action.

Very truly yours,

William H. Hodges

WHH/mlc

cc:  John M. Hollis, Esquire

BOOK 85 PAGE 736

VIRGINIA:  IN THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE

FRANCIS K. WEBSTER,

                                Plaintiff,

v.                                                    AT LAW NO.

CHESAPEAKE GENERAL HOSPITAL,                          17733-H

and

DR. FRANK GRUBER,

                                Defendants.

## O R D E R

THIS DAY came the parties, by counsel, upon the plea
of sovereign immunity and motion to dismiss filed herein by
defendant, Chesapeake General Hospital, and was argued by counsel.

And, it appearing to the Court that Chesapeake General
Hospital is a hospital authority and is therefore immune from suit.

It is ORDERED, ADJUDGED, and DECREED that the defendant's
plea of sovereign immunity and motion to dismiss is sustained and
that Chesapeake General Hospital be dismissed from this action.

ENTER: 9-7-82

_____
JUDGE

I ask for this:

_____
Counsel for Chesapeake General
Hospital

Seen:

_____
Counsel for Francis K. Webster

_____
Counsel for Dr. Frank Gruber

Exhibit J

 Caution
As of: May 17, 2024 5:37 PM Z

## *Hughes v. Lake Taylor City Hosp.*

Circuit Court of the City of Norfolk, Virginia

December 13, 2000, Decided

Case No. CL99-1677

**Reporter**
54 Va. Cir. 239 *; 2000 Va. Cir. LEXIS 585 **

Hughes, administrator of the estate of Lori Hughes, deceased v. Lake Taylor City Hospital, a/k/a Hospital Authority of Norfolk, t/a Lake Taylor Hospital, et al.

**Disposition:** Motion and special plea of sovereign immunity sustained in part as to hospital and overruled in part as to employees as individuals.

## Core Terms

patient, immunity, entitled to immunity, hospital authority, sovereign immunity, simple negligence, performing, individual defendant, allegations, nurses, governmental function, municipal corporation, attending physician, nursing home, patient care, involvement, respiratory, employees, therapist, factors, slight, weighs

## Case Summary

**Procedural Posture**
Plaintiff decedent's estate sued defendants, a hospital authority and four employees, for decedent's wrongful death. The hospital authority and the employees filed a motion and special plea of sovereign immunity.

**Overview**
The decedent died while a patient at the hospital authority's nursing home. The hospital authority was (1) created as a body corporate and politic and as a political subdivision of the commonwealth; (2) created to serve a public purpose; (3) given the power to have a common seal, to sue and be sued, to enter into contracts, to acquire, hold and dispose of its revenue, personal and real property; (4) given the power of eminent domain; (5) given the power to borrow money and issue tax exempt bonds; and (6) managed by a board of directors or commission. The authority's provision of health care services to those in need served an important governmental function. The primary function of the nurses and therapist was to give proper care and

treatment to patients, and the state's interest in patient care was the same whether the patient was treated in a public hospital or a private institution. The state's control over the employees was slight. The employees' exercise of a level of discretion in their jobs did not control whether they were entitled to sovereign immunity.

**Outcome**
The hospital authority was entitled to sovereign immunity, and the nurses and therapist were not entitled to sovereign immunity.

## LexisNexis® Headnotes

Governments > State & Territorial Governments > Claims By & Against

Healthcare Law > ... > Actions Against Facilities > Governmental & Nonprofit Liability > County, Municipal & State Liability

*HN1*[ ] State & Territorial Governments, Claims By & Against

A hospital, if it is considered to be an organ of the state, is immune from actions in tort.

Real Property Law > Eminent Domain Proceedings > Elements > Public Use

Tax Law > State & Local Taxes > Real Property Taxes > Exemptions

Torts > Public Entity Liability > Immunities > Sovereign Immunity

54 Va. Cir. 239, *239; 2000 Va. Cir. LEXIS 585, **585

Governments > Local Governments > Claims By & Against

Healthcare Law > ... > Actions Against Facilities > Governmental & Nonprofit Liability > County, Municipal & State Liability

Real Property Law > Eminent Domain Proceedings > Constitutional Limits & Rights > General Overview

### *HN2*[🔽] **Elements, Public Use**

A hospital authority, even though a local government subdivision, is considered a municipal corporation and enjoys tort immunity if it possesses six distinct criteria and performs a governmental function. Those six criteria are the following: (a) creation as a body corporate and politic and as a political subdivision of the Commonwealth; (b) created to serve a public purpose; (c) power to have a common seal, to sue and be sued, to enter into contracts, to acquire, hold and dispose of its revenue, personal and real property; (d) possession of the power of eminent domain; (e) power to borrow money and issue bonds which are tax exempt; (f) management of the corporation vested in a board of directors or a commission.

Governments > State & Territorial Governments > Claims By & Against

Torts > Public Entity Liability > Liability > General Overview

Governments > State & Territorial Governments > Employees & Officials

Torts > Public Entity Liability > General Overview

### *HN3*[🔽] **State & Territorial Governments, Claims By & Against**

There is a four-part test to determine whether a given employee is entitled to immunity for acts of simple negligence. The four factors to be considered are: (1) the nature of the function performed by the employee; (2) the extent of the state's interest and involvement in the function; (3) the degree of control and direction exercised by the state over the employee; and (4) whether the act complained of involved the use of judgment and discretion. If an employee meets the four factors of this test, the employee cannot be held liable

for any acts of simple negligence. If the employee does not meet the four factors, the employee can and will be held liable for acts of simple negligence. A state employee may be liable for his conduct while performing work for the state if his conduct is wrongful or the performance is so negligent as to take him outside the protection of his employment.

Governments > State & Territorial Governments > Claims By & Against

Torts > Public Entity Liability > Immunities > Sovereign Immunity

Governments > State & Territorial Governments > Employees & Officials

Torts > Public Entity Liability > Immunities > General Overview

### *HN4*[🔽] **State & Territorial Governments, Claims By & Against**

If the function that a government employee was negligently performing was essential to a governmental objective and the government had a great interest in that function, this weighs heavily in favor of granting immunity to the employee. If the employee's function has only a marginal influence upon a governmental objective, and the government's interest is slight, this weighs against granting immunity. Moreover, if broad discretion on the part of the employee is exercised this also weighs heavily in favor of immunity. A high level of control and direction by the government also weighs in favor of immunity. When a government employee is specially trained to make certain discretionary decisions, the control exercised by the government must be necessarily limited in order to make the best use of that person's special skill and judgment.

Governments > State & Territorial Governments > Claims By & Against

Healthcare Law > Healthcare Litigation > Actions Against Healthcare Workers > General Overview

### *HN5*[🔽] **State & Territorial Governments, Claims By & Against**

The state's interest as to a patient's care is the same

54 Va. Cir. 239, *239; 2000 Va. Cir. LEXIS 585, **585

whether that patient is treated at a public hospital or a private institution.

Governments > State & Territorial Governments > Claims By & Against

Healthcare Law > Medical Treatment > End-of-Life Decisions > Do-Not-Resuscitate Orders

Governments > State & Territorial Governments > Employees & Officials

*HN6*[↓] **State & Territorial Governments, Claims By & Against**

In determining whether an act performed by an employee involved the use of judgment and discretion, in determining whether the employee is entitled to immunity, it is the judgment and discretion used to perform the particular act in question, not the judgment and discretion used to perform the job generally which is relevant. A high level of discretion weighs in favor of immunity. Further, it is important to recognize that many acts involve discretion or judgment but that factor alone cannot be determinative of immunity.

## Headnotes/Summary

**Headnotes**

HEADNOTE: A hospital, if it is considered to be an organ of the state, is immune from actions in tort.

The operation of a nursing home is a governmental function rather than a proprietary one for the purposes of governmental immunity.

In this case, the individual defendants, nurses and a therapist, were not entitled to immunity for acts of simple negligence.

**Judges:** [**1] BY JUDGE JOHN C. MORRISON, JR.

**Opinion by:** Morrison

## Opinion

**[*239]** This matter comes before the Court on Defendants' Motion and Special Plea of Sovereign

Immunity with respect to the hospital as an entity and with respect to the individually named employee defendants. This is an action for wrongful death against the defendants. Three of the individual defendants are registered nurses, and the fourth individual defendant is a respiratory therapist. The Amended Motion for Judgment contains two counts: Count I alleges gross negligence as to all defendants, and Count II alleges simple negligence as to all defendants.

Lake Taylor Hospital Authority operates a nursing home. Plaintiff is the administrator of the estate of her daughter, Lori Hughes. Lori had cerebral palsy and mental retardation. Her mother admitted Lori to Lake Taylor Hospital for respite care for the weekend of March 12, 1999. Upon admission Lori was noted to be awake, alert, with a regular heart rate, among other **[*240]** things. Dr. Angela Mercer accepted Lori Hughes as her patient and thereafter ordered certain care and treatment for Lori to be administered by the health care providers at Lake Taylor. On March 13, 1999, at **[**2]** approximately 11:00 p.m., Lori was found to be bluish in color and not breathing normally. Around 1:00 a.m. on March 14th, a few hours later, Lori was clammy and cool to the touch, pale, had rapid breathing and oxygen saturations at about 82%. On March 14, 1999, Lori Hughes went into cardiac arrest and was administered CPR but ultimately expired.

Plaintiff essentially claims that defendants failed to properly recognize and treat the serious condition of her daughter, Lori Hughes. Plaintiff asserts that defendants failed to promptly notify her doctor of her condition, failed to recognize Lori as "full code" status instead of "Do Not Resuscitate" status, failed to timely transport Lori to an emergency care facility after being ordered to do so by her doctor, and left her uncared for and unattended despite her ongoing distress. Defendants assert that Lake Taylor Hospital is immune from liability in tort based upon the principle that the hospital is a municipal corporation, an organ of the state, and therefore entitled to immunity. Defendants also contend that the individual defendants, three nurses and a respiratory therapist, are entitled to immunity for simple negligence in the treatment **[**3]** of Lori Hughes. Plaintiffs also assert gross negligence against these individual defendants, which will be addressed later in this opinion.

I. Sovereign or Governmental Immunity of Lake Taylor Hospital Authority

*HN1*[↑] A hospital, if it is considered to be an organ of

the state, is immune from actions in tort. *Lawhorne v. Harlan, 214 Va. 405, 200 S.E.2d 569 (1973).* **HN2**[↑] A "hospital authority," even though a local government subdivision, is considered a municipal corporation and enjoys tort immunity if it possesses six distinct criteria and performs a "governmental" function. *Richmond v. Metropolitan Authority, 210 Va. 645, 172 S.E.2d 831 (1970).* Those six criteria are the following: (a) creation as a body corporate and politic and as a political subdivision of the Commonwealth; (b) created to serve a public purpose; (c) power to have a common seal, to sue and be sued, to enter into contracts, to acquire, hold and dispose of its revenue, personal and real property; (d) possession of the power of eminent domain; (e) power to borrow money and issue bonds which are tax exempt; (f) management of the corporation vested in a board of directors or a commission. *Richmond Metropolitan, 210 Va. 645, 172 S.E.2d 831.* [**4]

In the case at bar, Lake Taylor City Hospital was created by Resolution No. 466 pursuant to Virginia Code § 15.1-1535 et seq. on May 24, 1988. Its [*241] name was later changed to the Hospital Authority of Norfolk. The assets of Lake Taylor Hospital and operation and control of the hospital were transferred by the City to the Hospital Authority of Norfolk in July of 1988. Lake Taylor Hospital Authority is in fact a municipal corporation. It meets the six criteria stated above. Plaintiff's counsel does not contest the fact that Lake Taylor Hospital is a municipal corporation. See Plaintiff's Response to Defendants' Plea of Sovereign Immunity at 6. Plaintiff does, however, dispute any conclusion that Lake Taylor was performing a governmental function. As stated above, if the municipal corporation is performing a governmental function(s), then sovereign immunity applies in favor of the hospital. *Carter v. Chesterfield County Health Comm'n, 259 Va. 588, 527 S.E.2d 783 (2000).*

The Supreme Court in Carter, held that the Chesterfield County Health Commission's operation of a nursing home was a "governmental" function rather than "proprietary" [**5] for immunity purposes. *527 S.E.2d 783.* The administrator of the decedent's estate brought a negligence action against the Health Commission alleging that the Commission failed to properly and adequately treat the resident. The Court discussed the difficulty of determining whether something is proprietary or governmental. In finding that the nursing home was performing a governmental function, the Court reasoned that, prior to creating the Commission at issue in Carter, the county was required to find that there was a public need for the Commission and that

the nursing services were necessary to protect the public welfare. Id. Therefore the Court reasoned that, by enacting the resolution creating the Commission, the local government was exercising its police power. Id. The Court concluded by saying that "the provision of nursing services by the Commission was not a ministerial act of a proprietary nature but an exercise of the County's police power for the common good and, thus, was governmental in nature" and entitled to immunity. *527 S.E.2d at 787.*

In this case, the Court holds that Lake Taylor Hospital Authority is performing a governmental function and is entitled to immunity. [**6] The nursing home was created to serve the public by providing important health care services to those in need, particularly long-term health care services to the citizens of Norfolk. The Authority is a political subdivision ( Virginia Code § 15.1-1535) and serves an important governmental function involving patient care. See generally *Lawhorne v. Harlan, 214 Va. 405, 200 S.E.2d 569 (1973)* (affirming the trial court's dismissal of a claim against the University of Virginia hospital, its employees, administrators, and a surgical intern); Holloman v. Chesapeake Hospital Authority, Record No. 840237, Nov. 16, 1983 (finding that the hospital authority was a governmental entity immune from suit); Turner v. DePaul Hospital, et al., Record No. 89-2352, Circuit Court for the City of [*242] Norfolk, Nov. 7, 1990 (dismissing claim against Medical College of Hampton Roads because of sovereign immunity).

I. Immunity of the Individual Hospital Employees as It Applies to the Allegations of Simple Negligence

Defendants assert that sovereign or governmental immunity applies equally to the individual employees in this case, as they are agents or employees of the Commonwealth.

 [**7] In James v. Jane, the Virginia Supreme Court articulated **HN3**[↑] a four-part test to determine whether a given employee is entitled to immunity for acts of simple negligence. *221 Va. 43, 282 S.E.2d 864 (1980).* The four factors to be considered are: (1) the nature of the function performed by the employee; (2) the extent of the state's interest and involvement in the function; (3) the degree of control and direction exercised by the state over the employee; and (4) whether the act complained of involved the use of judgment and discretion. Id. If an employee meets the four factors of this test, the employee cannot be held liable for any acts of simple negligence. If the employee does not meet the

four factors, the employee can and will be held liable for acts of simple negligence. The Court also recognized that a state employee may be liable for his conduct while performing work for the state if his conduct is wrongful or the performance is "so negligent as to take him outside the protection of his employment." Id.; see also *Messina v. Burden, 228 Va. 301, 321 S.E.2d 657 (1984)*.

*HN4* [↑] ] If the function that a government employee was negligently performing was essential to a governmental **[**8]** objective and the government had a great interest in that function, this weighs heavily in favor of granting immunity. *Lohr v. Larsen, 246 Va. 81, 431 S.E.2d 642 (1993)*. If the employee's function has only a marginal influence upon a governmental objective, and the government's interest is slight, this weighs against granting immunity. Id. Moreover, if broad discretion on the part of the employee is exercised this also weighs heavily in favor of immunity. *Id. at 87*. A high level of control and direction by the government also weighs in favor of immunity. *Id. at 88*. When a government employee is specially trained to make certain discretionary decisions, the control exercised by the government must be necessarily limited in order to make the best use of that person's special skill and judgment. Id. In Lohr, the Court held that a state-employed physician was entitled to sovereign immunity, whereas, in James, the Court held that the three physician defendants employed by the University of Virginia's Medical School were not entitled to immunity. *Lohr, 246 Va. 81, 431 S.E.2d 642*; *James, 221 Va. 43, 282 S.E.2d 864*.

 **[*243]** **[**9]** One of the missing yet crucial elements in the James case for purposes of immunity was the second prong of the test, the extent of the state's interest and involvement in the function performed by the employees. The Court noted that the Commonwealth's interest and involvement in the treatment of a specific patient by a physician at University Hospital was slight. *James, 221 Va. at 54*. In fact the Court stated that the Commonwealth's interest was that the University operate a good medical school staffed with competent professors. Id. The Commonwealth's interest as to a patient's care was the same whether that patient was being treated in a public teaching hospital or a private medical institution. *Id. at 54-55*. Further, the control exercised by the Commonwealth over the physicians in the treatment of the patient was also slight. Id. The Court felt that, at the point when the physician agrees to treat or operate on a certain patient, "although his employment by the

University makes possible the arrangement, the relationship becomes one of doctor and patient, not the Commonwealth of Virginia and patient." Id. Similarly in Lee v. Bourgeois, the Virginia Supreme **[**10]** Court held that a patient's attending physician, who was a full-time faculty member at university hospital, was not entitled to sovereign immunity. *252 Va. 328, 477 S.E.2d 495 (1996)*. The Court reasoned that the physician's function and role as the attending physician was to ensure proper treatment of his patients and that his acts regarding patient care were within his professional judgment and were not subject to control by the Commonwealth. *Id. at 335*. Therefore the physician did not meet the four part James test. Id.

In Lohr v. Larsen, the Supreme Court distinguished Dr. Larsen and his functions from the three physicians at issue in James. The Court stated that Dr. Larsen's exercise of substantial discretion, while similar to that exercised by the James physicians, was different because Dr. Larsen used that discretion as an integral part of the Commonwealth's health care program. Further, Dr. Larsen was completely controlled by the Commonwealth in that he could not deny any patients treatment. *Lohr, 246 Va. 81, 431 S.E.2d 642*. The Commonwealth's interest and involvement in the doctor's function to provide quality medical care in certain areas **[**11]** for the citizens of this State who are economically unable to get care in the private sector was extremely great. Id. Similarly in Gargiulo v. Ohar, the Court held that a board-certified physician employed by a state hospital was entitled to immunity. *239 Va. 209, 387 S.E.2d 787 (1990)*. In discussing the nature of the employee's function, the Court concluded that the alleged negligent acts were performed by an employee as a student involved in a medical research program instead of a caregiver. Id. Therefore, this function was "essential to achievement of the Commonwealth's goal… of **[*244]** training and maintaining a pool of specialists skilled in a particular discipline." *Id. at 213*.

In the present case, there are three registered nurses and a respiratory therapist at issue. Their primary function is to give proper care and treatment to the patients who are admitted to the nursing home. They are not involved in any type of professional state-sponsored research program as the doctor was in *Gargiulo, 239 Va. 209, 387 S.E.2d 787*. They are not students or interns trying to pursue further training. They are not primarily engaged in teaching **[**12]** nor is their primary function to perform administrative type work for the state as in *Benjamin v. University Internal Medicine Foundation, 254 Va. 400, 492 S.E.2d 651 (1997)*

54 Va. Cir. 239, *244; 2000 Va. Cir. LEXIS 585, **12

(holding that the medical director of the episode care clinic was primarily engaged in administrative duties and was not performing the duties of an attending physician and was therefore entitled to immunity).

Taking into consideration the four factors articulated in James, the Court holds that the defendant nurses and respiratory therapist are not entitled to immunity for acts of simple negligence. The first factor in James looks at the nature of the primary function of the particular employee. In the case at bar, the primary function of all individual defendants is to give proper care and treatment to patients. The next factor is the state's interest or involvement in that function. It has been stated that the state's interest in "patient care" is slight. *James, 221 Va. 43, 54, 282 S.E.2d 864*. **HN5**[↑] The State's interest as to a patient's care is the same whether that patient is treated at a public hospital or a private institution. *Id. at 54-55*; *Bourgeois, 252 Va. 328, 335, 477 S.E.2d 495*. **[**13]** The third factor is the amount of control the State has over the employee. Here, the control by the State over these individuals is slight. It is true that they are paid by the hospital and receive no compensation from the patients themselves; however, that factor alone is not determinative and is in fact common. *James, 221 Va. at 50*. If any real control is exercised over these individuals, particularly the nurses, it is by the attending physician. The fourth and final factor is **HN6**[↑] whether the act complained of involved the use of judgment and discretion. It is the judgment and discretion used to perform the particular act in question, not the judgment and discretion used to perform the job generally. James; Puckett v. City of Richmond, 1988 WL 619092 (Va. Cir. 1988). A high level of discretion weighs in favor of immunity. *Lohr, 246 Va. at 88*. Further, it is important to recognize that many acts involve discretion or judgment but that factor alone cannot be determinative. *James, supra.* Although not necessary for this decision, this case involves two allegations that could possibly be classified as purely ministerial and therefore not **[**14]** entitled to immunity: the fact that the patient was stamped as "DNR" status instead of a "full code" status as requested and the failure to arrange for transport of the patient to an **[*245]** emergency facility immediately as ordered by the attending physician. Those two acts involved no real judgment or discretion. As for the other more general allegations and in light of the other three factors of the test, the nurses and respiratory therapist are not entitled to sovereign immunity even though they may exercise a level of discretion in their jobs.

The Court holds that the hospital as an entity is entitled

to the protection afforded by sovereign immunity. The individual defendants do not meet the four-part test set out in James. They are not entitled to immunity and are therefore liable for any acts of simple negligence. In light of the foregoing, the Court does not reach the issue of whether there are sufficient allegations to state a claim for gross negligence. However, even if gross negligence has occurred in this case, the Court finds that punitive damages are not proper in this case. In any event, the proffered evidence herein does not provide a basis for the malicious and **[**15]** intentional actions necessary to support such an award.

---

**End of Document**

Ahmed Khalil