IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA,

v.                                    Criminal Action No. 2:25-cr-1

CHESAPEAKE REGIONAL
MEDICAL CENTER,

       Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Chesapeake Regional Medical Center's Motions to Dismiss the Indictment charging it with conspiracy to defraud the United States and with healthcare fraud. Chesapeake Regional Medical Center argues that the Indictment is fatally defective because it does not name Chesapeake Hospital Authority, its governing authority, as a defendant. Dkt. No. 45. Chesapeake Regional Medical Center also substantively challenges the Indictment, asserting that it cannot, as a municipal entity, form criminal mens rea; that it is not a "person" that can be criminally liable under the applicable statutes; and that it is entitled to sovereign immunity. Dkt. No. 12. After consideration of the arguments raised in both motions, and for the reasons stated below, the Motions to Dismiss will be denied.

## I.    BACKGROUND

Chesapeake Regional Medical Center ("CRMC") is charged with aiding and abetting and conspiring with Dr. Javaid Perwaiz and others to defraud the United States and commit federal healthcare fraud. Dkt. No. 1. Perwaiz was an OB/GYN who, while practicing at CRMC, engaged in a scheme to maximize insurance payments through fraudulent and unethical medical and billing practices. As part of his criminal conduct, Perwaiz falsified medical documents, performed and

billed for medically unnecessary surgeries, billed for diagnostic procedures performed in a non-standard way, and falsified sterilization consent forms. *See United States v. Perwaiz*, No. 2:19-cr-189, 2019 WL 2533971 (E.D. Va. Nov. 18, 2019); No. 21-4255, 2024 WL 2891327 (4th Cir. June 10, 2024). For example, Perwaiz would induce labor in his patients before the medically recommended benchmark of thirty-nine weeks' gestation so that delivery could occur during his scheduled operating room time at CRMC. *Perwaiz*, 2024 WL 2891327, at *2. He would then falsify the patients' due dates so it would appear to insurance companies as though the patients had been induced at thirty-nine weeks, making the procedures medically necessary and reimbursable. *Id.* Perwaiz also repeatedly violated a Medicaid condition requiring that providers wait thirty days after obtaining a signed consent form to perform a sterilization on a Medicaid patient. *Id.* at *1–2. Perwaiz would have a patient sign a consent form but leave it undated, perform the sterilization, backdate the form to at least thirty days prior, and bill Medicaid for the procedure. *Id.* at *2. In 2019, Perwaiz was convicted of fifty-two counts of healthcare fraud and related offenses and sentenced to fifty-nine years of incarceration. *Perwaiz*, 2019 WL 2533971, at *1.

CRMC (formerly "Chesapeake General Hospital") describes itself as "the only independent, community-based hospital" in the Hampton Roads area. Chesapeake Regional Healthcare, *Chesapeake Regional Medical Center*, https://perma.cc/UYU8-UMWM (last visited Dec. 17, 2025). CRMC is operated by Chesapeake Regional Healthcare, which, in turn, is governed by the Chesapeake Hospital Authority. Chesapeake Regional Healthcare, *Chesapeake Hospital Authority*, https://perma.cc/69YZ-3599 (last visited Dec. 17, 2025). Chesapeake Hospital Authority was created through an enabling statute passed by the Virginia General Assembly in 1966. 1966 Va. Acts ch. 271 ("Enabling Statute").

On January 8, 2025, the Grand Jury returned a two-count Indictment against CRMC, which alleges that CRMC facilitated and actively participated in Perwaiz's fraudulent schemes. The Indictment charges CRMC with conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (Count One) and healthcare fraud in violation of 18 U.S.C. § 1347 (Count Two). Dkt. No. 1 at 25–29. The Indictment alleges, among other things, that CRMC's leadership helped Perwaiz misclassify and perform procedures on an outpatient basis that the Centers for Medicare & Medicaid Services designated as "inpatient only", ignored a string of warnings from CRMC staff and patients about Perwaiz's medically unnecessary procedures, and knowingly allowed Perwaiz to continue sterilizing Medicaid patients despite his noncompliance with the thirty-day waiting period requirement. *See id.* at 1–24.

CRMC moved to dismiss the Indictment. Dkt. No. 12. The Government responded in opposition, CRMC replied, and the Government filed a surreply. Dkt. Nos. 23, 24, 28. CRMC then filed a second "emergency" motion to dismiss the Indictment for lack of jurisdiction, to which the Government responded. Dkt. Nos. 45, 47. On August 5, 2025, the Court held a hearing on the motions. Dkt. No. 48. The Court took the parties' arguments under advisement and ordered supplemental briefing on the second motion to dismiss, *id.*, which the parties provided. Dkt. Nos. 51 and 52.

## II.    LEGAL STANDARD

Rule 12 of the Federal Rules of Criminal Procedure provides that defendants "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on

the merits." Fed. R. Crim. P. 12(b)(1). CRMC raises two grounds for dismissing the Indictment: lack of jurisdiction and failure to state an offense. Dkt. Nos. 12, 45.[1]

A criminal indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment fails to state an offense if it omits a required element, *United States v. Hooker*, 841 F.2d 1225, 1227–28 (4th Cir. 1988) (en banc), or if "the allegations therein, even if true, would not state an offense." *United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004). In ruling on a motion to dismiss, the Court is "limited to considering the factual allegations in the indictment and must accept them as true." *United States v. Brewbaker*, 87 F.4th 563, 579 (4th Cir. 2023). A motion to dismiss an indictment for lack of jurisdiction "may be made at any time while the case is pending." Fed. R. Crim. P. 12(b)(2). The Court lacks jurisdiction over an indictment that "fail[s] to charge conduct that amounts to an offense against the laws of the United States." *United States v. Scott*, 61 F.4th 855, 859 (11th Cir. 2023) (citation omitted).

In ruling on a motion to dismiss, the Court may not consider the sufficiency of the evidence supporting the indictment and may not dismiss the indictment "on a determination of facts that should have been determined at trial." *United States v. Wills*, 346 F.3d 476, 488 (4th Cir. 2003); *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) (citation omitted). The Court may, however, "make preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate factfinder." *United States v. Craft*, 105 F.3d 1123, 1126 (6th Cir. 1997).

---

[1]    CRMC's motion also references Federal Rule of Criminal Procedure 12(b)(3)(A), which provides for motions "alleging a defect in instituting the prosecution." At the evidentiary hearing, counsel for CRMC indicated that the motion was only intended to rely on subsections (b)(2) and (b)(3)(B) of Rule 12. Hr'g Tr., Dkt. No. 49 at 29:9–22 ("Hr'g Tr.").

The defendant bears the burden of proving it is entitled to sovereign immunity by a preponderance of the evidence. *See Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014) (holding, in a civil case, that "sovereign immunity is akin to an affirmative defense, which the defendant bears the burden of demonstrating"); Hr'g Tr., Dkt. No. 49 at 30:15–17 ("Hr'g Tr.") (agreement by CRMC's counsel that the same burden applies here).

### III.    ANALYSIS

CRMC submits various arguments in support of its Motions to Dismiss the Indictment. CRMC first contends that the Court lacks jurisdiction because the Indictment is defective. It also substantively challenges the Indictment for failure to state an offense. The Court will address each argument in turn below.

### A. Challenge to the Validity of the Indictment

CRMC argues that the Indictment is fatally defective because it does not name Chesapeake Hospital Authority, instead naming only Chesapeake Regional Medical Center (also known as Chesapeake General Hospital and Chesapeake Regional Healthcare). CRMC contends that such charging is fatal because Chesapeake Regional Medical Center (as well as the other associated names) are all fictious names and a "fictional name cannot be the subject of an indictment." Dkt. No. 46 at 3. The Government counters, arguing that the terms Chesapeake Regional Medical Center, Chesapeake Hospital Authority, and the predecessor name Chesapeake General Hospital, "are simply different names for the same entity" that was named and identified in the Indictment. Dkt. No. 47 at 2.

CRMC disagrees and maintains that a fair reading of the Indictment shows that "the government presented to the grand jury the theory that a *hospital* [(i.e. Chesapeake Regional Medical Center)] was criminally responsible for the actions of those who worked there, not that a

Commonwealth-created public hospital authority that is statutorily mandated to provide health care services to the public [(i.e. Chesapeake Hospital Authority)] bore any responsibility."[2] Dkt. No. 51 at 4 (emphasis added). CRMC states that the Indictment treats CRMC and Chesapeake Hospital Authority as separate entities and identifies the Defendant as

> Defendant Chesapeake Regional Medical Center ("CRMC") . . . a hospital in Chesapeake, Virginia. It was formerly known as Chesapeake General Hospital. Its parent company is Chesapeake Regional Healthcare (CRH), which owns CRMC as well as several ancillary imaging and diagnostic centers, and a medical group. CRMC was "rebranded" as CRH in 2015.

Dkt. No. 1 at ¶ 16. The Indictment describes Chesapeake Hospital Authority in a parenthetical as "the governing body over CRMC." *Id.* ¶ 27. Because the Indictment makes clear that Chesapeake Hospital Authority was not the intended target of the Indictment, CRMC contends the Indictment cannot be read to include a charge against it.

Relying primarily on *United States v. Sherpix, Inc.*, 512 F.2d 1361 (D.C. Cir. 1975), CRMC contends that the grand jury's failure to name Chesapeake Hospital Authority as a defendant reveals that it did not intend to charge it.[3] In *Sherpix*, a grand jury returned a five-count indictment charging a corporate entity, Sherpix, Inc. ("Sherpix"), as well as its president and seven codefendants, with violating federal and District of Columbia obscenity laws in connection with

---

[2]    CRMC contends that the Government has conceded that the Indictment does not charge Chesapeake Hospital Authority, pointing to the Government's statements that "[t]he defendant in this case is CRMC, a hospital in Chesapeake Virginia, formerly known as Chesapeake General Hospital . . . [Chesapeake Hospital Authority] is not a named defendant in this case." Dkt. No. 51 at 6. The Government responds that CRMC reads too much into these statements and explains that it was merely describing the caption of the Indictment. Dkt. No. 52 at 5. The Government goes on to state that "[t]he defendant uses the name [Chesapeake Hospital Authority] in two respects: *both* as one of the names for itself, and to refer to its governing board, and the [G]overnment's statement used the term in this latter context." *Id*.

[3]    CRMC further argues that there is no remedy to this alleged defect as this Court cannot (1) read something into the Indictment that is not there, (2) "retroactively insert" Chesapeake Hospital Authority as a charged defendant, or (3) construe that Chesapeake Hospital Authority has "waived jurisdictional challenges to the Indictment." Dkt. No. 51 at 1.

the distribution and exhibition of a film. *Id*. at 1364. On appeal, the District of Columbia Circuit Court reversed Sherpix's conviction on the conspiracy count, concluding that the allegations for that count were insufficient to charge Sherpix with the crime. *Id*. at 1368. The court reasoned that the factual allegations in the indictment failed to allege Sherpix reached an agreement with another person because the charge "[m]erely list[ed] the corporation as an instrumentality used by an officer in the conspiracy." *Id*. at 1367–68. The court concluded that this allegation was "not sufficient to establish that the grand jury charged the corporation as a co-conspirator." *Id*. The court also noted that "[t]he grand jury showed itself quite capable of clearly expressing its intent when it wished to include a corporate entity among the parties accused" because in other counts "both Sherpix and [its President were] clearly designated as accused parties[.]" *Id*. at 1368.

*Sherpix* is distinguishable from this case because the Indictment here only charges one party—Chesapeake Regional Medical Center, formerly Chesapeake General Hospital, operated by Chesapeake Regional Healthcare, which is governed by Chesapeake Hospital Authority—on two counts. CRMC has repeatedly acknowledged that each of these names is an alternative name for the same entity. *See e.g.*, Hr'g Tr. at 11:1–12 (Defendant's counsel agreeing that all entities are treated as the same entity); Hr'g Tr. at 82:13 (CRMC's witness, Douglas Mancino, agreeing that "both the Hospital Authority and the Medical Center [are] one and the same"); Dkt. No. 13 at 1 (stating Chesapeake Hospital Authority "does business as" Chesapeake Regional Medical Center). Because only one party of any kind acted, the problem presented in *Sherpix*—determining the intent of the grand jury in differentiating between multiple parties—does not arise. *See United States v. Chitron Elecs. Co.*, 668 F. Supp. 2d 298, 307 (D. Mass. 2009) (denying defendant's motion to dismiss on the ground that the indictment did not correctly name corporate defendant when evidence "show[ed] that Chitron–China has used both 'Chitron Electronics Company

Limited' and 'Chi–Chuang Electronics Company Limited' as identifying names in its correspondence, marketing literature, and website statements").

Courts have rejected a defendant's attempts to avoid charges when the indictment used an incorrect name, so long as the government established the identity of the person charged. *United States v. Fawcett*, 115 F.2d 764, 767 (3d Cir. 1940) ("[A]n indictment . . . is an accusation against a person, and not against a name. A name is not the substance of an indictment."). For instance, in *United States v. Nava*, the Ninth Circuit was not persuaded by the defendant's claim that the district court lacked jurisdiction over him because "the indictment charged the wrong person, [when the] arrest report and the probation report referred to Mario, not Alejandro Nava." 208 F.3d 223, *1 (9th Cir. 2000). Noting that several customs agents identified Nava as the person who had been stopped at the border with marijuana, the court stated that "[t]he government was not required to prove the true or legal name of the defendant—only that he was the person who committed the offense." *Id.*; *cf. Brown v. Kramer*, No. CV 06-6830, 2009 WL 2190079, at *2–3 (C.D. Cal. July 14, 2009) (denying prisoner's challenge to conviction and incarceration under wrong name).

As noted above, Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment "be a plain, concise and definite written statement of the essential facts constituting the offense charged." And "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974) (citation omitted). Here, the Indictment tracked the relevant statutory language, cited the charging statute, and established the identity of the person charged. Importantly, CRMC does not claim lack of notice or prejudice, nor can it; CRMC confirmed, in its filings, that it initially understood that "in the indictment, the grand jury had

intended to indict CHA [Chesapeake Hospital Authority] and that the error in the case style constituted a misnomer." Dkt. No. 46, at 2; *see also* Hr'g Tr. at 11:15–22. As the United States Court of Appeals for the Fourth Circuit has explained, "the primary consideration is the role of the indictment in informing the defendant of the charges in order that he may prepare his defense and in protecting the defendant against another prosecution for the same offense." *United States v. Holt*, 529 F.2d 981, 983 (4th Cir. 1975). The Indictment in this case clearly fulfilled this dual purpose. For these reasons, the Court finds the Indictment sufficiently identifies the Defendant.

### B. Failure to State an Offense

CRMC also substantively challenges the Indictment for failure to state an offense on three interrelated grounds: First, that it cannot form criminal intent; second, that it is an arm of the state and cannot be a "person" within the meaning of 18 U.S.C. §§ 2, 371, and 1347; and third, that it is protected by sovereign immunity from criminal prosecution.

#### 1. Mens Rea

CRMC contends that the Indictment must be dismissed because CRMC, as a municipal corporation, cannot form the criminal intent required to be convicted under the charged statutes. "To sustain a conviction under 18 U.S.C. § 1347, the government [is] required to prove beyond a reasonable doubt that [the defendant] knowingly and willfully executed a scheme to defraud insurers by billing for medically unnecessary procedures." *United States v. McLean*, 715 F.3d 129, 137–38 (4th Cir. 2013). To establish criminal liability under § 371, the Government must prove that the defendant acted with the "intent to agree to defraud the United States." *United States v. Winfield*, 997 F.2d 1076, 1082 (4th Cir. 1993) (citation omitted). The question, therefore, is whether CRMC is legally capable, as an entity, of acting "knowingly and willfully" and with criminal intent.

9

The question of whether a municipal corporation can form criminal mens rea for purposes of a federal prosecution appears to be a novel one.[4] Circuit court caselaw examining the liability of similar entities under the civil Racketeer Influenced and Corrupt Organizations ("RICO") Act, however, provides a helpful starting point. Like the statutes at issue here, to be liable on a civil RICO claim, the defendant must have the capacity to form the mens rea required for liability on certain state and federal crimes, known as predicate offenses.[5] Defendants who are found liable on a civil RICO claim must pay mandatory treble damages.

Several courts have found that municipal corporations cannot, as a matter of law, be liable for civil RICO claims because requiring a municipal entity to pay damages that are "punitive," as opposed to merely compensatory has undesirable practical implications. CRMC relies heavily on one such case: the Ninth Circuit's decision in *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397 (9th Cir. 1991). There, the court considered antitrust and civil RICO claims against a public hospital. The applicable predicate offense was mail fraud in violation of 18 U.S.C. § 1341, an element of which is that the defendant acted with the specific intent to defraud. The court concluded that the civil RICO claim failed as a matter of law because "government entities are incapable of forming a malicious intent." *Lancaster*, 940 F.2d at 404 (citations omitted). In drawing that conclusion, however, the court relied entirely on the policy-based and pragmatic implications of subjecting taxpayer-funded public entities to civil RICO liability. Treble damages, the court reasoned, "would burden the very taxpayers and citizens for whose benefit the wrongdoer

---

[4]    While CRMC contests its status as a municipal corporation for sovereign immunity purposes, it assumes that it is a municipal corporation for purposes of the mens rea argument, and the Court will do the same.

[5]    To prevail on a civil RICO claim, the plaintiff must establish that the defendant engaged in "racketeering activity," which includes certain state felonies and federal crimes as "predicate offenses." *See* 18 U.S.C. §§ 1962(a); 1961(1).

[i]s being chastised," because they go well beyond the damages needed to provide adequate compensation. *Id.* at 404–05 (alteration in original) (quoting *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 263 (1981)). The *Lancaster* opinion, therefore, does not hinge on the *ability* of a municipal corporation to form the criminal intent required for civil RICO liability, but rather on the practical consequences that would flow from that liability.

The Third Circuit reached a similar outcome in *Genty v. Resol. Trust Corp.*, another civil RICO case. 937 F.2d 899 (3d Cir. 1991). The defendant in *Genty*, a municipal township, argued that it could not form the criminal intent necessary to commit the alleged predicate acts of bribery and mail fraud. In addressing that argument, the court noted that other courts had "long . . . held ordinary corporations civilly and criminally liable for the malicious torts or crimes of their high officers, particularly when the corporation benefits from the officers' offensive conduct." *Id.* at 909. The court then determined that it did not need to decide whether municipal corporations facing RICO claims were "an exception to this general rule," because it would base its decision entirely on the purposes and practical consequences of civil RICO liability, particularly the implications of treble damages for the taxpaying public. *Id.* at 910. Like the Ninth Circuit in *Lancaster*, the Third Circuit held that a civil RICO claim, "with its mandatory award of treble damages which are punitive in character, cannot be maintained against a municipal corporation." *Id.* at 914.

Where these same policy interests were not at issue, however, at least one court has held that plaintiffs' civil RICO claim could go forward, finding the defendants—officers and arms of an Indian Tribe—capable of forming criminal intent. *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 124 (2d Cir. 2019). In *Gingras*, the plaintiffs sought an injunction, eliminating the possibility of a treble damages award. Defendants contended that the Tribe, as a government entity, was incapable of forming the necessary mens rea. *Id*. The Second Circuit rejected the Tribe's argument, which

relied heavily on the same cases cited by CRMC here, concluding that those decisions "ha[ve] less to do with the inability of a public entity to form a criminal intent than with concern over the appropriateness of imposing the burden of punitive damages on taxpayers based on misconduct of a public official." *Id.* at 125. The court additionally concluded that "concern for the inappropriateness of saddling the taxpayers with the financial burden of punitive damages . . . is plainly not implicated where, as here, the relief sought is an injunction and not money damages." *Id.*

The Supreme Court denied certiorari in both *Gingras* and *Lancaster*, while no appeal was taken in *Genty*. *See Sequoia Cap. Operations, LLC v. Gingras*, 589 U.S. 1134 (2020); *Antelope Valley Hosp. Dist. v. Lancaster Cmty. Hosp.*, 502 U.S. 1094 (1992). The Supreme Court has, however, considered municipal liability in a different context, the civil False Claims Act. *Cook Cnty. v. United States ex rel. Chandler,* 538 U.S. 119 (2003).[6] In *Chandler*, a former project director brought a *qui tam* action under the False Claims Act against a medical institute operated by a county, accusing it of presenting fraudulent claims to obtain grant funds. The county defendant argued that as a municipality it could not be subject to punitive damages. *Id.* at 129 (citing *Newport*, 453 U.S. at 260 n.21). The Court rejected the argument, concluding that the False Claims Act's treble damages provision did not foreclose municipal liability. In doing so, the Court distinguished treble damages from "classic punitive damages" or a "pure penalty" on the basis that treble damages do not "leave the jury with open-ended discretion over the amount [to award]." 538 U.S. at 132. Such "open-ended discretion" would implicate two concerns: first, "that a local

---

[6]    Notably, the Ninth and Third Circuits decided *Lancaster* and *Genty*, respectively, over twenty years before the Supreme Court opined on the compensatory purposes of treble damages in *Chandler*.

government's taxing power makes it an easy target for an unduly generous jury"; and second, "that blameless or unknowing taxpayers [would] be unfairly taxed for the wrongdoing of local officials." *Id.* (quoting *Newport*, 453 U.S. at 267) (quotation marks omitted). The *Chandler* Court determined that the first concern was mitigated in False Claims Act cases, because the jury is only tasked with determining the amount of actual damages at issue, leaving the judge to apply the treble damages multiplier. *Id.* (citing 31 U.S.C. § 3729(a)). The second concern, the Court reasoned, was also less germane in the False Claims Act context, where municipalities are paying damages because they have defrauded the federal government. Liability in these cases would "expose only local taxpayers who have already enjoyed the indirect benefit of the fraud, to the extent that the federal money has already been passed along in lower taxes or expanded services." *Id.*

The *Chandler* Court also considered the purpose served by the False Claims Act's treble damages provision, ultimately determining that it did not serve as a "pure penalty." *Id.* "[T]reble damages have a compensatory side," the Court determined, "serving remedial purposes in addition to punitive objectives." *Id.* at 130 (citations omitted). The Court recognized that the Government suffers from "costs, delays, and inconveniences" resulting from fraudulent claims, and that "some liability beyond the amount of the fraud" is needed for full compensation. *Id.* Treble damages also serve the purpose of encouraging relators to bring *qui tam* actions, and of compensating for at least some amount of pre-judgment interest, which is not otherwise available under the Act. *Id.* at 131. In light of these additional purposes, the *Chandler* Court concluded that "the facts about the [False Claims Act] show that the damages multiplier has compensatory traits along with the punitive." *Id.* at 130.

With this foundation in mind, the Court turns to the criminal context of this case. The Court agrees with the Second Circuit in *Gingras* that "courts exempting municipalities from RICO

liability on the ground that they are incapable of forming a [criminal] mens rea have failed to furnish a defensible explanation for their conclusion." 922 F.3d at 124 (citing *Genty*, 937 F.2d at 909). On that basis, the Court rejects those holdings as unpersuasive in the criminal context presented here. The Court finds the approach employed in *Chandler*, considering the particular remedy sought and the process by which that remedy is imposed, to be the appropriate analysis. Taking guidance from the Supreme Court's approach in *Chandler*, the Court will analyze two key questions with respect to the criminal penalties (or remedies) available here: (1) whether the penalty operates as a "pure penalty"—that is, serves a purely punitive purpose; and (2) whether the penalty implicates the same concerns around "open-ended [jury] discretion" that preclude municipal liability for "classic punitive damages." *See* 538 U.S. at 132.

### a. Felony Conviction and Collateral Consequences

First, the Court considers the felony conviction itself. It is clear that a criminal conviction and sentence is inherently punitive. One express purpose of criminal sentencing is to "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). *Chandler* makes clear, however, that a penalty can be punitive and remain compatible with municipal liability, as long as it serves some other purpose and is not a "pure" penalty. *See* 538 U.S. at 130. Criminal sentences serve, and indeed are statutorily required to serve, non-punitive purposes, including providing restitution to any victims of the offense. *See* § 3553(a)(7).

CRMC emphasizes that a conviction in this case would require CRMC's exclusion from federal health insurance programs, including Medicare and Medicaid. *See* 42 U.S.C. § 1320a-7. The parties agree that exclusion under § 1320a-7(a)(3) is not discretionary—if CRMC were convicted in this case, it could no longer bill federal insurance programs. Hr'g Tr. at 38:10–39:1, 168:23–169:5. In the Court's view, mandatory exclusion is a collateral consequence, akin to a

criminal defendant losing his right to vote as the result of a felony conviction. Collateral consequences are not part of the defendant's sentence and are not imposed by a judge or jury. Instead, in the example of an individual defendant losing his right to vote, the loss of civil rights results from the interaction of the conviction with other statutory provisions. Those statutory provisions, in turn, reflect independent legislative judgments regarding the extent to which individuals with felony convictions should maintain certain rights and privileges. *See Wilson v. Flaherty*, 689 F.3d 332, 338 (4th Cir. 2012) (noting "particularized collateral consequences stemming from the way States and individuals have reacted to persons who have been convicted" of certain felonies). Similarly, CRMC's exclusion from federal insurance programs is not within the purview of the court, the jury, or the criminal process, but rather is one step removed. The Court finds, because of that attenuation, that exclusion under § 1320a-7(a)(3) is not properly considered part of CRMC's potential penalty in this case. Even if it were a penalty, exclusion clearly serves other purposes "in addition to punitive objectives." *See Chandler*, 538 U.S. at 130. One clear purpose—and possibly the primary purpose—is to prevent entities who have previously defrauded federal insurance programs from continuing to have access to the funds distributed by those programs. Mandatory exclusion under § 1320a-7(a)(3) therefore serves a protective function, as well as a punitive one.

The next question is whether exclusion under § 1320a-7(a)(3) would place the burden of CRMC's conviction on "innocent taxpayers" who would be "unfairly punished for the deeds of persons over whom they had neither knowledge nor control." *Newport*, 453 U.S. at 266. CRMC contends that exclusion would be financially disastrous, leaving "tens of thousands of people without ready access to healthcare." Dkt. No. 24 at 8. It is clear to the Court that, were CRMC to be convicted in this case and barred from billing Medicare, Medicaid, and other federal insurance

programs, it would almost certainly cease to exist in its current form. However, if CRMC is convicted in this case, it will be because a jury or the Court finds that it conspired to defraud the federal Government, oftentimes at the expense of patients. Eliminating a criminal actor from the marketplace may ultimately protect the community more than it harms it. Further, as discussed in Part III.B.2.a.i, *infra*, it is possible—and even likely—that the initial gap in access to care would be filled quickly, and possibly to the overall benefit of its patients, given the competition in the Hampton Roads healthcare market.

### b. Restitution

Were CRMC to be convicted, its sentence would include a restitution order. Such an order is mandatory under the Mandatory Victims Restitution Act, which provides that the district court "shall order . . . that the defendant make restitution to the victim of the offense" upon conviction for offenses "against property . . . , including any offense committed by fraud or deceit" as well as offenses "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. §§ 3663A(c)(1)(A)(ii), (B).

While restitution does serve punitive purposes, its "primary goal . . . is remedial or compensatory." *Paroline v. United States*, 572 U.S. 434, 456 (2014). It therefore falls squarely on the "payback" side of "the tipping point between payback and punishment" that concerned the *Chandler* court. *See Chandler*, 538 U.S. at 130. Restitution also does not raise concerns around "open-ended jury discretion" for two reasons: First, the Court determines the amount owed in restitution, not the jury; and second, restitution cannot exceed "the full amount of each victim's losses." *See* § 3664(f)(1)(A). The Court cannot award any victim a "windfall" by requiring that a defendant pay more than is necessary to make the victim whole. *See United States v. Ritchie*, 858 F.3d 201, 215–16 (4th Cir. 2017). In addition, based on the evidence regarding CRMC's financials,

and given that CRMC receives only very limited state funding, the Court finds that a restitution award would not be paid directly with taxpayer money. For those reasons, the Court finds that a restitution order would not constitute a "pure penalty," and does not preclude criminal liability against CRMC.

### c. Forfeiture

The Indictment against CRMC includes a forfeiture allegation. *See* Dkt. No. 1 at 30. "A forfeiture judgment is not a free-standing criminal offense, but rather a particular form of punishment for otherwise proscribed conduct." *United States v. Day*, 700 F.3d 713, 723 (4th Cir. 2012) (citation omitted). Were CRMC convicted on the charged offenses, the Court would be required at sentencing to order that CRMC "forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." 18 U.S.C. § 982(a)(7). "Forfeiture is mandatory even when restitution is also imposed." *United States v. Blackman*, 746 F.3d 137, 143 (4th Cir. 2014). While the restitution amount corresponds to the victim's losses, the forfeiture amount (or the property subject to forfeiture) corresponds to the defendant's ill-gotten gains. In other words, forfeiture is overwhelmingly concerned with unjust enrichment.

Restitution and forfeiture "serve distinct purposes: restitution functions to compensate the victim, whereas forfeiture acts to punish the wrongdoer." *Blackman*, 746 F.3d at 143 (citation omitted). There is, therefore, a punitive aspect to forfeiture. Viewing forfeiture as purely punitive, however, overlooks its practical interplay with restitution. While a defendant facing both a restitution order and a forfeiture order may perceive these two remedies as requiring him to "pay at least twice," the reality is that "the two remedies need not be at cross-purposes." *See* Hr'g Tr. at 39:2–8; *Blackman*, 746 F.3d at 143. Where a defendant fails to pay a victim the restitution he is

due, the Government has discretion to use the forfeited assets for that purpose. Because "[t]he government's ability to collect on a judgment often far surpasses that of an untutored or impecunious victim of crime," it may be that "a victim's hope of getting paid . . . rest[s] on the government's superior ability to collect and liquidate a defendant's assets." *Blackman*, 746 F.3d at 143.

Finally, the magnitude of the forfeiture order is also constrained, as the money or property subject to forfeiture cannot exceed the amount the defendant gained through his criminal conduct. And again, it is the Court who orders forfeiture. Fed. R. Crim. P. 32.2. There is no concern, therefore, that CRMC's size, revenue, or perceived use of state funds would sway a jury to order an excessive payment. *See Chandler*, 538 U.S. at 132 (discussing risk to municipal entities from "unduly generous juries"). For those reasons, the Court finds, as it did for restitution, that forfeiture does not constitute a "pure penalty" such that its availability precludes municipal liability.

### d. Fine

CRMC would also be subject to a fine of $500,000 or no more than twice the gross gain or loss that resulted from its criminal conduct. 18 U.S.C. §§ 3571(c)(3), (e). Unlike restitution and forfeiture, the purpose of a fine is overtly punitive. Importantly, however, the Court is not statutorily bound to impose any fine at all, much less the maximum fine authorized. *Compare* 18 U.S.C. § 3571 ("may be sentenced to pay a fine"), *with Genty*, 937 F.2d at 912 (noting that treble damages are statutorily required in civil RICO cases). In fact, the Court is prohibited from imposing a fine if doing so "[would] impair the ability of the defendant to make restitution." 18 U.S.C. § 3572(b). As with the other financial penalties, the jury plays no role in setting the fine. The Court finds, therefore, that while a fine is the criminal remedy bearing the closest resemblance

to a "pure penalty", its mere availability does not justify finding that CRMC cannot form criminal intent.

For those reasons, both the available penalties and the way in which the penalties would be determined support a finding that CRMC can form the required mens rea and be criminally liable under the charged statutes.

## 2. Whether CRMC Constitutes a "Person"

In Count One of the Indictment, CRMC is charged with violating 18 U.S.C. § 371, which imposes criminal liability where "two or more *persons* conspire . . . to defraud the United States." (emphasis added). Count Two charges CRMC under the federal healthcare fraud statute, 18 U.S.C. § 1347, which imposes liability for:

> *Whoever* knowingly and willfully executes, or attempts to execute, a scheme or artifice . . . to defraud any health care benefit program; or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services.

§ 1347(a)(1)–(2) (emphasis added).[7] CRMC contends that it cannot be considered a "person" whose conduct is punishable by these two statutes,[8] either because it is an arm of the state or because it is a municipal corporation. The Court will first analyze the arm-of-the-state issue before turning to CRMC's status as a municipal corporation.

---

[7]    CRMC is also charged with violating this statute under an aiding and abetting theory pursuant to 18 U.S.C. § 2, which provides that "[w]hoever . . . aids, abets, counsels, commands, induces or procures [the] commission [of an offense against the United States], is punishable as a principal."

[8]    Procedurally, the Court considers "personhood" to be an element of the charged offenses and treats this argument as asserting that the Indictment does not state a cognizable offense. *See* Fed. R. Crim. P. 12(b)(3)(v); *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency ("Oberg II")*, 745 F.3d 131, 136 (4th Cir. 2014) (finding, in civil context, that "personhood is an element of the statutory [False Claims Act] claim").

a. *Arm of the State*

In discussing whether CRMC is a "person" subject to liability or an arm of the state that is not subject to liability, the parties draw on a robust body of caselaw analyzing a similar question in *qui tam* actions under the civil False Claims Act. In that context, the Supreme Court has held that states are not "persons" amenable to suit. *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 787 (2000). Similarly, entities that are "arms of the state"—meaning they are "subject to sufficient state control to render them a part of the state"—are not "person[s]" under the False Claims Act. *United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.*, 681 F.3d 575, 579 (4th Cir. 2012) ("*Oberg I*"). The Fourth Circuit has articulated a four-factor test to determine whether a municipal entity constitutes a "person" who may be liable in a False Claims Act *qui tam* action. *Id.* at 579–80. Those factors are:

> (1) whether any judgment against the entity as defendant will be paid by the State or whether any recovery by the entity as plaintiff will inure to the benefit of the State;
>
> (2) the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions;
>
> (3) whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and
>
> (4) how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State.

*Id.* at 580 (citing *S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.*, 535 F.3d 300, 303 (4th Cir. 2008)). The same four factors are used to determine whether an entity has sovereign immunity from suit in federal court. *Id.* at 579–80 (citing *Hoover Universal, Inc.*, 535

F.3d at 303, and noting the "arm-of-the-state analysis used in the Eleventh Amendment context provides the appropriate legal framework for this inquiry").[9]

The *Oberg I* factors originated in the civil context. Because the parties agree that the framework applies, at least to some extent, in the context of a criminal case, the Court will begin by applying it to CRMC. *See* Hr'g Tr. at 158:15–159:12, 167:24–168:3. In conducting this analysis, the Court, similar to CRMC's treatment in its briefing, refers to CRMC and its governing authority, Chesapeake Hospital Authority, as interchangeable entities.[10]

### i. Payment of Judgments

The first and most important factor in the arm-of-the-state analysis considers "whether any judgment against the entity as a defendant will be paid by the State." *Oberg I*, 681 F.3d at 580. To answer that question, the Court analyzes both legal liability and functional liability. *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency ("Oberg II")*, 745 F.3d 131, 137 (4th Cir. 2014). The inquiry into legal liability considers "whether state law indicates that a judgment against the entity can be enforced against the State." *Id.* (citation modified). The functional liability

---

[9]     As the Fourth Circuit has recognized, "the Eleventh Amendment does not 'memorializ[e] the full breadth of the sovereign immunity retained by the States.'" *Jackson Creek Marine, LLC v. Maryland*, 153 F.4th 423, 429 (4th Cir. 2025) (alteration in original) (quoting *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 753 (2002)). Nevertheless, the term "Eleventh Amendment immunity" is often used by courts as a "convenient shorthand" but it is "something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment. Rather, . . . the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution[.]" *Alden v. Maine*, 527 U.S. 706, 713 (1999).

[10]     In its briefing on this issue, CRMC identifies the defendant as "Chesapeake Hospital Authority ('CHA'), which does business as the Chesapeake Regional Medical Center" and thereafter refers to both entities interchangeably throughout its argument. *See e.g.*, Dkt. No. 13 at 1, 17 (stating Chesapeake Healthcare Authority—not CRMC— "operates a mobile mammography unit that travels to several Virginia communities[,]" and "CRMC has served inpatients living in 375 distinct zip codes").

analysis, meanwhile, considers whether "as a *practical matter*, if the agency is to survive, a judgment must expend itself against state treasuries." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 50 (1994) (emphasis added).

The parties appear to agree that the Commonwealth of Virginia is not legally liable for Chesapeake Hospital Authority's judgments. Chesapeake Hospital Authority's Enabling Statute states that:

> [t]he bonds and other obligations of the Authority . . . *shall not be a debt of the Commonwealth or any political subdivision thereof* and neither the Commonwealth nor any political subdivision thereof other than the Authority shall be liable thereon, nor shall such bonds or obligations be payable out of any funds or properties other than those of the Authority.

Enabling Statute § 10 (emphasis added). In short, the statute expressly provides that the Commonwealth is not liable for Chesapeake Hospital Authority's "obligations."[11] Such an explicit statutory bar weighs heavily against finding that the Commonwealth would pay a judgment against Chesapeake Hospital Authority. *See Oberg II*, 745 F.3d at 138 (considering similar statutory language providing that "no obligation of the agency shall be a debt of the State").

CRMC argues, however, that the Commonwealth would be functionally liable for any penalties levied against it. In support of that proposition, CRMC cites the Hospital Authorities Act, Va. Code § 15.2-5300 *et seq.*, which provides that:

> In each city there shall be a political subdivision of the Commonwealth, with such public and corporate powers as are set forth in this chapter, to be known as the "hospital authority" of the city.

---

[11]     CRMC initially characterized this section of the Enabling Statute as only applying to bonds issued by Chesapeake Hospital Authority. *See* Dkt. No. 13 at 11. In its reply brief, however, CRMC seems to agree with the Government that § 10 applies to "financial obligations" generally. Dkt. No. 24 at 6. The Court agrees with this interpretation and reads "bonds *and other obligations*" to encompass financial obligations other than bonds issued by Chesapeake Hospital Authority. Enabling Statute § 10 (emphasis added).

*Id.* § 15.2-5302. The preceding declaration of findings and necessity states that "[t]he providing of adequate hospital and medical care are public uses and purposes for which public money *may* be spent." Va. Code § 15.2-5300 (emphasis added). CRMC contends that, with these grants of authority, the Virginia legislature delegated essential public functions to hospital authorities and signaled its intent to use state funds to ensure those functions were carried out.

However, as the Government points out, the General Assembly created Chesapeake Hospital Authority through the Enabling Statute and not pursuant to the Hospital Authorities Act, which was enacted thirty years after the creation of Chesapeake Hospital Authority. *See DuPuy-German v. Perwaiz*, No. CL20-2667, 2022 WL 18934088, at *2 (Va. Cir. Ct. Feb. 3, 2022). Even if the Court were to read the Hospital Authorities Act as applying to Chesapeake Hospital Authority, the language providing that public money *may* be spent on hospital authorities is clearly permissive ("may") rather than mandatory ("shall") and does not conclusively establish that the Commonwealth would cover a monetary judgment against Chesapeake Hospital Authority. *Cf. Oberg II*, 745 F.3d at 141 (considering Vermont's statutory duty to "support and maintain" a corporate entity and finding that "an obligation stated in such general terms is not conclusive").

Finding no clear evidence that the Commonwealth would be legally liable for a potential criminal judgment against Chesapeake Hospital Authority, the Court turns to functional liability which considers whether, despite any legal liability, a judgment would put state funds at risk. *See, e.g., Hutto*, 773 F.3d at 543 (citation omitted) ("Thus, if the State treasury will be called upon to pay a judgment against a governmental entity, then Eleventh Amendment immunity applies to that entity."). The Government suggests that history is a helpful guide, pointing out that CRMC has not identified a single example of the Commonwealth paying an obligation or judgment on Chesapeake Hospital Authority's behalf. *See* Hr'g Tr. at 162:19–24 (concession from CRMC's

23

counsel of no historical examples). The Government additionally points to a 2018 settlement between Chesapeake Hospital Authority and a federal agency, where Chesapeake Hospital Authority appears to have covered the settlement amount with its own funds. *See* Dkt. No. 23 at 9; Dkt. No. 23-2. The settlement concerned, among other things, Chesapeake Hospital Authority's purported overpayment for physician services in violation of 42 U.S.C. § 1320a-7b, which establishes penalties for illegal payments for physician services. The Settlement Agreement, which obligated Chesapeake Hospital Authority to pay approximately $180,000 to the federal government, was approved at a Chesapeake Hospital Authority board meeting with no state government representatives present (for example, from the Attorney General's Office). *See* Dkt. No. 23-3. The Settlement Agreement was subsequently signed on behalf of Chesapeake Hospital Authority by its President & CEO and by an attorney at a private law firm. Dkt. No. 23-2 at 4. No state government officials signed the agreement. While not a criminal penalty, the Court does find Chesapeake Hospital Authority's resolution of this financial obligation—seemingly without input from or recourse to the Commonwealth of Virginia—to be instructive.

The overwhelming majority of Chesapeake Hospital Authority's revenue comes from patient services—that is, payments from public and private insurers or from self-paying patients. *See* Dkt. No. 23–4 at 9 (financial statements showing that in fiscal year 2023, patient service revenue made up approximately 97% of CRMC's total revenue); Hr'g Tr. at 72:6–8. The former Chief Financial Officer testified that during his three years managing Chesapeake Hospital Authority's financials, the hospital did not receive any funding from the Commonwealth of Virginia. Hr'g Tr. at 69:24–70:4, 71:24–72:4. As evidence that the Commonwealth does appropriate money to Chesapeake Hospital Authority, CRMC cites an appropriation of $4.5 million that Chesapeake Hospital Authority received from the Virginia General Assembly for

behavioral health services in 2023.[12] *See* Dkt. No. 13 at 12–13; H.B. 6001, 2023 Gen. Assemb., Spec. Sess. 1, at ch. 1, item 312 § U.2 (Va. 2023). The most recent figure provided by the parties for Chesapeake Hospital Authority's total revenue was in excess of $350 million for fiscal year 2019. Dkt. No. 23–4 at 9. Assuming no increase in revenue between fiscal year 2019 and fiscal year 2023, the $4.5 million appropriated by the General Assembly would account for only 1% of revenue. CRMC has not identified any other appropriations from the General Assembly.[13] *See* Hr'g Tr. at 163:9–18. The General Assembly's modest contribution through the behavioral health appropriation does not, without more, indicate that the Commonwealth "provides whatever economic support is necessary over and above [CRMC's] net revenues to insure its continued vitality." *Ristow v. S.C. Ports Auth.*, 58 F.3d 1051, 1054 (4th Cir. 1995).

Despite these facts, CRMC cites *Ristow* in support of its argument that a conviction in this case would have the practical effect of implicating the state's treasury. In *Ristow*, the Fourth Circuit determined that the South Carolina Ports Authority was an arm of the state for Eleventh Amendment purposes, even though, like here, "nothing in the South Carolina statutes or case law impos[ed] liability per se on the state for judgments against its Ports Authority." *Id.* at 1053. The similarities stop there, as there are key structural differences between the Ports Authority and

---

[12]    The behavioral health appropriation was made following a competitive bidding process. As the Government notes, other organizations that are indisputably not arms of the state, including Restoration and Hope House and the Jewish Foundation for Youth Homes, also received funds through the bill. *See* H.B. 6001, 2023 Gen. Assemb., Spec. Sess. 1, at ch. 1, item 312 §§ K, T (Va. 2023).

[13]    One witness for CRMC, Randy Forbes, who previously served in the Virginia General Assembly, testified that "the General Assembly ha[d] appropriated dollars to [Chesapeake Hospital Authority] throughout the years." Hr'g Tr. at 112:3–18. However, Forbes could not recall how many appropriations were made or the amounts appropriated. *Id.* at 112:3–4. When the Court asked counsel for CRMC if there had been General Assembly contributions other than the behavioral health appropriation, referencing Forbes' testimony, counsel was unable to identify any. *Id.* at 163:9–18. The Court, therefore, has no basis for considering additional appropriations.

Chesapeake Hospital Authority which weigh against a finding of functional liability in this case. In *Ristow*, South Carolina had issued over one hundred million dollars in bonds to fund the Ports Authority's capital improvements. *Id.* at 1053–54. Those bonds were repaid using general tax revenue. *Id.* at 1054. By comparison, Chesapeake Hospital Authority's Enabling Statute expressly disclaims the Commonwealth's liability for its bond obligations. *See* Enabling Statute § 10. The South Carolina legislature also had the ability to withdraw funds from the Ports Authority, which it regularly did. *Ristow*, 58 F.3d at 1054. Here, Chesapeake Hospital Authority's profits or surplus "stay[] within the entity" and are not disbursed back to the Commonwealth. Hr'g Tr. at 72:19–73:1. Given these key differences, the Court finds that a judgment against Chesapeake Hospital Authority would *not* "involve the core concern of the Eleventh Amendment—the ebb and flow of funds into and out of [the Commonwealth's] treasury." *Ristow*, 58 F.3d. at 1054–55 (citation modified).[14]

---

[14]    CRMC cites Chesapeake Hospital Authority's treatment under federal tax law and under the federal Employee Retirement Income Security Act ("ERISA") in support of the first factor. *See* Dkt. No. 13 at 13. It is not clear to the Court how Chesapeake Hospital Authority's treatment under these federal statutes informs "whether any judgment against [CRMC] as defendant [would] be paid by the [Commonwealth]." *See Oberg I*, 681 F.3d at 580. CRMC does not cite caselaw connecting an entity's status under ERISA or the tax code to the arm-of-the-state analysis.

CRMC has presented expert testimony from a tax lawyer, Douglas Mancino, who previously advised the Chesapeake Hospital Authority. Mancino formed the opinion through that representation that Chesapeake Hospital Authority was a *political subdivision*. Hr'g Tr. at 52:18–21. That opinion, however, contradicted the IRS's determination that Chesapeake Hospital Authority was an *instrumentality* of the Commonwealth of Virginia. *See id.* at 65:6–10. An "instrumentality" of the Commonwealth is an entity with fewer delegated powers than a political subdivision. *Id.* at 66:2–7. These conflicting analyses have little bearing on the Court's reasoning because CRMC has not articulated a compelling connection between "political subdivision" status, "instrumentality" status, and arm-of-the-state status.

On the ERISA issue, Mancino's testimony established that Chesapeake Hospital Authority's employee benefit plans are treated as "governmental plans," and are therefore exempt from ERISA. Hr'g Tr. at 54:5–8; *see* 29 U.S.C. § 1003(b)(1). Again, it is not clear to the Court that providing "governmental plans" weighs one way or the other in the arm-of-the-state analysis. However, Mancino also testified that the Commonwealth has no liability as to Chesapeake

No doubt recognizing the absence of any compelling historical evidence of functional liability, CRMC urges the Court to look forward. As discussed in Part III.B.2.a.i, *supra*, federal law mandates exclusion from federal health programs, including Medicare and Medicaid, for any entity that is convicted of healthcare fraud. 42 U.S.C. § 1320a-7(a)(3). CRMC contends that this consequence would be so "calamitous" that the Commonwealth would have no choice but to step in. *See* Dkt. No. 24 at 6. The Court, however, finds the potential impact of CRMC's exclusion under § 1320a-7(a)(3) to be too "indirect . . . and ancillary" to support a finding of functional liability. *See Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 225 (4th Cir. 2001). Chesapeake Hospital Authority's former Chief Financial Officer testified that the healthcare market in the Hampton Roads area is competitive, with CRMC facing market pressure from players like Sentara and Bon Secours. Hr'g Tr. at 76:11–24. As discussed above, a conviction in this case, and the resulting exclusion from federal insurance programs, would almost certainly be fatal for CRMC. And it is possible that, facing a gap in care, the General Assembly would decide to step in and fund the creation of another hospital authority.[15] It is also possible, however, that the other health care organizations in the Hampton Roads market would expand to meet any unmet demand. The causal connection between a criminal judgment and the state treasury is, therefore, too attenuated to shift the analysis in CRMC's favor. The Court cannot find by a preponderance of the evidence

---

Hospital Authority's ERISA plan, which provides an additional indication of financial separation between the two. *Id.* at 59:14–24.

[15]     It is also possible that the General Assembly would not do so. CRMC has enjoyed significant competitive advantages in the marketplace—it is exempt from state and federal taxes and participates in the Virginia Debt Setoff Program, which allows CRMC to garnish patients' tax refunds to recapture any payments owed to CRMC. Hr'g Tr. at 84:14–17. Private hospitals, and even nonprofit hospitals, do not participate in the Debt Setoff Program. *Id.* at 84:25–85:4. None of these benefits, however, have resulted in lower prices for insurance companies or patients. *See id.* at 74:5–11.

that the Commonwealth would bear the cost of a criminal judgment against CRMC, even indirectly.

### ii. Degree of Autonomy

The second factor in the arm-of-the-state analysis is "whether the entity exercises a significant degree of autonomy from the state." *Ram Ditta By and Through Ram Ditta v. Md. Nat. Capital Park and Plan. Comm'n*, 822 F.2d 456, 457–58 (4th Cir. 1987). This includes consideration of "who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions." *Oberg I*, 681 F.3d at 575 (citation omitted). "Also relevant to the autonomy inquiry is the determination whether an entity has the ability to contract, sue and be sued, and purchase and sell property' and whether it is represented in legal matters by the state attorney general." *Oberg II*, 745 F.3d at 137 (citations omitted).

Chesapeake Hospital Authority appears to operate with significant autonomy from the Commonwealth of Virginia, though it does so within the guardrails of the Enabling Statute. The Enabling Statute prescribes the process by which Chesapeake Hospital Authority's board is appointed, the amount of compensation that board members can receive, and the frequency with which they must meet. Enabling Statute § 2. Ultimately, however, the members of the board are appointed by and "serve at the pleasure of" the Chesapeake City Council. *Id.* They are not appointed by the Governor of Virginia or any other state government official. *See Ram Ditta*, 822 F.2d at 458 (finding that commission was autonomous from state in part because its members were appointed by county governments); *cf. Oberg II*, 745 F.3d at 139 (finding that an agency was sufficiently autonomous to not be an arm of the state even where the Pennsylvania Governor appointed its board of directors). Chesapeake Hospital Authority's employees are not employed

by the Commonwealth of Virginia, and the General Assembly does not control how much they are paid or when they can be hired or fired. Hr'g Tr. at 121:11–15.

As discussed in relation to the first factor, Chesapeake Hospital Authority also operates with significant financial independence from the Commonwealth of Virginia. Chesapeake Hospital Authority obtains the vast majority of its revenues from insurance reimbursements, not from state funds. That means that the Commonwealth is not leveraging "the power of the purse" to ensure that Chesapeake Hospital Authority's operations "reflect the General Assembly's changing legislative priorities." *See Singleton*, 103 F.4th at 1051. Chesapeake Hospital Authority obtains its own insurance. Hr'g Tr. at 73:19–74:1; *see Cash*, 242 F.3d at 225 (finding that a school board's statutory authority to purchase liability insurance weighed against treating it as an arm of the state). Chesapeake Hospital Authority's Enabling Statute grants it the ability to contract, sue and be sued, purchase and sell property, and even exercise the power of eminent domain. Enabling Statute §§ 1, 5. Its former Chief Financial Officer testified that Chesapeake Hospital Authority's budget is approved annually by its board, not by the General Assembly. Hr'g Tr. at 73:2–3, 73:16–18. Chesapeake Hospital Authority is also not required to get approval from the General Assembly before beginning a capital improvement project. *Id.* at 73:16–18. Each of these indicia support a finding that Chesapeake Hospital Authority operates with significant autonomy in financial matters and is not an arm of the state.

CRMC is not represented by the Attorney General's office in this case and does not cite an example of it or Chesapeake Hospital Authority *ever* being represented by the Attorney General's office. *Compare with Singleton*, 103 F.4th at 1046 (finding that an entity was an arm of the state where state statute designated the Maryland Attorney General as its legal advisor and prohibited the entity from hiring additional lawyers without Attorney General approval). The Government

additionally cites cases in both state and federal court, as well as the previously discussed Settlement Agreement, where Chesapeake Hospital Authority was represented by private counsel. *See, e.g., DuPuy-German*, 2022 WL 18934088; *Hardy v. Chesapeake Hosp. Auth.*, No. 2:24-cv-29 (E.D. Va. filed Jan. 12, 2024); *Chesapeake Hosp. Auth. v. Commonwealth, Dep't of Med. Assistance Servs.*, 85 Va. Cir. 387 (Va. Cir. Ct. 2012). Included among these cited cases is a case where the Attorney General's office represented the opposing party—the Virginia State Health Commissioner. *Chesapeake Hosp. Auth. v. State Health Comm'r*, 872 S.E.2d 440 (Va. 2022). The Court agrees with the Government that it would make little sense to find that Chesapeake Hospital Authority is the arm of the state when it has also litigated *against* state officials and agencies. *See Ram Ditta*, 822 F.2d at 457.

Arguing that the Virginia Attorney General has some role in Chesapeake Hospital Authority's legal affairs, CRMC cites a Virginia statute providing that "[w]here any dispute, claim or controversy involves the interests of any . . . authority . . . of the Commonwealth, the Attorney General *may* compromise and settle or discharge the same" after obtaining approval from the head of the authority. Va. Code § 2.2-514 (emphasis added). Where the settlement amount exceeds $250,000, the Attorney General's office must also obtain approval from the Governor. *Id.* Crucially, however, this statutory language is permissive—the Attorney General's office *may* settle claims involving authorities of the Commonwealth, but it is not required to. Further, CRMC provides no evidence of the Virginia Attorney General ever exercising its authority under the statute and actually compromising a claim against Chesapeake Hospital Authority. *See* Hr'g Tr. at 132:10–19. Absent any historical evidence, the Court cannot find that the Attorney General's office exercises meaningful control through this provision.

There is some dispute over whether and from whom Chesapeake Hospital Authority would have to obtain permission if it were to sell all of its assets and dissolve. The Enabling Statute provides that Chesapeake Hospital Authority "may not sell or otherwise dispose of all, or substantially all, of its property providing hospital care" without the approval of the Chesapeake City Council. Enabling Statute § 5. While two witnesses for CRMC speculated that Chesapeake Hospital Authority would need approval from the Virginia General Assembly to dissolve, the Court finds no basis to credit that speculation. *See* Hr'g Tr. at 97:6–8, 155:16–23. Chesapeake Hospital Authority's former Chief Financial Officer testified that he did not recall obtaining state approval for the sale of any asset during his time working for the Chesapeake Hospital Authority. *Id.* at 77:9–13. A 2002 advisory opinion to a member of the House of Delegates from the Virginia Attorney General, meanwhile, indicates that hospital authorities created under the Hospital Authorities Act[16] must petition a state circuit court, not the state legislature, before they can dissolve. Counties, Cities, and Towns: Hospital Authorities, 2002 Op. Att'y Gen. 2-084 (Va. 2002). Absent conclusive evidence one way or the other, the Court finds that the issue of complete asset sale or dissolution is neutral in the autonomy analysis.

In response to these points, CRMC argues that although Chesapeake Hospital Authority "functions with a degree of autonomy," the Commonwealth's control over its structure, scope of operations, and use of funds should be controlling here. CRMC cites restrictions in the Enabling Statute, as well as the General Assembly's ability to amend the Enabling Statute, to argue that the Commonwealth has significant power to shape Chesapeake Hospital Authority's operations. For example, the Enabling Statute lists the services that it can provide, requires that Chesapeake

---

[16]    As noted in Part I, *supra*, the Chesapeake Hospital Authority was not established under the Hospital Authorities Act, Va. Code § 15.2-5300 *et seq*, and instead was created pursuant to its own Enabling Statute.

Hospital Authority hold all funds in trust, prohibits it from discriminating when it procures goods and services, and limits how it can exercise its power of eminent domain. Enabling Statute §§ 2–5, 7.3, 14. The General Assembly has also amended the Enabling Statute a dozen times and could do so in the future. Hr'g Tr. at 119:6–12. Chesapeake Hospital Authority is clearly both state-created and, through the structure of the Enabling Statute, remains under some degree of state control.

Chesapeake Hospital Authority's status as a creature of statute is not, however, dispositive. "[U]ltimate control of every state-created entity resides with the State, for the State may destroy or reshape any unit it creates." *Hess*, 513 U.S. at 47. The purpose of the *Oberg* factors, and of the autonomy factor in particular, is to parse the relative degree of control. *See Oberg I*, 681 F.3d at 580. The dividing line, for sovereign immunity purposes, is between "a State-created entity functioning independently of the State" and "a State-created entity functioning as an arm of the state." *Id.* (quoting *Hoover Universal*, 535 F.3d at 303).

It is instructive to compare Chesapeake Hospital Authority to state universities—which have "[a]lmost universally" been deemed arms of the state—and to hospitals affiliated with state universities. *See Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255 (4th Cir. 2005) (citations omitted) (finding that the University System of Maryland is an arm of the state and collecting cases finding the same for other state universities). For example, the District of South Carolina determined that the Medical University Hospital Authority ("Medical University") is an arm of the state of South Carolina, in large part because "the State of South Carolina maintains a 'veto' over many of [the Medical University's] actions." *MUSC Health Cancer Care Org., LLC v. Med. Univ. Hosp. Auth.*, 659 F. Supp. 3d 700, 712 (D.S.C. 2023). The Medical University can only purchase or dispose of real estate with approval from a state agency. *Id.* Like Chesapeake Hospital

Authority, the Medical University cannot levy taxes, making it "more like an arm of the state than a county or city." *Id.* (*quoting Md. Stadium Auth.*, 407 F.3d at 264). Unlike Chesapeake Hospital Authority, however, the Medical University requires state approval to issue bonds. *Id.* The Medical University shares a Board of Trustees with the Medical University of South Carolina, and the members of that Board are appointed by the state General Assembly and the Governor. *Id.* The South Carolina legislature and the Governor also have the power to audit the Medical University, imposing a level of financial oversight that does not apply to Chesapeake Hospital Authority. *Id.* In short, in nearly every area where Chesapeake Hospital Authority answers only to its board or to the City of Chesapeake, the Medical University answers to the state.

The Court finds that, while the Commonwealth imposes some limitations on Chesapeake Hospital Authority through the Enabling Statute, the Commonwealth does not "retain[] a veto" over Chesapeake Hospital Authority. *See Oberg*, 681 F.3d at 575. On balance, therefore, the second factor weighs against finding that Chesapeake Hospital Authority is an arm of the state.

### iii. Involvement in State Versus Non-State Concerns

Under the third arm-of-the-state factor, the Court considers whether Chesapeake Hospital Authority "is involved with statewide, as opposed to local or other non-state concerns." *Oberg II*, 745 F.3d at 137 (quoting *Hoover Universal*, 535 F.3d at 307). "[O]ther non-state concerns" include out-of-state operations. *Id.*

CRMC argues that, as a healthcare provider, it is inherently involved in statewide concerns because healthcare is an important government function. Whether an entity "is engaged in an area of statewide concern" is relevant to the third factor. *See, e.g., Md. Stadium Auth.*, 407 F.3d at 265 (finding that the University of Maryland is an arm of the state in part because "[h]igher education is an area of quintessential state concern and a traditional state governmental function"). The

inquiry does not end there, however. Fourth Circuit caselaw indicates that when an entity's service area is local, the entity may still be primarily involved in local concerns, even if its services further an important state interest. For example, in *Cash*, the Fourth Circuit determined that a county school board was involved in local concerns, even though education was a statewide concern. 242 F.3d at 226. The *Cash* court also noted that "[j]ust as law enforcement can be thought of as a statewide concern, we have nevertheless concluded that a county sheriff's duties . . . can be primarily local." *Id.* (citing *Harter v. Vernon*, 101 F.3d 334, 342 (4th Cir. 1996)).

The Court agrees that healthcare "is an area of quintessential state concern." *Md. Stadium Auth.*, 407 F.3d at 265. Chesapeake Hospital Authority does not, however, provide statewide services and its focus is indisputably regional. Its Enabling Statute designates it as "a public instrumentality . . . to provide for the public health, welfare, convenience and prosperity of the *residents of the City of Chesapeake* and such other persons who might be served by the Authority." Enabling Statute § 3 (emphasis added). CRMC attributes significant weight to the phrase "such other persons," arguing that it extends Chesapeake Hospital Authority's service area beyond the City of Chesapeake. Reading the Enabling Statute as a whole, however, makes clear that the General Assembly intended Chesapeake Hospital Authority's focus to be largely local. For example, the Enabling Statute provides that Chesapeake Hospital Authority's members will be chosen by the Chesapeake City Council. *Id.* § 2. It also provides that Chesapeake Hospital Authority can exercise the power of eminent domain, but only "within the corporate limits of the City of Chesapeake." *Id.* § 5. Even CRMC concedes—as the current iteration of its name would suggest—that "its operations have a regional focus" within the Hampton Roads area, including Newport News, Norfolk, Virginia Beach, and Suffolk. Dkt. No. 13 at 17; Dkt. No. 24 at 11. CRMC appears to suggest, however, that there is a meaningful difference, for purposes of the arm-of-the-

state analysis, between a "regional" focus and a "local" one. The Court is not convinced. The crucial question for purposes of this factor is whether Chesapeake Hospital Authority's focus is "statewide." If Chesapeake Hospital Authority provides services only to a particular region of the state, it is not "involved . . . in statewide concerns." *See Oberg II*, 745 F.3d at 139.

Other courts considering hospitals and hospital authorities have found such entities to be arms of the state not just because they provided healthcare, but also because they functioned under significant state control, performed teaching functions, or both. *See, e.g., MUSC*, 659 F. Supp. 3d at 711–13. For example, the Fifth Circuit found that the University of Texas Health Science Center in Houston was an arm of the state in part because "[e]ducation and research are statewide concerns," but also because the University of Texas System is governed by a board of regents whose members are appointed by the Governor. *United States ex rel. King v. Univ. of Tex. Health Scis. Ctr.-Houston*, 544 F. App'x 490, 497–98 (5th Cir. 2013). The Court finds that, while Chesapeake Hospital Authority certainly operates in an area of statewide concern, its focus is inherently local, rather than statewide.[17] The third factor therefore counsels against finding that it is an arm of the state.

### iv. Treatment Under State Law

The final factor in the arm-of-the-state inquiry considers "how the entity is treated under state law," including under "relevant state statutes, regulations, and constitutional provisions which characterize the entity," as well as "the holdings of state courts on the question." *Oberg II*, 745 F.3d at 138 (citations omitted). In other words, even though the arm-of-the-state inquiry is

---

[17] The statistics cited by CRMC to describe its patient population do not change the Court's analysis. CRMC argues that in 2024, it served "inpatients living in 375 distinct zip codes, 366 of which were outside the City of Chesapeake." Dkt. No. 13 at 17. This artfully presented datapoint is largely unhelpful because it does not tell the Court the proportion of CRMC's patient population that comes from outside of Chesapeake or the Hampton Roads region.

ultimately a federal question, the fourth factor asks whether state law has "define[d] the agency's character." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 430 n.5 (1997).

Here, Chesapeake Hospital Authority's Enabling Statute defines its character as a "public instrumentality" that exercises "public and essential governmental functions." Enabling Statute § 3. That statutory language invokes the foundational principle under Virginia law that "sovereign immunity protects municipalities from tort liability arising from the exercise of governmental functions." *City of Chesapeake v. Cunningham*, 604 S.E.2d 420, 426 (Va. 2004) (citation omitted). Municipalities—or municipal corporations—are not, however, protected by sovereign immunity when they exercise "proprietary functions." *Id.* Against this backdrop, Virginia state courts have consistently determined that Chesapeake Hospital Authority is entitled to sovereign immunity. *See DuPuy-German*, 2022 WL 18934088, at *2 ("[a]ssuming, without deciding, that [Chesapeake Hospital Authority] is not an arm of the Commonwealth entitled to sovereign immunity," but determining that Chesapeake Hospital Authority is immune as a municipal corporation performing governmental functions); Dkt. No. 13 at 49–75 (collecting cases). While these cases show that state courts regularly afford Chesapeake Hospital Authority the protections of sovereign immunity, they do so not necessarily because they view it as an extension of the state, but because of the functions and services that Chesapeake Hospital Authority provides. While the Court "give[s] deference to the rationale used by a state court in deciding questions of state sovereign immunity," the inquiry here must "include all factors bearing on the federal policy entitling appropriate governmental entities to [E]leventh [A]mendment immunity." *See Ram Ditta*, 822 F.2d at 460. Under Eleventh Amendment analysis, immunity "does not extend to counties and similar municipal corporations, even if the counties and municipalities exercise a slice of State power."

*Cash*, 242 F.3d at 222 (citation modified). Federal immunity doctrine, in other words, explicitly disclaims the functionalist approach that applies under Virginia law.

The fourth factor, therefore, reflects a more expansive concept of sovereign immunity under Virginia law. That more expansive concept operates in Chesapeake Hospital Authority's favor in Virginia courts. The Court is not convinced, however, that Virginia courts view Chesapeake Hospital Authority as being the state's "alter ego." Instead, the sovereign immunity analysis appears to turn on Chesapeake Hospital Authority's putative status as a municipal corporation, and the extent to which it performs essential government functions.

This factor is at best neutral: On the one hand, Chesapeake Hospital Authority is protected by immunity that is akin to the immunity enjoyed by the state itself; on the other hand, that immunity results from an analysis that federal law has expressly disclaimed. Regardless of which way the scales tip, the fourth factor cannot outweigh the other three, all of which counsel against defining Chesapeake Hospital Authority as an arm of the state. *See Ram Ditta*, 822 F.2d at 459–60. In accordance with all four *Oberg I* factors, the Court concludes that Chesapeake Hospital Authority is not an arm of the state. It follows that, absent some other basis for exclusion, Chesapeake Hospital Authority constitutes a "person" within the meaning of the charged statutes.

### b. Status as a Municipal Corporation

Having found that CRMC is not an arm of the state, the Court next considers whether CRMC is otherwise excluded from the definitions of "persons" who may be criminally liable under 18 U.S.C. §§ 2, 371, and 1347. CRMC argues that, arm-of-the-state status notwithstanding, a

municipal corporation cannot be a "person" within the meaning of these statutes.[18] Thus, this issue turns on the Court's interpretation of the term "person" in each statute.

The parties agree that the Dictionary Act, 1 U.S.C. § 1, governs the relevant statutory language. The Dictionary Act provides that, "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' include corporations . . . as well as individuals." 1 U.S.C. § 1. Both the Supreme Court and the Fourth Circuit have "applied the Dictionary Act's definition of the term 'person' to the statutes defining criminal offenses in Title 18 of the United States Code." *United States v. Bly*, 510 F.3d 453, 462 (4th Cir. 2007) (citing *United States v. A&P Trucking*, 358 U.S. 121 (1958)). It is also well-established that "municipal corporations, like private ones, 'should be treated as natural persons for virtually all purposes of constitutional and statutory analysis.'" *Chandler*, 538 U.S. at 127 (quoting *Monell v. N.Y. City Dept. of Soc. Servs.*, 436 U.S. 658, 687–88 (1978)). Absent contextual evidence that Congress intended otherwise, this convention applies as codified in the Dictionary Act. *Id.* at 127–28.

The Supreme Court's analysis in *Chandler* provides a helpful starting point on this issue. There, the Court held that municipal corporations, including counties, are "persons" who may be liable in *qui tam* actions under the civil False Claims Act. In drawing that conclusion, the Court noted that, by the time the False Claims Act was enacted in 1863, it was well-understood that "municipal corporations and private ones were simply two species of body politic and corporate, treated alike in terms of their legal status as persons capable of suing and being sued." *Id.* at 126–

---

[18]    In addressing this argument, the Court assumes without deciding—and the parties do not dispute—that Chesapeake Hospital Authority can properly be considered a municipal corporation in accordance with its treatment under state law. *See DuPuy-German*, 2022 WL 18934088, at *2 (finding that the "express language of [Chesapeake Hospital Authority's Enabling Statute] leaves no doubt that the Hospital Authority has the attributes of a municipal corporation").

27 (citation modified). The originally enacted version of the False Claims Act also included a provision for criminal liability. *Id.* at 128 (citing Act of Mar. 2, 1863, ch. 67, §§ 1, 3, 12 Stat. 696–98). The *Chandler* Court assumed, without deciding, that a municipal corporation could be subject to criminal penalties for fraud against the federal government, noting that "it has not been regarded as anomalous to require compliance by municipalities with the substantive standards of federal laws which impose *both civil and criminal* sanctions upon 'persons.'" *Id.* (citation modified) (emphasis added).

If it was well-established in 1863 that "persons" included municipal corporations, it was also well-established in 1867, when the first federal criminal conspiracy statutes were enacted, and in 1996, when the healthcare fraud statute was enacted. *See Tanner v. United States*, 483 U.S. 107, 128 (1987) (describing 18 U.S.C. § 371 as "the descendent of . . . conspiracy laws that have been in the federal statute books since 1867"). It follows that, absent evidence in the legislative history that Congress intended to displace the traditional definition of "persons," the Dictionary Act applies. The Court finds no contextual clues indicating that Congress intended to disrupt the operation of the Dictionary Act on these two statutes. The legislative history of the healthcare fraud statute, in particular, indicates that Congress intended for it to have expansive reach. *See* H.R. Rep. No. 104-747 (1996), at *2 (describing "[t]he need to confront waste, fraud and abuse in the Nation's health care plans more aggressively"). Reading the two statutes to include fraud perpetrated by municipalities makes even more sense in an era when county and regional hospitals like CRMC are major participants in federal health insurance programs and are "no less able than individuals or private corporations" to perpetrate fraud against those programs. *Chandler*, 538 U.S. at 129 (citing *Monell*, 436 U.S. at 685–86 (finding that municipalities could "equally with natural persons, create the harms intended to be remedied by [42 U.S.C. § 1983]")).

CRMC also urges the Court to adhere to the "presumption" that statutory "persons" do not include sovereign entities. To the extent CRMC argues that this presumption should apply to *local* sovereign entities, the Court finds that argument unavailing. CRMC does not identify any cases applying a presumption against statutory personhood to sovereign entities smaller than a state. Such a presumption would fly in the face of the Supreme Court's rulings in *Monell* and *Chandler* that local entities can be "persons" within the meaning of civil statutes. If this theoretical presumption exists, therefore, it applies only in the criminal context and has not yet been articulated by any court. In urging this Court to be the first to do so, CRMC invokes the "rule of lenity." Hr'g Tr. at 158:1–4. The rule of lenity "applies only when, after consulting traditional canons of statutory construction, [the Court is] left with an ambiguous statute." *Shular v. United States*, 589 U.S. 154, 165 (2020) (quoting *United States v. Shabani*, 513 U.S. 10, 17 (1994)). The rule of lenity is not, however, triggered merely by a novel theory of prosecution or a new type of criminal case. The Court does not find that the statutes at issue here are ambiguous. Rather, the traditional canons of statutory construction point the Court towards the long-standing principle that "municipal corporations, like private ones, 'should be treated as natural persons for virtually all purposes of constitutional and statutory analysis.'" *Chandler*, 538 U.S. at 120 (quoting *Monell*, 436 U.S. at 687–88). CRMC has not offered a compelling reason—beyond the mere novelty of the prosecution—to abandon that principle here.

### 3. Sovereign Immunity

CRMC's final argument in favor of dismissal is that, even if it is treated as a municipal corporation rather than an arm of the state, it does nonetheless enjoy some form of sovereign immunity from federal criminal prosecution. In support of this argument, CRMC cites only Virginia state court cases, with the exception of one Fourth Circuit case that applied Virginia law.

*See* Dkt. No. 13 at 24 (citing *Massey v. Va. Polytechnic Inst. & State Univ.*, 75 F.4th 407, 415 (4th Cir. 2023)). In these cases, the Virginia courts determined that municipal corporations were immune from suit under the doctrine of state sovereign immunity when they were engaged in governmental functions. However, "just because a person or entity has a defense or immunity under state law does not mean it can claim federal-law sovereign immunity." *Global Innovative Concepts, LLC v. Fl. Div. Emergency Mgmt.*, 105 F.4th 139, 142 (4th Cir. 2024).

To put it simply, sovereign immunity in federal courts is strictly a question of federal law—and a nuanced one at that. *See, e.g., Jackson Creek Marine, LLC v. Maryland*, 153 F. 4th 423, 428 (4th Cir. 2025) (providing extensive overview of the history and development of state sovereign immunity). It is well-settled that "Eleventh Amendment immunity does not extend to mere political subdivisions . . . such as counties or municipalities." *Kitchen v. Upshaw*, 286 F.3d 179, 183–84 (4th Cir. 2002) (citing *Mt. Health City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). Nevertheless, CRMC contends that entities like Chesapeake Hospital Authority enjoy some form of inherent immunity that is "foundational to the Constitution" and analogous to the immunity that the states retained when they entered the union. Hr'g Tr. at 172:9–14. That purported immunity, however, clearly does not apply in the civil context, given the Supreme Court's holdings in *Chandler* and *Monell*. The immunity CRMC advocates for, then, is an immunity for local government entities from criminal prosecution. On the evidence provided, the Court does not find a compelling historical or normative reason to articulate such a doctrine.

State sovereign immunity, with its evolving contours, reflects a centuries-long effort to fine-tune the balance between state and federal power. That effort has been spurred along by national emergencies, and with accompanying anxieties over federal intervention or lack thereof. At its inception, the Eleventh Amendment "responded most immediately to the States' fears that

federal courts would force them to pay their Revolutionary War debts, leading to their financial ruin." *Hess*, 513 U.S. at 39 (citation modified). The Civil War, the Reconstruction Amendments, and the enactment of 42 U.S.C. § 1983 and other federal civil rights statutes pushed federal courts to continually reevaluate the federal-state relationship and the scope of state sovereign immunity. *See, e.g., Quern v. Jordan*, 440 U.S. 332, 338 (1979) (holding that enactment of § 1983 through the Civil Rights Act of 1871 did not abrogate states' Eleventh Amendment immunity). CRMC provides no evidence of a similarly nuanced or fraught relationship between municipal governments and the federal government. That is not to say that there are not important interests in municipal independence, or in the ability of municipal corporations to provide effective services free from burdensome federal imposition. Here, however, it is CRMC's burden to establish that it is entitled to the amorphous and undefined form of sovereign immunity invoked in its motion, and it has failed to carry it.

Having found each of CRMC's arguments for dismissal to be unavailing, the Court denies both of CRMC's motions, and will allow the prosecution in this case to proceed.

## IV.    CONCLUSION

For the reasons stated above, CRMC's Motions to Dismiss, Dkt. Nos. 12 and 45, will be denied. An appropriate order will be entered contemporaneously with this Memorandum Opinion.

It is so ORDERED.

_____
/s/
Elizabeth W. Hanes
United States District Judge

Norfolk, Virginia
Date: December 23, 2025

42